**OUTTEN & GOLDEN LLP**
Adam T. Klein (AK 3293)
Justin M. Swartz (JS 7989)
Cara E. Greene (CG 0722)
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005

**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP**
Kelly M. Dermody, *pro hac vice forthcoming*
Heather H. Wong, *pro hac vice forthcoming*
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP**
Rachel Geman (RG 0998)
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

---

JUDY CALIBUSO, JULIE MOSS, and
DIANNE GOEDTEL,
on behalf of themselves
and all others similarly situated,

                    Plaintiffs,

- against -

BANK OF AMERICA CORPORATION; MERRILL
LYNCH & CO., INC.; and MERRILL LYNCH,
PIERCE, FENNER & SMITH, INC.,

                    Defendants.



**CLASS ACTION
COMPLAINT
(Trial by Jury Demanded)**

**BIANCO, J.**

**ORENSTEIN, M.J.**

---

      Individual and Representative Plaintiffs Judy Calibuso, Julie Moss, and Dianne Goedtel

(collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, allege, upon

personal knowledge as to themselves and upon information and belief as to other matters, as

follows:

## NATURE OF THE CLAIM

1.      This case is about deep-rooted and pervasive gender discrimination at the nation's largest bank and brokerage firm.  Measured by both equity and assets, Defendant Bank of America Corporation ("BofA") is the largest bank company in the United States and one of the largest financial institutions in the world.  Following its combination with Merrill Lynch & Co., Inc. ("ML") and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S")[1], Defendants also have attained the status of being the largest brokerage firm in the world.  Defendants' retail brokerage unit, now operating under the banner of Merrill Lynch Global Wealth Management, employs over 15,000 Financial Advisors (also referred to as "FAs" and "brokers") nationwide.  These Financial Advisors provide financial and investment services to customers across the United States and manage over $2 trillion in client assets.

2.      Beneath the veneer of a world-class financial institution, Defendants treat their female Financial Advisors as second-class citizens.  Both BofA and Merrill alike have discriminated and continue to discriminate against female Financial Advisors on the basis of gender with respect to business opportunities, compensation, professional support, and other terms and conditions of employment.  When female Financial Advisors have complained about these discriminatory practices, Defendants have retaliated against them.  Defendants' discrimination and retaliation violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, New York Executive Law § 296 *et seq.* ("NYSHRL"), the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 *et seq.* ("NYCHRL"), and the Florida Civil Rights Act of 1992, F.S.A. § 760.01 *et seq.* ("FCRA").

---

[1] The Complaint will hereinafter refer to ML and MLPF&S collectively as "Merrill."  The Complaint will hereinafter refer to all three named defendants collectively as "Defendants."

3.      The violations are systemic, based upon company-wide policies and practices, and the result of unchecked gender bias that pervades Defendants' corporate culture.  They are not isolated or exceptional incidents, but rather the regular and predictable result of Defendants' company-wide policies and practices.  Defendants' policies and practices with regard to the distribution of investment accounts and business opportunities under their control deny qualified female Financial Advisors equal opportunities for compensation.  These policies and practices existed at both BofA and Merrill before the merger, and they continue to exist at the combined company today.

4.      As a result of Defendants' company-wide policies and practices, female FAs have earned substantially less than similarly situated male FAs.  This earnings disparity, which Defendants caused by reckless indifference and/or intentional conduct, has existed every year throughout the liability period in this case and is part of a pattern or practice of intentional discrimination.

5.      Defendants, through their conduct throughout the liability period, have caused these gender-based earnings disparities by intentionally (a) implementing company-wide policies and practices that have allowed and encouraged BofA and Merrill managers to favor male FAs over female FAs in distributing client accounts from departing or retiring FAs, and other business opportunities, which give male FAs greater opportunities to earn compensation; and (b) implementing company-wide policies and practices that have created a "cumulative advantage" effect by perpetuating and widening the gender-based earnings disparities that Defendants' discriminatory policies and practices have caused.

6.      Defendants have intentionally implemented these company-wide policies and practices, and maintained their discriminatory compensation system, in order to pay their male

3

FA's more money than their female counterparts.  Upon information and belief, Defendants' company-wide client account distribution policies and practices that, while facially neutral, have an adverse impact on the compensation of female brokers as compared to their male counterparts.

7.     Accordingly, in addition to bringing this action on their own behalf, Plaintiffs also bring this action on behalf of a class of similarly situated current and former female Financial Advisors employed by Defendants ("the Class"), in order to end Defendants' discriminatory policies and/or practices and to make the Class whole.

## PARTIES

### Plaintiffs

#### *Judy Calibuso*

8.     Plaintiff Judy Calibuso is a woman who lives in Miami-Dade County, in the State of Florida.  She is a citizen of the United States.

9.     Calibuso is presently employed by Defendants as a Financial Advisor.  She has held this position since approximately 1995.

#### *Julie Moss*

10.     Plaintiff Julie Moss is a woman who lives in Leon County, in the State of Florida. She is a citizen of the United States.

11.     Moss was employed by BofA as a Financial Advisor from approximately March 2003 through October 2006.

#### *Dianne Goedtel*

12.     Plaintiff Dianne Goedtel is a woman who lives in Suffolk County, in the State of New York.  She is a citizen of the United States.

13.     Goedtel was employed by BofA as a Financial Advisor from approximately February 2006 through September 2007.

**Defendants**

*Bank of America Corporation*

14.     Upon information and belief, Defendant Bank of America Corporation ("BofA") is a Delaware corporation doing business within Kings County in the State of New York and maintains corporate headquarters within the City and County of Charlotte-Mecklenburg at Bank of America Corporate Center, 100 N. Tryon St., Charlotte, North Carolina 28255.

15.     Upon information and belief, Defendant BofA maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

16.     During all relevant times, Defendant BofA was Plaintiffs' employer within the meaning of all applicable statutes.

17.     On information and belief, at all times pertinent hereto, Defendant BofA has employed more than five hundred people.

*Merrill Lynch & Co., Inc.*

18.     Upon information and belief, Defendant Merrill Lynch & Co., Inc. ("ML") is a Delaware corporation doing business within Kings County in the State of New York and maintains corporate headquarters within the City and County of Charlotte-Mecklenburg at Bank of America Corporate Center, 100 N. Tryon St., Charlotte, North Carolina 28255.  ML is a wholly owned subsidiary of BofA Corp.

19.     Upon information and belief, Defendant ML maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

20.     Since January 1, 2009, Defendant ML has been Plaintiff Calibuso's employer within the meaning of all applicable statutes.

21.     On information and belief, at all times pertinent hereto, Defendant ML has employed more than five hundred people.

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*

22.     Upon information and belief, Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S") is a Delaware corporation doing business within Kings County in the State of New York and maintains corporate headquarters within the City and County of New York at 4 World Financial Center, New York, New York 10080.  MLPF&S is a wholly owned subsidiary of BofA and ML.

23.     Upon information and belief, Defendant MLPF&S maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

24.     Since January 1, 2009, Defendant MLPF&S has been Plaintiff Calibuso's employer within the meaning of all applicable statutes.

25.     On information and belief, at all times pertinent hereto, Defendant MLPF&S has employed more than five hundred people.

## JURISDICTION AND VENUE

26.     This Court has original subject matter jurisdiction over the Title VII claims pursuant to 28 U.S.C. §§ 1331 and 1343, because they arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.

27.     This Court has original jurisdiction over the NYSHRL, NYCHRL, and FCRA claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This is a putative class action in which: (1) there are 100 or more members in the Class; (2) at least some members

of the proposed class have a different citizenship from at least one Defendant; and (3) the claims of the proposed class members exceed $5,000,000.00 in the aggregate.

28.     In addition, this Court has supplemental jurisdiction over the NYSHRL, NYCHRL, and FCRA claims under 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

29.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3), because Defendants conduct business and can be found in this district and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and because the alleged unlawful employment practice was committed here, and employment records relevant to that practice are maintained and administered here.

30.     Plaintiffs have exhausted their administrative remedies and complied with all statutory prerequisites to their Title VII claims. Calibuso filed a charge of discrimination individually and on behalf of all similarly situated female FAs with the Equal Employment Opportunity Commission ("EEOC") on January 10, 2007. Pursuant to the EEOC's worksharing agreement with the Florida Commission on Human Rights ("FCHR"), her charge is considered dually filed with the FCHR. She then filed a supplemental charge of retaliation on March 4, 2008. By notice dated June 17, 2008, the EEOC dismissed Calibuso's case and issued a Notice of Right to Sue. On August 19, 2008, the parties entered into a Tolling Agreement ("Tolling Agreement") that tolled Calibuso's right to sue through April 5, 2010.

31.     On or about April 5, 2007, Moss filed a charge of discrimination and retaliation with the EEOC individually and on behalf of all others similarly situated. By notice dated June

17, 2008, the EEOC dismissed Moss's case and issued a Notice of Right to Sue.  The Tolling

Agreement tolled Moss's right to sue through April 5, 2010.

      32.     On or about November 12, 2007, Goedtel filed a charge of discrimination and

retaliation with the EEOC individually and on behalf of all others similarly situated.  Pursuant to

the EEOC's worksharing agreement with the New York State Division of Human Rights

("NYSDHR"), her charge is considered dually filed with the NYSDHR.  By notice dated May

21, 2008, the EEOC dismissed Goedtel's case and issued a Notice of Right to Sue.  The Tolling

Agreement tolled Goedtel's right to sue through April 5, 2010.

      33.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

      34.     Female Financial Advisors employed by Defendants work under company-wide

policies and practices that are set up to disadvantage them.  By unfairly relying on past

performance as a basis for distributing current business opportunities, Defendants' company-

wide policies and practices create a "cumulative advantage" effect, under which "the rich get

richer" and "success breeds success."

      35.     Defendants cause this "cumulative advantage" effect by intentionally (a)

implementing company-wide policies and practices that have allowed and encouraged BofA and

Merrill managers to favor male FAs over female FAs in distributing accounts and other business

opportunities, which give male FAs greater opportunities to earn compensation; and (b)

implementing company-wide policies and practices that perpetuate and widen gender-based

earnings disparities by distributing greater business opportunities to men and compensating men

more richly for having benefitted from Defendants' discriminatory policies and practices, and

penalizing female Financial Advisors for failing to catch up.

**BofA's Acquisition of Merrill**

36.     By way of background, on January 1, 2009, BofA completed its acquisition of

Merrill.  The combination brought together BofA's retail brokerage unit, Banc of America

Investment Services, Inc. ("BAI"), which employed over 2,000 Financial Advisors, with

Merrill's powerhouse brokerage operations, MLPF&S, which employed over 15,000 Financial

Advisors.  Upon information and belief, after the merger with Merrill, BofA kept intact

MLFP&S as a wholly-owned subsidiary and swept its "legacy" Financial Advisors who had

worked for BAI into MLFP&S.

**Defendants' Policies and Practices Create and Perpetuate Discrimination**

37.     Despite this corporate upheaval, Defendants' company-wide policies and

practices, which discriminate against female Financial Advisors, have remained largely the same,

or have become worse.

### Subjective Decision-Making

38.     Defendants have implemented company-wide policies that allow and encourage

their predominantly male management to discriminate against female Financial Advisors in

distributing accounts and business opportunities and providing support and training.  These

policies allow branch managers to distribute business opportunities on an arbitrary and subjective

basis.  Unchecked by corporate oversight, Defendants' largely male branch managers

systematically favor male brokers by entrusting them with their most plum business

opportunities and otherwise grooming them for success.

39.     The business opportunities that Defendants distribute disproportionately to male

FAs include, but are not limited to: (1) call-ins, walk-ins, leads, referrals, and client accounts

from departing brokers' books (collectively "account distributions"); (2) partnership

9

opportunities; (3) upfront money, pay-out rate, and other benefits in Defendants' compensation plan; and (4) sales, administrative, and professional support.

### The "Cumulative Advantage" Effect

40.     Defendants further perpetuate this discrimination by using past performance as one of their primary criteria for handing out business opportunities and for compensating their brokers. Defendants measure past performance by two primary metrics: "production" and "assets under management." "Production" is the amount of revenue that an FA generates for Defendants, usually stated over a 12-month period. "Assets under management" is the value of the assets in the client investment accounts that Defendants have assigned to the FA.

41.     BofA and Merrill also have common histories of discriminating against female employees, including female Financial Advisors. Over many years, both before and during the liability period in this case, Defendants' gender discrimination has caused female brokers to accumulate fewer assets under management than similarly situated men, produce less than similarly situated men, and, therefore, earn less than similarly situated men.

42.     Defendants compensate their FAs using a commission "grid" metric. The percentage payouts increase based on total production, which means that the higher producing FAs earn more money in commissions and bonuses and also earn the right to receive a larger percentage of their yearly production based on the grid targets.

43.     Using past performance as a criterion for distributing business opportunities and setting compensation thus has the purpose and effect of discriminating against female FAs.

### Account Distribution

44.     Defendants pay their Financial Advisors primarily on a commission basis, which they calculate based on the revenue FAs generate from the investment accounts assigned to

10

them.  Accounts typically come from one of four sources:

      (a)     when individuals call ("call-ins") or walk ("walk-ins") into the office to open a new account;

      (b)     through "leads" and "referrals" (e.g., when Defendants tell a Financial Advisor of a potential account opportunity and the Financial Advisor makes contact with the potential account holder);

      (c)     when a Financial Advisor departs from the firm (e.g., when a Financial Advisor retires, leaves the business, or moves to another firm); or

      (d)     through partnerships between Financial Advisors within an office or branch, whereby partnered Financial Advisors split the partnership's earned revenue according to a negotiated or predetermined ratio.

45.     These accounts and potential accounts are not simply "acquired" by brokers in a vacuum.  Defendants direct the distribution of accounts and business through a company-wide policy that delegates discretion to allocate or distribute accounts, as well as opportunities to gain new accounts, to their branch management.  Because Financial Advisors obtain so many accounts through the distribution process rather than on their own initiative, Defendants' account distribution policies and practices have a substantial impact on the number and quality of accounts a Financial Advisor ultimately manages.

46.     Defendants' company-wide policy and practice allows branch managers to consider their own preferences in making account distribution decisions.  This extraordinary discretion allows branch managers to distribute accounts and other business opportunities as they choose, allowing their gender stereotypes and the company-wide culture of gender discrimination to influence their decisions.  This policy and practice has the purpose and effect of systematically discriminating against female FA's by causing managers to distribute greater and more lucrative accounts and business opportunities to male FA's than to similarly situated female FA's.

47.     Defendants' company-wide policy and practice also directs branch management to consider past performance, as well as branch management's own preferences, in distributing accounts to FAs.

48.     When a male FA receives a client investment account, he gains much more than the value of the client investment account or the revenue that the client investment account can generate.  He also gains the growth potential of the assets in the client account and the growth potential of the account's production.  And not only do the accounts grow in value, but they spawn other accounts, as each client refers other individuals who have money to invest.  As the accounts generate revenues, they also boost the FA's production numbers, which cause him to earn greater and more lucrative accounts and increase his commission grid entitlements.  These mechanisms exponentially increase the broker's assets under management and production – and therefore also increase his compensation.

49.     Defendants' policies thus create a cumulative advantage.  By disproportionately giving a greater number of accounts and more lucrative accounts to male FAs, Defendants disproportionately groom male FAs to qualify for, and ultimately secure, additional accounts and other business opportunities under Defendants' company-wide account distribution policy.  These additional accounts and business opportunities directly and indirectly increase the male FAs' assets under management and production, and place male FAs in an even better position for the next round of account distributions.

50.     Because Defendants have historically favored male FAs for account distributions and other business opportunities, at both BofA and Merrill, male FAs have higher production and assets under management than female FAs.  Defendants' policies and practices that create the cumulative advantage effect thus discriminate against female FAs.  The disparity between the

12

accounts allocated to male and female FAs grows wider and wider, and women cannot catch up.

**Partnerships**

51.     The ability to enter into partnerships with other FAs allows FAs to increase their earnings.  Defendants permit their branch managers to create partnerships that systematically and unlawfully disadvantage female FAs and that further perpetuate the cumulative advantage enjoyed by male FAs.

52.     In addition, pursuant to Defendants' company-wide policies and practices, Defendants' management often encourages male FAs to form lucrative partnership agreements to the exclusion of female FAs.  Defendants treat female FAs less favorably with respect to partnerships and the division of assets and production therein in relation to their male counterparts.  These discriminatory policies and practices have the purpose and effect of systematically discriminating against female FAs who work for Defendants with respect to compensation and business opportunities.

53.     By excluding women from partnership opportunities, Defendants' policies and practices further perpetuate the cumulative advantage of men over women by precluding female FAs from the benefits of future business opportunities that are generated by these lucrative partnerships.

**Upfront Money**

54.     Defendants also allow their branch managers and upper management wide discretion to advance "upfront money" to new FAs.  "Upfront money" refers to forgivable loans that Defendants extend to new FAs when they join the company.  Defendants' branch managers systematically give more upfront money to male FAs than to female FAs, allowing new male FAs to gain a head start on their female peers both in terms of status within the company and

13

compensation.

### Sales, Administrative, and Professional Support

55.     The wide discretion that Defendants bestow upon branch management also allows branch managers to discriminate against female FAs by offering less sales, administrative, and professional support and fewer marketing dollars for business development than it offers to male FAs. These company-wide policies set up female FAs to underperform as compared to their male peers by depriving them of critical resources to perform their jobs. Defendants' failure to provide female FAs with the same levels of support given to male FAs directly impacts their ability to generate revenue.

### Compensation

56.     Defendants' nationwide compensation plan also discriminates against women by causing the cumulative advantage effect to depress female FAs' earnings compared to those of their male counterparts.

57.     Defendants pay all of their FAs according to a two-tiered compensation grid set out in the nationwide compensation plan. FAs with production below a certain threshold are paid in accordance with plan "FA1"; FAs above the threshold are paid in accordance with "FA2."

58.     The compensation grid determines the percentage of an FA's production that the FA takes home as earnings.

59.     The compensation grid is "progressive" – the higher an FA's production during the prior year, the higher the percentage of that production the FA receives as compensation.

60.     Because the production of female FAs are, on average, lower than that of their similarly situated male FAs due to Defendants' gender discrimination, the compensation grid

14

dictates that Defendants pay male FAs at a higher rate than similarly situated female FAs for performing the same work.

61.   Defendants have known that their compensation plan has favored male FAs throughout the class period.  Defendants' compensation plan has the purpose and effect of favoring male FAs.

62.   Defendants' compensation plan, including the grid, has applied to all FAs in all of Defendants' branches throughout the liability period.

63.   In addition to the grid, other aspects of Defendants' compensation plan also have the purpose and effect of discriminating against female FAs including, but not limited to, bonuses, stock awards, recognition programs, deferred compensation, and other benefits because these benefits, in part, are the function of direct compensation.

64.   From even before the beginning liability period, pursuant to its longstanding discriminatory practices, Defendants distributed accounts, partnership opportunities, upfront money, and sales, administrative, and professional support on more favorable terms to male FAs than to similarly situated female FAs—both intentionally and pursuant to policies and practices that had an unlawful disparate impact on women.  These discriminatory account distributions and allocations of other business opportunities have continued to affect female Financial Advisors during the liability period.  Female financial advisors have earned less during the class period, and continue to earn less, as a result of these discriminatory policies and practices.

**Titles**

65.   According to its company-wide policies and practices, Defendants award corporate titles to Financial Advisors at the discretion of branch managers and as a function of Financial Advisors' production.  Because Defendants permit their branch managers to favor male

15

FAs and because the production of female FAs are, on average, lower than that of their similarly situated male FAs due to Defendants' gender discrimination, these policies and practices discriminate against female FAs by awarding disproportionately more corporate titles to male FAs than to female FAs.

## Defendants Refuse to Change Policies and Practices They Know Discriminate Against Women

66.     As troubling as these discriminatory policies and practices are, more disturbing still is the cavalier way in which Defendants have treated the subject of sex discrimination against their female FAs. Defendants have responded with indifference to complaints from female FAs about the various ways in which they have been subjected to inferior terms and conditions of employment as compared to their male counterparts.

67.     Worse, Defendants have retaliated against female FAs who have complained of gender discrimination. After female FAs have complained about Defendants' unfair allocation of business opportunities and compensation, Defendants have retaliated against them in various ways, including, but not limited to:  denying them necessary resources and support to perform their jobs, subjecting them to harsher discipline, constructively discharging them, placing negative and misleading language on their U-5 forms, and even bringing legal proceedings against them.

68.     Moreover, BofA's merger with Merrill has only worsened its treatment of female FAs. Prior to its acquisition by BofA Corp., Merrill maintained company-wide policies and practices that discriminated against female FAs with respect to business opportunities, compensation, professional support, and other terms and conditions of employment that had the same purpose and effect as those found at BofA. Both companies treated women unfairly, and the merger of the two companies has only exacerbated the discriminatory treatment of female

FAs. The discriminatory policies and practices that plagued BofA and Merrill before the merger continue to persist at the company today.

69.     Accordingly, this class action is brought by Calibuso, Moss, and Goedtel on behalf of themselves individually and all similarly situated female FAs in the United States. This action seeks to end Defendants' discriminatory policies and/or practices and retaliation, and to make the Plaintiff class whole by requesting the following remedies: injunctive relief to remedy systemic sex discrimination; an award of back pay and front pay; compensatory and punitive damages; and attorneys' fees.

**CLASS ACTION ALLEGATIONS**

70.     Plaintiffs bring this Class Action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a Class of all female Financial Advisors employed by Bank of America Corporation and its predecessors; Merrill Lynch & Co., Inc. and its predecessors; and Merrill Lynch, Pierce, Fenner & Smith, Inc., and its predecessors; in the United States at any time from March 16, 2006 through the resolution of this action. Plaintiffs also bring this Class Action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a Subclass of all female Financial Advisors employed by BofA, ML, MLPF&S, and its predecessors in New York at any time from August 19, 2005 through the resolution of this action for claims under the NYSHRL; a Subclass of all female Financial Advisors employed by BofA, ML, MLPF&S, and its predecessors at any time from August 19, 2005 through the resolution of this action for claims under the NYCHRL; and a Subclass of all Female Financial Advisors employed by BofA, ML, MLPF&S, and its predecessors in Florida at any time from January 10, 2006 through the resolution of this action for claims under the FCRA. Plaintiffs reserve the right to amend the definitions of the Class and Subclasses based on discovery or legal

17

developments.

71.     Plaintiffs are members of the Class they seek to represent.  Plaintiff Goedtel is a
member of the New York State and New York City Subclasses, and Plaintiffs Calibuso and Moss
are members of the New York City Subclass and the Florida Subclass.

72.     The members of the Class identified herein are so numerous that joinder of all
members is impracticable.  As of the filing of this Complaint, Defendants have approximately
15,000 Financial Advisors.  Although the precise number of female Financial Advisors is
currently unknown, it is far greater than can be feasibly addressed through joinder.

73.     There are questions of law and fact common to the Class, and these questions
predominate over any questions affecting only individual members.  Common questions include,
among others:

> (a)     whether Defendants' policies or practices discriminate against female
>         FAs;
>
> (b)     whether Defendants have failed to implement policies and procedures to
>         prevent retaliation against employees who challenge perceived bias in the
>         workplace and failed to addressed complaints and conduct proper
>         investigations;
>
> (c)     whether Defendants' policies and practices violate Title VII, the
>         NYSHRL, the NYCHRL, and/or the FCRA; and
>
> (d)     whether equitable remedies, injunctive relief, compensatory damages, and
>         punitive damages for the Class are warranted.

74.     The Representative Plaintiffs' claims are typical of the claims of the Class.

75.     The Representative Plaintiffs will fairly and adequately represent and protect the
interests of the members of the Class.  Plaintiffs have retained counsel competent and
experienced in complex class actions, employment discrimination litigation, and the intersection
thereof.

76.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole.  The Class members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and discriminatory policies and practices.

77.     Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The Class members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, unfair, and discriminatory policies and practices.  Defendants have computerized account data, payroll data, and personnel data that will make calculation of damages for specific Class members relatively simple.  The propriety and amount of punitive damages are based on Defendants' conduct, making these issues common to the Class.

## CLAIMS OF REPRESENTATIVE PLAINTIFFS

### Judy Calibuso

78.     In June 1995, Plaintiff Judy Calibuso began working as an FA for Barnett Bank, which was acquired by BofA's predecessor firm in or around January 1998.  Since January 1998, Calibuso has been employed by BofA as an FA and currently works in the Brickell Avenue office of Merrill in Miami, Florida.

79.     During the course of her employment, Defendants denied Calibuso compensation, extra bonuses, business opportunities, titles, and other conditions of employment made available to similarly situated male FAs.

80.     BofA, and later Merrill as well, routinely distributed business opportunities, including accounts from departing and retiring brokers, referrals, leads, and potential clients, and more advantageous partnerships with different departments within the firm, to male FAs rather than to Calibuso or other female FAs. As a result of the inequitable and discriminatory distribution of accounts and account prospects, Calibuso and female FAs generally have less income potential and less actual income than similarly situated male employees.

81.     In September 2006, Calibuso met with her then-manager and asked for fee-based accounts because BofA had not given her any earlier that year when several FAs within her office departed BofA. Her manager told her that he did not have any fee-based accounts to give her, but that even if he did, he would give them all to a specific male FA. Several weeks later, Calibuso learned that her manager had distributed fee-based accounts from the departed FAs to three male FAs.

82.     By denying compensation or the opportunity for compensation to Calibuso that it made available to similarly situated male FAs, Defendants denied her the opportunity to form partnerships, and to earn discretionary bonuses and stock options, which are awarded based on a Financial Adviser's level of compensation. Moreover, Calibuso would have earned a higher grid payout if she had received these accounts.

83.     In February 2007, Calibuso notified her current manager that she had filed a discrimination charge with the Equal Employment Opportunity Commission.

84.     Following the filing of her charge, Defendants engaged in a constant campaign of retaliation.

85.     Upon information and belief, in or around March 2007, BofA designated several FAs to form partnerships with BofA's lucrative private banking business in order to help both

FAs and Private Bank Relationship Managers grow their respective businesses, thereby increasing each partnered FA's total compensation and production. BofA designated several male FAs who were no more qualified, or who were less qualified, than Calibuso to form these partnerships, but did not designate Calibuso.

86.     Calibuso's manager also excluded Calibuso from meetings involving her own accounts. In October 2007, her manager did not invite her to a lunch that the manager organized for one of BofA's Commercial Banking relationship managers and several FAs from their office to promote cross referrals for investments. The manager invited other FAs who serviced accounts covered by the relationship manager, yet did not invite Calibuso, even though Calibuso and the relationship manager shared a major client.

87.     On several different occasions, BofA retaliated against Calibuso by requiring her to get approvals before performing routine activities that it did not require male FAs to get and that it had not required Calibuso to get before she filed her discrimination charge.

88.     In April 2007, in order to develop potential sources of referrals, Calibuso planned a luncheon with several select relationship managers from different lines of business and advisors from Private Bank and Commercial Banking to meet with a BofA insurance specialist. When Calibuso's manager learned about the luncheon the night before, she told Calibuso to cancel it because she had not requested pre-approval. The luncheon, scheduled for 12:30 the next day, did not happen.

89.     In contrast, on the same day as Calibuso's scheduled luncheon, two male FAs organized two separate group luncheons with wholesalers without pre-approval.

90.     In October 2007, her manager issued Calibuso an undeserved reprimand letter, her first in her 12-year tenure with the company. The manager claimed that Calibuso had not

followed the proper procedure for a client referral to BofA's Private Bank. When Calibuso

asked her manager to approve a shared revenue partnership with the Private Bank client

manager, her manager did not approve it. Instead, BofA took away these high value accounts

from Calibuso and gave them to a male FA. Calibuso's manager also required Calibuso to attend

a "coaching session" with management.

91.     In or around March 2008, Calibuso received a referral from Commercial Banking

to a high net worth client. Calibuso successfully serviced the account and brought two of the

client's partners as new clients. After Calibuso had serviced these new accounts for several

months, BofA stripped these accounts from her and gave them to a male FA because Calibuso

had not been designated to work with Private Bank clients.

92.     In or around November 2008, Calibuso requested reimbursement for continuing

education classes for her Certified Financial Planner designation. BofA denied her request for

reimbursement, although it approved reimbursements as well as additional travel expenses to

male FAs taking similar courses.

93.     On or about January 10, 2007, Calibuso filed a charge of discrimination with the

Florida Commission on Human Relations and the Equal Employment Opportunity Commission

("EEOC"). On or about March 4, 2008, Calibuso filed a supplemental charge of retaliation. On

June 17, 2008, she received a Notice of Right to Sue from the EEOC. The Tolling Agreement

tolled Calibuso's right to sue through April 5, 2010. Her charge, supplemental charge, and

Notice of Right to Sue from the EEOC are attached to this Complaint as Exhibit 1 and are

incorporated by reference.

**Julie Moss**

94.     Julie Moss was hired by BofA on March 15, 2003, as an Assistant Vice

President/Financial Advisor.

95.     BofA denied Moss compensation and extra bonuses that it made available to similarly situated male employees.  BofA routinely distributed business opportunities, including accounts from departing brokers, referrals, leads, and potential clients to male FAs rather than to Moss or other female FAs.  For instance, when another female FA left (as a result of harassment and discrimination by her supervisor, a male), BofA allowed a male broker to choose the accounts he wanted from her book of business.  When a different female broker transferred back to the bank side of the business, she made a spreadsheet of her clients and who she thought would be the best FA for each one.  The Market Director, a male, disregarded her recommendations and gave almost all the fee-based clients and the annuity clients with large commission trails to one male FA.

96.     In March 2006, the Market Director hired a male FA who, on information and belief, had been a very small producer at a prior brokerage firm.  When the new male FA arrived, the Market Director forced Moss to move out of her primary downtown office and buy her own furniture to move into a smaller office at another location.  At the time, she held first place with the highest revenue in the Tallahassee market.  When Moss left BofA in October 2006, she was still number one in the Tallahassee market.

97.     On June 13, 2006, Moss contacted BofA's human resources department ("HR") and filed a claim of gender discrimination and hostile work environment.  She told HR that she feared for her job, that the Market Director was intentionally harassing her and interfering with her production, and that the resulting stress was making her physically ill.  HR arranged a meeting for July 11, 2006 in Jacksonville, but HR did not attend this meeting – instead Moss found herself meeting with her boss, the Market Director, and his boss, a Senior Vice President.

23

On information and belief, this ambush meeting was in retaliation for her complaint of discrimination.

98.     Subsequent to the meeting on July 11, Moss suffered other instances of discrimination and retaliation, including:

(a)     The Market Director questioned Moss's trades and required her to call him for preapproval for trades. Moss had seven years experience in the brokerage business at that point, with no customer complaints, no questionable trades, and a clean U-4. On information and belief, BofA did not require other similarly situated FAs to obtain preapproval for trades.

(b)     The Market Director did not require male FAs to repay BofA for the balance of start-up money advanced to them at the start of their employment as he required of Moss. Upon information and belief, the Market Director did not seek repayment from two male FAs for over $100,000 each – more than twice what Moss owed. In contrast, BofA initiated arbitration proceedings against Moss for the money she was advanced.

(c)     She was told she would have to call the Market Director for preapproval to expense office lunches. On information and belief, no male FAs had to call for preapproval to expense office lunches.

(d)     On Moss's last day of employment with BofA, Moss received a "letter of education" from the Market Director reprimanding her for failing to get manager pre-approval for an advertisement she had placed in a local paper. He copied several senior managers at BofA. Contrary to the Market Director's assertion, Moss had followed all BofA procedures for placing the advertisement.

99.     BofA required Financial Advisers opening accounts for clients who had more than a certain net worth to go through the firm's Private Bank. Male FAs were told to circumvent this rule by falsifying documents to open accounts without going through the Private Bank, and did not suffer negative consequences for falsifying the documents and violating BofA's official policy. In contrast, Moss completed such documents truthfully and did not try to circumvent the Private Bank; nonetheless, the Market Director investigated her, yelled at her, and threatened to take away the production that she generated from one particular high-value

account.

100.    Through this misconduct, BofA constructively discharged Moss, forcing her to

resign effective October 27, 2006.

101.    BofA would not permit Moss to repay her start-up loan without obtaining a

release of her discrimination claims.  After she refused to release her discrimination claims and

informed BofA of the possibility that she would file an EEOC charge, BofA continued to

retaliate against Moss by commencing a claim against her in arbitration.

102.    On or about April 5, 2007, Moss filed a charge of discrimination and retaliation

with the Florida Commission on Human Relations and the EEOC.

103.    On June 17, 2008, Moss received a Notice of Right to Sue from the EEOC.  Her

charge and Notice of Right to Sue from the EEOC are attached to this Complaint as Exhibit 2

and are incorporated by reference.  The Tolling Agreement tolled Moss's right to sue through

April 5, 2010.

**Dianne Goedtel**

104.    Plaintiff Dianne Goedtel worked as a Financial Advisor in the Melville, Long

Island, New York office of BofA from February 3, 2006 to September 20, 2007.  During the

course of her employment, BofA denied Goedtel business opportunities and compensation that it

made available to similarly situated male FAs, disciplined her more harshly than similarly

situated males for similar infractions, and retaliated against her when she complained about

gender discrimination.

105.    From the start of her employment, BofA discriminated against Goedtel on the

basis of her gender by denying her start-up support and business opportunities that it provided to

similarly situated men, which directly impacted her compensation.  For example, BofA denied

25

Goedtel upfront money when she first began working for BofA that it offered to similarly situated males when they began working.

106.   On multiple occasions in or around the summer of 2007, BofA distributed accounts of departing FAs to similarly situated male FAs that it did not offer to Goedtel. Her manager distributed fewer assets to Goedtel than to male FAs and distributed to her almost no fee-based accounts, which are among the most lucrative. Ms. Goedtel's production had been in the top five for her office, but as a result of these discriminatory distributions, she dropped out of the top five.

107.   BofA also engaged in gender discrimination and/or retaliation against Goedtel in other ways, including applying compliance standards more rigidly to Goedtel than to similarly situated males. For example, BofA compliance officers attempted to write her up on the grounds that she regularly submitted required paperwork later than her male colleagues. A comparative review, done at Goedtel's request, showed that this accusation was false. When Goedtel complained about the discriminatory account distributions, her manager was hostile and took no steps to remedy her complaints. In retaliation, a few weeks later her manager told her to resign after a minor compliance violation and placed excessive and misleading language on her form U-5, which all prospective employers in the financial industry obtain from FINRA.

108.   As a result of this discrimination and retaliation, BofA constructively discharged Goedtel from her employment with BofA on September 20, 2007. The constructive discharge caused Goedtel to lose income, including her earned commissions for her last month of employment. Goedtel also lost clients and had to start over to build her business.

109.   BofA has discriminated against Goedtel on the basis of her gender by denying her upfront money, business opportunities that directly impacted her compensation, subjecting her to

excessive discipline and inferior terms and conditions of employment, constructively discharging her, and retaliating against her for her complaints of gender discrimination.

110.    On or about November 12, 2007, Goedtel filed a charge of discrimination and retaliation with the EEOC.  On May 27, 2008, Goedtel received a Notice of Right to Sue from the EEOC.  The Tolling Agreement tolled Goedtel's right to sue through April 5, 2010.  Her charge and Notice of Right to Sue are attached to this Complaint as Exhibit 3 and are incorporated by reference.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Intentional Discrimination
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*)
### (On Behalf of All Plaintiffs and the Class)

111.    Plaintiffs incorporate the preceding paragraphs as alleged above.

112.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Class they represent.  Plaintiffs have timely filed charges with the EEOC making classwide claims of discrimination as well as individual claims and have thus exhausted their administrative remedies.

113.    Defendants have engaged in an intentional company-wide systematic pattern or practice of discrimination against female FAs.  The discriminatory acts that constitute Defendants' pattern or practice of discrimination occurred both within and outside the liability period in this case.

114.    Defendants have intentionally maintained a system that perpetuates and increases discrimination against female Financial Advisors by implementing company-wide policies and practices that rely heavily on past performance as a criterion for account distributions, partnership opportunities, compensation, titles, and other terms and conditions of employment,

27

and by implementing company-wide policies and practices that are discriminatory, subjective,

standardless, and/or arbitrary, and by encouraging branch management and senior management

to rely on their personal preferences and stereotypes to favor male FAs with respect to the above-

mentioned business opportunities. Defendants' discriminatory policies or practices described

above have denied female FAs business opportunities and compensation, in the form of lost past

and future wages and other job benefits, as compared to similarly situated male Financial

Advisors.

115.    Defendants have intentionally discriminated against Plaintiffs and the Class by

maintaining a pattern or practice of denying business opportunities that directly affect

compensation to qualified female FAs on the basis of sex. The foregoing conduct constitutes

illegal, intentional discrimination and unjustified disparate treatment prohibited by 42 U.S.C. §§

2000e *et seq.*

116.    Plaintiffs request relief as hereinafter described.

**SECOND CLAIM FOR RELIEF**
**Disparate Impact Discrimination**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*)**
**(On Behalf of All Plaintiffs and the Class)**

117.    Plaintiffs incorporate the preceding paragraphs as alleged above.

118.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and

the Class they represent. Plaintiffs have timely filed charges with the EEOC making classwide

claims of discrimination as well as individual claims, and have thus exhausted their

administrative remedies.

119.    Defendants' discriminatory, subjective, standardless, and/or arbitrary policies and

practices with respect to account distributions, partnership opportunities, compensation, titles,

and other terms and conditions of employment have an adverse impact on female FAs in

28

violation of Title VII and are not, and cannot be, justified by business necessity. Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

120.    Defendants' company-wide policies and practices of distributing accounts and other business opportunities, determining upfront money and compensation, awarding titles, and setting other terms and conditions of employment based on FAs' past performance also have an adverse impact on female FAs in violation of Title VII and are not, and cannot be, justified by business necessity. Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

121.    Plaintiffs request relief as hereinafter described.

### THIRD CLAIM FOR RELIEF
### Intentional Discrimination
### (NYSHRL, New York Executive Law § 296 *et seq.*)
### (On Behalf of Dianne Goedtel and the New York Subclass)

122.    Plaintiff Goedtel incorporates by reference each allegation of each preceding paragraph.

123.    Defendants have maintained a system that discriminates on the basis of gender with respect to upfront money, account distributions, partnerships, other business opportunities, compensation, titles, and other terms and conditions of employment.

124.    Defendants have intentionally discriminated against Plaintiff Goedtel and the New York Subclass in violation of NYSHRL by, among other things:

> (a)    treating them in a discriminatory manner based on their gender;
>
> (b)    denying them other opportunities for advancement because of their gender;
>
> (c)    denying them opportunities for increased compensation because of their gender;

(d)     providing them with less favorable compensation because of their gender;

(e)     providing disparate terms and conditions of employment because of their gender; and

(f)     failing to examine their workplace to correct gender-biased and discriminatory policies and failing to address problems of disparate treatment on the basis of gender.

125.    The foregoing conduct constitutes illegal, intentional discrimination prohibited by New York Executive Law § 296 *et seq.*

## FOURTH CLAIM FOR RELIEF
### Disparate Impact Discrimination
### (NYSHRL, New York Executive Law § 296 *et seq.*)
### (On Behalf of Dianne Goedtel and the New York Subclass)

126.    Plaintiff Goedtel incorporates the preceding paragraphs as alleged above.

127.    Defendants' discriminatory, subjective, standardless, and/or arbitrary policies and practices with respect to upfront money, account distributions, partnerships, other business opportunities, compensation, titles, and other terms and conditions of employment have an adverse impact on female employees in violation of the NYSHRL and are not, and cannot be, justified by business necessity. Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

128.    Defendants' company-wide policies and practices of distributing accounts and other business opportunities, determining compensation, awarding titles, and setting other terms and conditions of employment based on brokers' past performance also have an adverse impact on female FAs in violation of the NYSHRL and are not, and cannot be, justified by business necessity. Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

129.   The foregoing conduct constitutes illegal discrimination prohibited by New York

Executive Law § 296 *et seq.*

## FIFTH CLAIM FOR RELIEF
### Intentional Discrimination
**(NYCHRL, New York City Administrative Code § 8-107 *et seq.*)**
**(On Behalf of All Plaintiffs and the Class)**

130.   Plaintiffs incorporate the preceding paragraphs as alleged above.

131.   This Claim is brought by all Representative Plaintiffs on behalf of themselves and

the Class they represent.

132.   Defendants have maintained a system that discriminates on the basis of gender

with respect to upfront money, account distributions, partnerships, other business opportunities,

compensation, titles, and other terms and conditions of employment.

133.   Defendants have intentionally discriminated against Plaintiffs in violation of

NYCHRL by, among other things:

(a)   treating them in a discriminatory manner based on their gender;

(b)   denying them other opportunities for advancement because of their gender;

(c)   denying them opportunities for increased compensation because of their gender;

(d)   providing them with less favorable compensation because of their gender;

(e)   providing disparate terms and conditions of employment because of their gender; and

(f)   failing to examine their workplace to correct gender-biased and discriminatory policies and failing to address problems of disparate treatment on the basis of gender.

134.   Defendants set and/or maintained these discriminatory practices during liability

period within the City of New York.

135.    The foregoing conduct constitutes illegal discrimination prohibited by the

Administrative Code of the City of New York § 8-107 *et seq.*

**SIXTH CLAIM FOR RELIEF**
**Disparate Impact Discrimination**
**(NYCHRL, New York City Administrative Code § 8-107 *et seq.*)**
**(On Behalf of All Plaintiffs and the Class)**

136.    Plaintiffs incorporate the preceding paragraphs as alleged above.

137.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and

the Class they represent.

138.    Defendants' discriminatory, subjective, standardless, and/or arbitrary policies and

practices with respect to upfront money, account distributions, partnerships, other business

opportunities, compensation, titles, and other terms and conditions of employment have an

adverse impact on female employees in violation of the NYCHRL and are not, and cannot be,

justified by business necessity.  Even if such system and/or policies could be justified by

business necessity, less discriminatory alternatives exist and would equally serve any alleged

necessity.

139.    Defendants' company-wide policies and practices of distributing accounts and

other business opportunities, determining compensation, awarding titles, and setting other terms

and conditions of employment based on brokers' past performance also have an adverse impact

on female FAs in violation of the NYCHRL and are not, and cannot be, justified by business

necessity.  Even if such system and/or policies could be justified by business necessity, less

discriminatory alternatives exist and would equally serve any alleged necessity.

140.    Defendants set and/or maintained these discriminatory practices during liability

period within the City of New York.

32

141.    The foregoing conduct constitutes illegal discrimination prohibited by the

Administrative Code of the City of New York § 8-107 *et seq.*

## SEVENTH CLAIM FOR RELIEF
### Discrimination
**(Florida Civil Rights Act of 1992, F.S.A. § 760.01 *et seq.*)**
**(On Behalf of Judy Calibuso and Julie Moss and the Florida Subclass)**

142.    Plaintiffs Calibuso and Moss incorporate the preceding paragraphs as alleged

above.

143.    This Claim is brought on behalf of Plaintiffs Calibuso and Moss and the Florida

Subclass.

144.    As described herein, Defendants' actions constitute gender discrimination in

violation of the Florida Civil Rights Act of 1992 ("FCRA").  Plaintiffs Judy Calibuso and Julie

Moss have both timely complied with all prerequisites to sue.  They have both filed charges of

gender discrimination with the EEOC and the Florida Commission on Human Relations.

145.    Plaintiffs request relief as hereinafter provided.

## EIGHTH CLAIM FOR RELIEF
### Retaliation
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*)**
**(On Behalf of All Plaintiffs Individually)**

146.    Plaintiffs incorporate the preceding paragraphs as alleged above.

147.    This Claim is brought by Plaintiffs Calibuso, Moss, and Goedtel individually.

Plaintiffs have timely filed charges with the EEOC alleging retaliation claims and have thus

exhausted their administrative remedies.

148.    Plaintiffs engaged in protected activities, including making internal complaints of

unlawful discrimination and filing charges with the EEOC complaining of Defendants'

discriminatory policies and practices.

33

149.    Defendants took adverse actions against the Plaintiffs with the purpose of retaliating against them because of their participation in protected activities, and Plaintiffs suffered damages as a result of that conduct.

150.    Plaintiffs request relief as hereinafter described.

## NINTH CLAIM FOR RELIEF
### Retaliation
### (NYSHRL, New York Executive Law § 296 *et seq.*)
### (On Behalf of Dianne Goedtel Individually)

151.    Plaintiff Goedtel incorporates by reference each allegation of each preceding paragraph.

152.    This Claim is brought by Plaintiff Goedtel individually.

153.    Goedtel engaged in protected activities, including making internal complaints of unlawful discrimination and filing a charge with the EEOC complaining of Defendants' discriminatory policies and practices.

154.    Defendants took adverse actions against Goedtel with the purpose of retaliating against her because of her participation in protected activities, and Goedtel suffered damages as a result of that conduct.

155.    Plaintiffs request relief as hereinafter described.

## TENTH CLAIM FOR RELIEF
### Retaliation
### (Florida Civil Rights Act of 1992, F.S.A. § 760.01 *et seq.*)
### (On Behalf of Judy Calibuso and Julie Moss Individually)

156.    Plaintiffs Calibuso and Moss incorporate the preceding paragraphs as alleged above.

157.    This Claim is brought on behalf of Plaintiffs Calibuso and Moss individually.

158.    Calibuso and Moss engaged in protected activities, including making internal

34

complaints of unlawful discrimination and filing charges with the EEOC complaining of

Defendants' discriminatory policies and practices.

159.    Defendants took adverse actions against Calibuso and Moss with the purpose of

retaliating against them because of their participation in protected activities, and Calibuso and

Moss suffered damages as a result of that conduct.

160.    Plaintiffs request relief as hereinafter provided.

## ALLEGATIONS REGARDING RELIEF

161.    Plaintiffs and the Classes they seek to represent have no plain, adequate, or

complete remedy at law to redress the wrongs alleged herein, and the injunctive relief they seek

in this action is the only means of securing complete and adequate relief.  Plaintiffs and the

Classes they seek to represent are now suffering, and will continue to suffer, irreparable injury

from Defendants' discriminatory acts and omissions.

162.    Defendants' actions have caused and continue to cause Plaintiffs and all Class

members substantial losses in earnings and other employment benefits.

163.    In addition, Representative Plaintiffs and the Class suffer and continue to suffer

humiliation, embarrassment, and anguish, all to their damage in an amount according to proof.

164.    Defendants performed the acts herein alleged with malice or reckless indifference.

Plaintiffs and Class members are thus entitled to recover punitive damages in an amount

according to proof.

## PRAYER FOR RELIEF

165.    WHEREFORE, Plaintiffs and the Class pray for relief as follows:

(a)    Certification of the case as a class action on behalf of the proposed Class
and the proposed Subclasses;

(b)    Designation of Representative Plaintiffs Judy Calibuso, Julie Moss, and

35

Dianne Goedtel as representatives of the Class and the New York City Subclass; designation of Plaintiffs Calibuso and Moss as representatives of the Florida Subclass; and designation of Plaintiff Goedtel as representative of the New York State Subclass;

(c)     Designation of Representative Plaintiffs' counsel of record as Class counsel;

(d)     A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. §§ 2000e, *et seq.*, and Administrative Code of the City of New York § 8-107 *et seq.*, and, with respect to Plaintiffs Calibuso and Moss and the Florida Subclass, the Florida Civil Rights Act of 1992, F.S.A. §§ 760.01, et *seq.,* and with respect to Plaintiff Goedtel and the New York Subclass, the New York Executive Law § 296 *et seq.*;

(e)     A preliminary and permanent injunction against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

(f)     An order that Defendants institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender, and that it eradicate the effects of their past and present unlawful employment practices;

(g)     An order restoring Plaintiffs and Class members to their rightful positions at BofA, or in lieu of reinstatements, an order for front pay benefits;

(h)     Back pay (including interest and benefits) for the Representative Plaintiffs and Class and Subclass members;

(i)     All damages sustained as a result of Defendants' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof;

(j)     Exemplary and punitive damages in an amount commensurate with Defendants' ability to pay and to deter future conduct;

(k)     Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(l)     Pre-judgment and post-judgment interest, as provided by law; and

(m)     Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

166.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand

a trial by jury in this action.

Dated: New York, New York
        March 30, 2010

Respectfully submitted,

By: _____

Adam T. Klein (AK 3293)
Justin M. Swartz (JS 7989)
Cara E. Greene (CG 0722)
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005

Kelly M. Dermody, *pro hac vice forthcoming*
Heather H. Wong, *pro hac vice forthcoming*
LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Rachel Geman (RG 0998)
LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

*Attorneys for Plaintiffs*
*and the Putative Class*

EXHIBIT 1

EEOC FORM 131 (5/01)

## U.S. Equal Employment Opportunity Commission

| | |
|---|---|
| ⌐    Susan L. Gray<br>   Sr. Vice President<br>   **Bank of America**<br>   325 E. Street<br>   Davis, CA 95616<br><br>└                  ⌐ | **PERSON FILING CHARGE**<br><br>    **Judy E. Calibuso**<br><br>THIS PERSON *(check one or both)*<br><br>[X] Claims To Be Aggrieved<br><br>[ ] Is Filing on Behalf of Other(s)<br><br>EEOC CHARGE NO.<br>    **510-2007-01656** |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act        [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act        [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **26-FEB-07** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [X] Please respond fully by **26-FEB-07** to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by
to
If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| | |
|---|---|
| **Robert Metaxa,**<br>**Enforcement Supervisor**<br>─────────────────────<br>*EEOC Representative*<br><br>*Telephone*   **(305) 808-1750** | **Miami District Office - 510**<br>**2 South Biscayne Blvd**<br>**Suite 2700**<br>**Miami, FL 33131** |

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE    [ ] COLOR    [X] SEX    [ ] RELIGION    [ ] NATIONAL ORIGIN    [ ] AGE    [ ] DISABILITY    [ ] RETALIATION    [ ] OTHER

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **January 25, 2007** | **Federico Costales,**<br>**District Director** | |

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA  ☐ EEOC | 510 2007 01656 |

Florida Commission on Human Relations and EEOC
*State or local Agency, if any*

| NAME (indicate Mr. Ms. or Mrs.) | HOME TELEPHONE (include area code) |
|---|---|
| Ms. Judy E. Calibuso | Home (305) 827-6776 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 7539 NW 175th St. | Miami, FL 33015 | |

**NAME OF THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** (If more than one, list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (include area code) |
|---|---|---|
| Bank of America | Cat. D (500+) | (800) 432-1000 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| Bank of America Corporate Center, 100 N. Tryon St., Charlotte, NC 28255 | | |

CAUSE OF DISCRIMINATION BASED ON (*Check appropriate box(es)*)

☐ RACE  ☐ COLOR  ■ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (*specify*)

DATE DISCRIMINATION TOOK PLACE
EARLIEST  1997 – Present  LATEST
☐ CONTINUING ACTION

THE PARTICULARS ARE (*If additional space is needed, attach extra sheet(s)*):

**I.    Overview of Allegations**

1.    This sex discrimination charge is filed on behalf of myself, Judy E. Calibuso, and all others similarly situated. Like other female employees of Banc of America Investment Services, Inc. (hereafter "BofA"), I have been harmed by a continuing pattern and practice or policy of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and Fla. Stat. § 760.10.

**II.    Work History**

2.    I was hired as a Financial Adviser by Barnett Bank in June, 1995, which later became BofA. I am still employed by BofA as a Financial Adviser in its Brickell office in Miami, Florida.

| | |
|---|---|
| ■ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedure. | NOTARY - (When necessary for State and Local Requirements) |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Date 1/9/07    Charging Party (signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) 9th, January 2007 |

DHYANA RODRIGUEZ
Notary Public - State of Florida
My Commission Expires Apr 4, 2010
Commission # DD 537000
Bonded By National Notary Assn.

**Judy E. Calibuso**
Charge of Discrimination

The Particulars Are (continued):

**III.    Claims**

3.    <u>Compensation and Promotion</u>:  I believe that I have been denied compensation and extra bonuses made available to similarly-situated male employees.

BofA routinely distributed business opportunities, including accounts from departing and retiring brokers, referrals, leads, and potential clients, and more advantageous partnerships with different departments within BofA, to male Financial Advisers rather than to female Financial Advisers. As a result of the inequitable and discriminatory distribution of accounts and account prospects, female Financial Advisers have diminished income potential and diminished actual income as compared to similarly-situated male employees.

For example, in December 2006 two male Financial Advisers in the Private Bank division left BofA, which assigned half of their book of accounts to the brokerage retail level in which I work. BofA gave all of these accounts to two male Financial Advisers, both of whom had already received substantial accounts from BofA earlier that year. BofA did not assign any of these accounts to the designated Private Bank Financial Advisor, who is female. She had asked BofA for these accounts and explained that she already knew and serviced these clients, but BofA told her that it would not assign her any of these accounts.

In another example, in September 2006, I met with my manager and asked for fee-based accounts, since BofA did not give me any earlier that year when several brokers left. My manager told me that he did not have any fee-based accounts to give me, but that if he did, he would give them all to a specific male broker. Several weeks later, I learned that my manager had distributed fee-based accts from the departed brokers to three male brokers.

By denying compensation to me that was made available to similarly-situated male Financial Advisers, BofA has also denied me promotions, extra bonuses, and stock options, which are awarded based on a Financial Adviser's level of compensation.

**IV.    <u>Class Claims</u>**

4.    It is my understanding and belief that BofA has engaged in a continuing pattern or practice of discrimination against female Financial Advisers with respect to compensation, business allocation, and other terms and conditions of employment in the downtown Miami, Florida office and at other BofA facilities.

5.    I would like this charge filed with the EEOC and the Florida Commission on Human Relations. I swear under penalty of perjury that I have read the above charge and that it is true and correct to the best of my knowledge, information and belief.

EEOC FORM 131 (5/01)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| **Vincent Castle**<br>**Employee Relations Manager**<br>**BANK OF AMERICA**<br>**101 S. Marengo Ave, 3rd Floor**<br>**Pasadena, CA 91101** | **Judy E. Calibuso** |

THIS PERSON (check one or both)

☐ Claims To Be Aggrieved

☐ Is Filing on Behalf of Other(s)

EEOC CHARGE NO.
**510-2008-02882**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

☒ Title VII of the Civil Rights Act           ☐ The Americans with Disabilities Act

☐ The Age Discrimination in Employment Act       ☐ The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. ☐ No action is required by you at this time.

2. ☐ Please call the EEOC Representative listed below concerning the further handling of this charge.

3. ☒ Please provide by **26-MAY-08** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. ☒ Please respond fully by **26-MAY-08** to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. ☐ EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by

to

If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Robert Metaxa,**
**Enforcement Supervisor**

*EEOC Representative*

*Telephone*    **(305) 808-1750**

**Miami District Office**
**2 South Biscayne Blvd**
**Suite 2700**
**Miami, FL 33131**

Enclosure(s):  ☒ Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☐ AGE  ☐ DISABILITY  ☒ RETALIATION  ☐ OTHER

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| April 24, 2008 | **Federico Costales,**<br>**District Director** | |

**Judy E.Calibuso**
Supplemental Charge of Discrimination

The Particulars Are (continued):

**BofA Has Denied Me Business and Promotional Opportunities.**

4.  In late March 2007, I learned that Respondent partnered several FAs with BofA's Private Bank in order to help both FAs and Private Bank Relationship Managers grow their respective businesses, thereby increasing each partnered FA's total compensation and production.  Among the FAs partnered were Doug Swartz, Eddie Fazzah, Yvette Sanchez (a female FA who has not, to my knowledge, filed a complaint about discrimination), and Mike Cannegieter.  (Several months earlier, my prior manager partnered Scott Huffman and Silvano "Siby" Vizoso with Private Bank).

5.  In or around April 2007, I talked to a colleague, Leo Porcella, about the partnerships. Leo told me that he asked my manager, Pilar, why BofA did not partner me with anyone since I was more senior and more experienced than most of the FAs selected. Pilar responded "because Judy has issues." At the time I had an unblemished disciplinary record during my 12 years with BofA and its predecessor.  Given my clean record with the company and the proximity in time to the filing of my discrimination charge, I believe that Pilar was referring to my EEOC charge when she told Leo that I had "issues."

6.  In August 2007, BofA selected a less experienced male, Oti Roberts, instead of me for a position, Private Client Manager, in Private Bank that I applied for despite the fact that I met most of the "preferred" qualifications outlined in the job posting. During my interview for the position, the interviewer, Tanya Scavuzzo, asked about my recent low production numbers.  I told her they were the result of discriminatory account distributions stemming in part from my charge of discrimination.

7.  Pilar has denied me the same opportunities to partner with Client Managers ("CM") that she has given other FAs.  Pilar has partnered most other FAs with three to five CMs.  Until October 2007, I had only one Client Manager.  Pilar finally partnered me with one more CM after the CM requested to partner with me.  As a result I have not had the same opportunities for business referrals or shared revenues as other FAs.

8.  Pilar has excluded me from meetings involving my own accounts.  In October 2007, she did not invite me to a lunch that she organized for one of BofA's Commercial Banking advisors, Gonzalo Dequesada, and several FAs from our office to help promote cross referrals for investments.  Pilar invited other FAs who service accounts covered by Gonzalo.  Pilar also invited Ivette Sanchez, who, to my knowledge, does not share any accounts with Gonzalo or in his niche market.  Even though I share one of my biggest accounts with Gonzalo, Pilar did not invite me to the lunch.

2

9. Despite my repeated requests, Pilar has not distributed unassigned accounts from departed FAs to me. In the Fall 2006, I completed a two-month project researching and compiling BofA "orphan" annuity accounts, i.e., accounts that had not been re-assigned from departed FAs. At the time I began working on the project, my then-manager and I agreed that most of the large accounts would be reassigned to me. To date, Pilar still has not assigned me those accounts. Because Pilar has refused to assign me the accounts, totaling approximately $120 million in annuity assets, I have lost out on significant opportunities for additional revenue production.

**BofA Has Subjected Me to Harsher Rules and Compliance Standards.**

10. On several different occasions, BofA required me to follow burdensome approval procedures before performing routine activities that other FAs were not required to follow and that I had not been required to follow before filing my discrimination charge.

   a. In one instance, I planned to give another branch manager, Clayton Williams, two tickets to a basketball game to thank him for an account referral. My sales assistant asked Operations Manager, Michelle Queen—who reports to Pilar, to approve all of my outgoing mail, which included the tickets. When Michelle opened the mail and saw the tickets, she told my sales assistant that Pilar had to approve the gift before it could be sent out. By the time Michelle returned the tickets with Pilar's approval, it was too late to deliver them to Mr. Williams. I know of others who have given gifts for referrals without pre-approval. For example, male FA Manny Fernandez gave a branch manager tickets to the same game without pre-approval. Similarly, male FA Scott Huffman has given theater tickets and other gifts to BofA employees who referred business to him.

   b. In another instance in April 2007, I planned a luncheon with several select relationship managers from different lines of business and advisors from Private Bank and Commercial Banking to meet with John Prescott, a BofA insurance specialist.[1] When Pilar learned about the luncheon the night before, she told me to cancel it because I had not submitted any pre-approval or written request for a seminar type of function. She said that regional manager Steve Imus would not approve it. Both John and I spoke with Steve late that evening and provided details about the planned event to assure him that the luncheon did not violate any compliance rules. Steve said he did not see any problems with that and that he would give his final approval early morning the next day. The following morning, I could not reach Steve. At or around 10:30, Pilar called me and said that after having a conference call with

---

[1] Private Bank and Commercial Banking manage high net worth clients and are a source of high revenue-producing account referrals. BofA encourages FAs to establish relationships with various departments to encourage "Partnership For Growth ("PFG"), especially between CMs and advisors from Private Bank and Commercial Banking. CMs and FAs work together to best meet the full range of the client's financial needs to keep clients from taking their business (or some portion of it) to a competitor.

3

regional management, she decided that she was not comfortable with the luncheon and that she decided not to approve it. The luncheon, scheduled for 12:30 that day, did not happen.

    c.  In contrast, on the same day, I am aware of at least two male FAs who organized two separate group luncheons with wholesalers without any pre-approval or written request. Mike Cannegeiter and Manny Fernandez, along with some other male FAs, were leaving the Brickell office for a lunch they planned with two different outside wholesalers. A couple of client managers from BofA's Premier Client group also attended. Pilar and Michelle stopped Mike and the other FAs at the elevator and asked where they were going. When Mike told Pilar that they were taking referral sources to lunch, Michelle told them that they needed pre-approval for the lunch. Mike told them, "Ok, I'm asking for permission now!" Pilar gave her approval on the spot and Mike and the rest of the group left for lunch. Adding insult to injury, the male FAs went for lunch at the same restaurant where I planned to have my luncheon.

11. On May 14, 2007, I asked Pilar, and regional management, for approval to re-schedule my luncheon. I was told to get approvals from all department heads—a time-consuming process. I then had to go through another round of approval from upper level management. Anne Curlis, one of the top compliance executives, finally approved the lunch. She said that it was ridiculous that I had to go through this for a luncheon promoting PFG, partnership for growth, (a BofA initiative encouraging interdepartmental collaboration), given that no clients, only internal employees, would be attending. After receiving Ms. Curlis's approval on May 23rd, BofA still required me to get Pilar's final approval. She did not give me her approval until only several days before the planned event.

12. Pilar issued me an undeserved reprimand letter in October 2007. Pilar claimed that I had not followed procedure regarding a client referral to BofA's Private Bank. There was no basis for her claim because I told her about the client. I emailed her the necessary forms and asked her to see if she would approve it in order to allow me to share revenue with the Private Bank advisor for my referral. As with the incidents described above, Pilar denied my request. As a result, I did not receive any revenue or compensation for the business that I referred. Nonetheless, Pilar required me to attend a "coaching session" with her and the manager from the Private Banking group. The reprimand letter was my first in my 12-year tenure with the company. Again, I believe Pilar applied stricter rules to me in retaliation for my charge.

13. The above is non-exhaustive list of the retaliatory treatment I have been subjected to in violation of Title VII. Time and again I have been singled out, denied opportunities, and treated more harshly than other FAs.

4

14. As with my original charge, I would like this charge filed with the EEOC and the Florida Commission on Human Relations.  I swear under penalty of perjury that I have read the above charge and that it is true and correct to the best of my knowledge, information and belief.

5

DC Form 161-B (3/98)

## U.S. EQUA. .MPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| : Judy E. Calibuso<br>7539 Nw 175th St<br>Hialeah, FL 33015 | From: Miami District Office<br>2 South Biscayne Blvd<br>Suite 2700<br>Miami, FL 33131 |
|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 0-2007-01656 | Katherine E. Gonzalez,<br>Investigator | (305) 808-1766 |

(See also the additional information enclosed with this form.)

**NICE TO THE PERSON AGGRIEVED:**

e VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA): This is your Notice of Right to Sue, issued
ler Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or
ADA must be filed in a federal or state court **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this
irge will be lost. (The time limit for filing suit based on a state claim may be different.)

☒ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have c ... ...s EEOC will
be able to complete its administrative processing within 180 days from the fil

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

a Discrimination in Employment Act (ADEA): You may sue under the ADEA at ant
days after you receive notice that we have completed action on the charge. In this
ir case:

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADE/
**90 DAYS** of your receipt of this Notice. Otherwise, your right to sue b/

☐ The EEOC is continuing its handling of your ADEA case. However, if e
you may file suit in federal or state court under the ADEA at this time.

ial Pay Act (EPA): You already have the right to sue under the EPA (filing an EEO
ederal or state court within 2 years (3 years for willful violations) of the alleged EP.
r violations that occurred **more than 2 years (3 years)** before you file suit ma

ou file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*R. K. Metz*

**Manuel Zurita,**
**Acting Director**

**JUN 1 7 2008**
(Date Mailed)

nclosures(s)

| : Vincent Castle<br>Employee Relations Manager<br>BANK OF AMERICA<br>101 S. Marengo Ave., 3rd Floor<br>Pasadena, CA 91101 | Piper Hoffman, Esq.<br>Outten & Golden LLP<br>3 Park Avenue, 29th Floor<br>New York, NY 10016 |
|---|---|

7004 2510 0004 9478 4173

# EXHIBIT 2

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA<br>■ EEOC | 510-2007-03174 |

Florida Commission on Human Relations and EEOC
*State or local Agency, if any*

| NAME (indicate Mr., Ms. or Mrs.)<br><br>Ms. Julie Moss | HOME TELEPHONE (include area code)<br><br>850-893-4603 |
|---|---|
| STREET ADDRESS          CITY, STATE AND ZIP CODE<br><br>3911 Leane Drive   Tallahassee, Florida 32309 | DATE OF BIRTH |

NAME OF THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

| NAME<br><br>Bank of America Investment Services, Inc. | NUMBER OF EMPLOYEES, MEMBERS<br><br>Cat. D (500+) | TELEPHONE (*include area code*)<br><br>(800) 432-1000 |
|---|---|---|
| STREET ADDRESS          CITY, STATE AND ZIP CODE<br><br>Bank of America Corporate Center, 100 N. Tryon St., Charlotte, NC 28255 | | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (*Check appropriate box(es)*)<br><br>☐ RACE   ☐ COLOR   ■ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN<br>■ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (*specify*) | DATE DISCRIMINATION TOOK PLACE<br>*EARLIEST*<br>*LATEST*<br>2004 - Present<br>☐ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (*If additional space is needed, attach extra sheet(s)*):

Please see attached.

| ■ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedure. | NOTARY  - (When necessary for State and Local Requirements)<br><br>*[signature]*   3 April 2007<br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>3 April 2007   *[signature]*<br>Date<br>(signature)          Charging Party | SIGNATURE OF COMPLAINANT<br><br>*[signature]*<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year)<br>3rd day of April 2007<br><br>Leslie V. Godwin<br>Commission # DD578939<br>Expires July 30, 2010<br>Bonded Troy Fain - Insurance, Inc. 800-385-7019 |

### Affidavit of Julie K. Moss
<u>Moss v. Bank of America Investment Services, Inc.</u>

1.      This gender discrimination and retaliation charge is filed on behalf of me, Julie K. Moss, and others similarly situated.  Like other female employees of Bank of America Investment Services Inc. (hereafter "BofA"), I have been harmed by a continuing policy, pattern or practice of sex discrimination in violation of  Title VII of the Act, codified as Subchapter VI of Chapter 21 of Title 42 of the United States Code, 42 U.S.C. § 2000e[1] et seq., and Fla. Stat. § 760.10.

2.      I was hired by BofA on March 15, 2003, as an Assistant Vice President/Financial Advisor.

3.      I believe that BofA denied me compensation and extra bonuses that it made available to similarly-situated male employees.  BofA routinely distributed business opportunities, including accounts from departing brokers, referrals, leads, potential clients, and more advantageous partnerships with different BofA departments, to male advisors rather than to female advisors.  For instance, when Joan Bavi left (as a result of harassment and discrimination by her supervisor, Joe Carrington), BofA allowed Rick Abbott to choose the accounts he wanted from her book of business.  When Lara Burdack switched from BofA investments back to the bank side of the business as a premier partner, she made a spreadsheet of her clients and who she thought would be the best fit for them (Rick Abbott, Michael Schaeffer, or me).  Bank of America investments is a subsidiary of Bank of America.  Mr. Carrington, Market Director, disregarded her input and gave almost all the fee-based clients and the annuity clients with large trails to Rick Abbott.

4.      In March 2006 Mr. Carrington hired Michael Schaeffer from AG Edwards.  Mr. Schaeffer had been a very small producer at AG Edwards, where he handled in-house accounts that were so small that no one else wanted them.  When Mr. Schaeffer arrived, Mr. Carrington forced me to move out of my primary downtown office.  At the time, I was in first place with the highest revenue in the Tallahassee market.  BofA made me move into a smaller office downtown and forced me to buy my own desk.  According to Lewis Fogel, Senior Vice President, Senior Regional Investment Executive, and Mr. Carrington's supervisor, I am the only Financial Adviser in his region who was forced to buy my own desk.  When I left BofA in October, 2006, I was still number one in the Tallahassee Market; my revenues/production for the previous 12 months was $335,000.

5.      On June 13th, 2006, I contacted BofA's human resources department ("HR") and filed a claim of gender discrimination and hostile work environment.  I told HR that I feared for my job, that Mr. Carrington was intentionally harassing me and interfering with my production, and that all of the stress was making me physically ill.  A meeting was set for July 11, 2006 in Jacksonville.  To my dismay, HR was not present at this meeting.  The only people in attendance were Mr. Carrington, Mr. Fogel, and me.  I believe that this meeting was retaliation for my complaint.

6.      Mr. Fogel finally reimbursed me for the desk I had to buy after I brought it to his attention at the July 11, 2006 meeting.  There were many similar occurrences.
   - I was told I would have to call Mr. Carrington for preapproval to expense office lunches.  For three years, I just filled out the expense report and did not have to speak with Mr. Carrington.  To my knowledge no one else had to call for preapproval.
   - It took two months to get the phone set up at the new primary office Mr. Carrington had forced me into on Monroe Street, causing unease with my clients.
   - Mr. Carrington questioned trades and required me to call him for preapproval for trades.  I had been in the business for seven years at that point, with no customer complaints, no questionable trades, and a clean U-4.

7.      At the meeting on July 11, 2006, with Mr. Carrington and Mr. Fogel, Mr. Carrington informed me that I had two weeks to move out of the smaller office downtown on Monroe Street, which was blatant retaliation.  I had spent

၁ပ.    .ပပ decorating it to try and make it not appear to my clients that I had been demoted since it was smaller office than the office Mr. Carrington forced me to give to Mr. Schaeffer.

8.       BofA has also retaliated against me by threatening to come after me and my new employer (Morgan Stanley) if I file this EEOC complaint. I will provide a copy of that document as well.

9.       BofA required Financial Advisers opening accounts for clients who had more than a certain net worth to go through the firm's Private Bank. Male employees were told to falsify documents to open accounts without going through the Private Bank, and did not suffer negative consequences for falsifying the documents and violating BofA's policy. For instance, on October 5th, Rick Abbott was told to falsify documents to open an account without going through the Private Bank. The client's name was Mark Clark as executor for James Clark. (Mr. Carrington's assistant, Matt Glass, instructed Mr. Abbott to falsify the documents. Witnesses to this incident include Nancy Thomas, Registered Assistant; Lara Burdack, Vice President at Bank of America; Yvonne Solario, Premier Market Manager for Tallahassee; and Carol Gallant, Vice President Private Bank at BofA. Ms. Gallant witnessed other similar incidents as well.) In contrast, I completed such documents truthfully and did not try to circumvent the Private Bank, but I was investigated and yelled at, and Mr. Carrington threatened to take my production that I generated from one particular high-value account.

10.      BofA's discrimination and retaliation against me was extremely stressful and caused me health problems. Through this misconduct BofA constructively discharged me, forcing me to resign effective October 27, 2006. It is my understanding and belief that BofA has engaged in a continuing pattern or practice of discrimination against female financial advisors with respect to compensation, business allocation, and other terms and conditions of employment. Upon information and belief, the following individuals witnessed this discrimination or have information relevant to this claim:

- Joan Bavi (239)-287-4653, (239)-352-5625 – witnessed Mr. Carrington's discrimination against female Financial Advisers.
- Lara Burdack (850)-907-3144 – witnessed Mr. Carrington's discrimination against women.
- Jeri Winkleblack (850)-561-1737 – witnessed BofA forcing me out of my office twice.
- Andrea Morris (850) 561-1774 – witnessed BofA forcing me out of my office twice.
- Carol Gallant (904) 608-4770 – witnessed discrimination against female Financial Advisers.
- Amy Lynn (former Financial Adviser)– witnessed Mr. Carrington's favoritism toward male Financial Advisers.
- Kristin Harrison (850) 561-1776 – worked in the same complex as Mr. Carrington in Jacksonville and witnessed his treatment of women.

11.    I would like this charge filed with the EEOC and the Florida Commission on Human Relations.  I swear under penalty and perjury that I have read the above charge and that it is true and correct to the best of my knowledge, information and belief.


_____                    _____

Julie K. Moss                                                       3 April 2007
                                                                        Date


_____                    _____

Notary Public                                                     4/2/2007
                                                                        Date


**Leslie V. Godwin**
Commission # DD578939
Expires July 30, 2010
Bonded Troy Fain - Insurance, Inc. 800-385-7019

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:   Julie Moss<br>3911 Leane Drive<br>Tallahassee, FL 32309 | From:   Miami District Office<br>2 South Biscayne Blvd<br>Suite 2700<br>Miami, FL 33131 |

RECEIVED JUN 19 2008

☐   On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 510-2007-03174 | Katherine E. Gonzalez,<br>Investigator | (305) 808-1766 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X]   More than 180 days have passed since the filing of this charge.

☐   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]   The EEOC is terminating its processing of this charge.

☐   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐   The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

JUN 17 2008

Manuel Zurita,
**Acting Director**

*(Date Mailed)*

Enclosures(s)

| | |
|---|---|
| cc:   Annette Torres<br><br>Stearns Weaver Miller<br><br>Museum Tower, Ste 2200<br><br>150 West Flagler street<br><br>Miami, FL 33130 | Piper Hoffman, Esq.<br><br>Outten & Golden LLP<br><br>3 Park Avenue, 29th Floor<br><br>New York, NY 10016 |

# EXHIBIT 3

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA<br>■ EEOC | 520 2008 00546 N |

New York State Division of Human Relations and EEOC
*State or local Agency, if any*

| NAME (indicate Mr., Ms. or Mrs.)<br><br>Ms. Dianne Goedtel | HOME TELEPHONE (include area code)<br><br>516-991-5733 |
|---|---|
| STREET ADDRESS          CITY, STATE AND ZIP CODE<br><br>35 Stewart Circle N., Centereach, NY 11720 | DATE OF BIRTH |

**NAME OF THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)**

| NAME<br><br>Bank of America Investment Services, Inc. | NUMBER OF EMPLOYEES, MEMBERS<br><br>Cat. D (500+) | TELEPHONE (*include area code*)<br><br>(800) 432-1000 |
|---|---|---|
| STREET ADDRESS          CITY, STATE AND ZIP CODE<br><br>Bank of America Corporate Center, 100 N. Tryon St., Charlotte, NC 28255 | | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (*Check appropriate box(es)*):<br><br>☐ RACE    ☐ COLOR    ■ SEX    ☐ RELIGION    ☐ NATIONAL ORIGIN<br>■ RETALIATION    ☐ AGE    ☐ DISABILITY    ☐ OTHER (*specify*) | DATE DISCRIMINATION TOOK PLACE<br>*EARLIEST*   2/3/06<br>*LATEST*      10/4/06<br>☐ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (*If additional space is needed, attach extra sheet(s)*):

Please see attached.

| ■ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedure. | NOTARY  - (When necessary for State and Local Requirements)<br><br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>11/12/07<br>Date (signature)          Charging Party | SIGNATURE OF COMPLAINANT<br><br>*Piper Hoffman*<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year)   11/12/07 |

RECEIVED
NOV 2 0 2007
EEOC-NYDO-CRTIU

PIPER HOFFMAN
Notary Public, State of New York
Kings County, REG#02HO6089787
My Commission Expires March 31, 20 11



### Affidavit of Dianne Goedtel
#### Goedtel v. Bank of America Investment Services, Inc.

1.  This sex discrimination charge is filed on behalf of myself, Dianne Goedtel, and others similarly situated. Like other female employees of Bank of America Investment Services Inc. (hereafter "BofA"), I have been harmed by a continuing policy, pattern or practice of sex discrimination in violation of Title VII, 42 U.S.C. § 2000e[1] et seq., and the New York State Human Rights Law, New York Executive Law § 296 et seq. ("NYSHRL").

2.  I began working at BofA as a Financial Adviser ("FA") on February 3, 2006, in the Melville, Long Island office. Apart from my first few months at BofA, I was the only female FA out of approximately 15 FA's in the Melville office. I believe I was also the only newly-hired FA in all of Long Island who was female.

3.  Josh Nagel, who had been my manager at Smith Barney, recruited me from there to BofA. In his process of recruiting me to BofA from Smith Barney he said that BofA was offering a forgivable draw and would assign to me any assets that were not currently assigned to an FA, e.g. assets from departing FA's. BofA did not give me any "upfront" money because, according to Mr. Nagel, I had not been in the business long enough or accumulated enough assets to bring over from my previous firm.

4.  While working at BofA I have seen the company give upfront money to four new male FA's, three of whom brought less in assets to BofA than I did and one of whom had been in the business for less time than I had when I came to BofA. I was the only one of all the newly-hired FAs on Long Island who did not get a check upfront.

5.  Most firms in the financial industry use a software program called Reuters. I had access to Reuters while working at Smith Barney and requested it when I joined BofA. At first BofA gave me access to this program, which was necessary to my business. BofA also gave Reuters access to the four new male FA's.

6.  The day after my six-month anniversary at BofA, in August 2006, Mr. Nagel and Frank Casali told me that BofA was revoking my access to Reuters. Instead it gave me generic software that lagged 20 minutes behind Reuters, which hurt my business.

7.  Mr. Nagel told me that BofA provided Reuters to "new FA's" for only six months unless their commissions exceeded a certain level. BofA did not revoke any male FA's Reuters access. I told Mr. Nagel, Mr. Casali, and FA's Ira Katz, Jason Latorre, and Bob Mermin, among others, that this was not fair. Mr. Nagel said that my commissions were not high enough for me to access Reuters. I asked him why BofA did not revoke Reuters access for FA's Gary Leventhal, Robert Perconte, Mr. Latorre, or Mr. Mermin, all of whom had lower commissions than I did. Mr. Nagel responded that he was not looking at all commissions, just equity commissions. I asked Mr. Nagel's assistant, Mr. Casali, to show me the equity commissions of the other FA's,

and found that Messrs David Boliver, Leventhal, Latorre, and Mermin's equity commissions were all lower than mine.

8.  A short time after BofA revoked my Reuters access, I walked into the office one morning and noticed that all the FAs' offices had new flat-screen TV's – except mine. I went to Mr. Casali and had asked where my TV was. He said they had forgotten about me. Still he did not order a TV for my office. Instead, I had to spend half of my work day getting my name on the list and contacting people to get a TV, as well as the technician and cable company to set it up.

9.  BofA's compliance employees in the Melville office, Jim Bebry and Dana Brandes, discriminated against me based on my gender. Mr. Bebry and Ms. Brandes held me to higher standards and treated me more rudely than my male counterparts. This disparate treatment was apparent to others; Mr. Latorre even asked me why compliance treated me so differently and was tougher on me.

10. In or around January 2007 Bill Bellow took over as my manager. In or around June 2007, Mr. Bellow told me that he had to write me up pursuant to instructions from the compliance department because I had handed in an internal breakpoint worksheet one day late. I knew from conversations with other FA's that many of them routinely handed in the same form much later than one day. Mr. Bellow said that he thought it was harsh to write me up for this, but said he had no choice. I told Mr. Bellow that I would not sign the write-up unless he wrote up all the male FA's who handed in internal breakpoint worksheets late. Mr. Bellow said that the compliance workers told him they felt that I always handed papers in late and made excessive errors. This was false. I asked that compliance and Mr. Bellow review all of my forms and trades, and if after that review they still felt that I made excessive errors, then I would sign the write-up. Compliance and Mr. Bellow spent about one month reviewing my forms and transactions and found no basis to write me up.

11. Nevertheless, the compliance workers continued to treat me more harshly than the male FA's. This created a very tense environment that made me anxious.

12. Around this time two FA's, John Abrams and Chris Affinita, left BofA and Mr. Bellow distributed their assets to the remaining FA's. He gave me some of their accounts, but I received fewer assets than many male FA's did and I received almost no fee-based accounts, which are the most lucrative.

13. A few months later, FA Gary Leventhal departed. Mr. Bellow said that he would distribute Mr. Leventhal's accounts to the five FA's who produced the highest revenues from fee-based accounts. Before the distribution of Messrs Abrams and Affinita's accounts I was among the top five fee-based producers. By handing over a number of fee-based accounts to male FA's David Morrissey and Chris Axelson, however, Mr. Bellow pushed me out of the top five fee-based producers. He did not give me any of Mr. Leventhal's accounts.

14. As soon as I learned of this distribution I complained to Mr. Bellow that it was his assignment of fee-based accounts to Messrs. Morrissey and Axelson that pushed me out of the top five fee-based producers. I also complained about how few accounts he distributed to me from Messrs. Abrams and Affinita.

15. After I complained to Mr. Bellow, he criticized me to Mr. Katz, saying that I was a "spitfire" because I complained. BofA did assign me some accounts the next time an FA left.

16. On or around September 20, 2007, Mr. Bellow told me to resign because of an error in judgment that I made in completing a form for compliance. I followed his orders. The form in question was a disclosure form for a mutual fund. I had a disclosure form that my client had completed and signed. We were allowed to use copies of signed disclosure forms as long as the client knew about it. I used a copy of a form and changed the date, but I did not discuss it with my client because I had not yet placed a trade based on that form.

17. Mr. Bellow said that the worst language BofA would put on my U5 would be that I resigned "pending an investigation." He said that BofA would not mention anything about falsification of documents, because that would be excessive given the error I made.

18. BofA wrote on my U5: "internal investigation was ongoing at time of termination regarding management being made aware of one instance of falsification of documentation. Internal investigation completed on 9/26/2007. Confirmed that this incident as well as one additional incident did involve falsification of documentation." By tarnishing my U5 with this excessive and misleading language, BofA caused me severe anxiety. I was out of work for six weeks because potential employers were put off by the language on my U5 – several told me that they could not hire me because of the language BofA put on my U5. During an interview with one potential employer, the interviewer said they could not understand why BofA would put such harsh language on my U5. I believe that BofA put this language on my U5 in retaliation for my complaints about compliance treating me more harshly than male FAs.

19. BofA withheld 25% of FAs' commissions until three months after they were earned; because of this policy, when my employment ended BofA failed to pay me $10,000 that I had earned, and in addition did not pay me any of the commissions I earned in September.

20. As a result of the termination of my employment with BofA I have lost clients, and have to start over to build my business. BofA's treatment of me and the resulting damage to my business has caused me severe emotional distress.

21.    I believe that the conduct described above is part of a pattern and practice of discrimination against female FA's at BofA.  I believe that BofA routinely discriminates against female FA's with respect to pay, business opportunities, and other terms and conditions of employment.

22.    By engaging in the conduct described herein, BofA has violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and other laws by intentionally discriminating against me and other women and implementing policies and practices that had a disparate impact on me and other women.

23.    The above description is a short summary of the circumstances of my employment and is not intended to be an exhaustive recitation of the facts.

24.    This charge is representative and is intended to put BofA on notice of class-wide allegations of gender discrimination throughout BofA.


_____                    _____
Dianne Goedtel                                                    Date   11/12/07


_____                    _____
Notary Public                                                        Date   11/12/07



RECEIVED
NOV 2 0 2007
EEOC-NYDO-CRTIU

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Dianne Goedtel<br>35 Stewart Circle N.,<br>Centereach, NY 11720 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2008-00546 | Peter Holland,<br>Investigator | (212) 336-3781 |

*(See also the additional information enclosed with this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X] More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Spencer H. Lewis, Jr.,
Director

5/21/08
*(Date Mailed)*

Enclosures(s)

cc: Jerry Demone
Senior VP, H.R. Case Managemen
BANK OF AMERICA
1 Federal Street
Mail Code MA5-503-06-04
Boston, MA 02110

Piper Hoffman
3 Park Avenue, 29th Floor
New York, NY 10016