**OUTTEN & GOLDEN LLP**
Adam T. Klein
Justin M. Swartz
Cara E. Greene
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000
Facsimile:  (212) 977-4005

**LIEFF, CABRASER, HEIMANN &**
  **BERNSTEIN, LLP**
Kelly M. Dermody, *admitted pro hac vice*
Heather H. Wong, *admitted pro hac vice*
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

**LIEFF, CABRASER, HEIMANN &**
  **BERNSTEIN, LLP**
Rachel Geman
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

---

JUDY CALIBUSO, JULIE MOSS, DIANNE
GOEDTEL, V. KATHERINE AIRD, and
JEAN EVANS, on behalf of themselves and
all others similarly situated,

               Plaintiffs,

            -against-

BANK OF AMERICA CORPORATION;
MERRILL LYNCH & CO., INC.; and
MERRILL LYNCH, PIERCE, FENNER &
SMITH, INC.,

            Defendants.

**FIRST AMENDED CLASS AND
COLLECTIVE ACTION COMPLAINT
(Trial by Jury Demanded)**

---

       Individual and Representative Plaintiffs Judy Calibuso, Julie Moss, Dianne

Goedtel, V. Katherine Aird, and Jean Evans (collectively "Plaintiffs"), on behalf of themselves

and all others similarly situated, allege, upon personal knowledge as to themselves and upon

887527.1

information and belief as to other matters, as follows:

## <u>NATURE OF THE CLAIM</u>

1.      This case is about deep-rooted and pervasive gender discrimination at the nation's largest bank and brokerage firm.  Measured by both equity and assets, Defendant Bank of America Corporation ("BofA") is the largest bank company in the United States and one of the largest financial institutions in the world.  Following its combination with Merrill Lynch & Co., Inc. ("ML") and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S"), Defendants also have attained the status of being the largest brokerage firm in the world.  Defendants' retail brokerage unit, now operating under the banner of Merrill Lynch Global Wealth Management, employs over 15,000 Financial Advisors (also referred to as "FAs" and "brokers") nationwide. These Financial Advisors provide financial and investment services to customers across the United States and manage over $2 trillion in client assets.

2.      Beneath the veneer of a world-class financial institution, Defendants treat their female Financial Advisors as second-class citizens.  Both BofA and Merrill alike have discriminated and continue to discriminate against female Financial Advisors on the basis of gender with respect to business opportunities, compensation, professional support, and other terms and conditions of employment.  When female Financial Advisors have complained about these discriminatory practices, Defendants have retaliated against them.  Defendants' discrimination and retaliation violate the Equal Pay Act, 29 U.S.C. § 206 *et seq*. ("Federal EPA"), the New York Equal Pay Act, N.Y. Labor Law § 194 *et seq*. ("NY EPA"), the California Equal Pay Act, Cal. Labor Code § 1197.5 ("CA EPA), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the New York State Human Rights Law, New York Executive Law § 296 *et seq*. ("NYSHRL"), the Florida Civil Rights Act of 1992, F.S.A. § 760.01

*et seq.* ("FCRA"), the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940 *et seq.*, and the Missouri Human Rights Act ("MHRA"), RSMo. § 213.010 *et seq.*

       3.      The violations are systemic, based upon company-wide policies and practices, and the result of unchecked gender bias that pervades Defendants' corporate culture. They are not isolated or exceptional incidents, but rather the regular and predictable result of Defendants' company-wide policies and practices.  Defendants' policies and practices with regard to the distribution of investment accounts and business opportunities under their control deny qualified female Financial Advisors equal opportunities for compensation.  These policies and practices existed at both BofA and Merrill before the merger, and they continue to exist at the combined company today.

       4.      As a result of Defendants' company-wide policies and practices, female FAs have earned substantially less than similarly situated male FAs.  This earnings disparity, which Defendants caused by reckless indifference and/or intentional conduct, has existed every year throughout the liability period in this case and is part of a pattern or practice of intentional discrimination.

       5.      Defendants, through their conduct throughout the liability period, have caused these gender-based earnings disparities by intentionally (a) implementing company-wide policies and practices that have allowed and encouraged BofA and Merrill managers to favor male FAs over female FAs in distributing client accounts from departing or retiring FAs, and other business opportunities, which give male FAs greater opportunities to earn compensation; and (b) implementing company-wide policies and practices that have created a "cumulative advantage" effect by perpetuating and widening the gender-based earnings disparities that Defendants' discriminatory policies and practices have caused.

6.      Defendants have intentionally implemented these company-wide policies and practices, and maintained their discriminatory compensation system, in order to pay their male FA's more money than their female counterparts.  Upon information and belief, Defendants' company-wide client account distribution policies and practices, while facially neutral, have an adverse impact on the compensation of female brokers as compared to their male counterparts.

7.      Accordingly, in addition to bringing this action on their own behalf, Plaintiffs also bring this action on behalf of a class of similarly situated current and former female Financial Advisors employed by Defendants ("the Rule 23 and Collective Action Class" or "the Class"), in order to end Defendants' discriminatory policies and/or practices and to make the Class whole.

## PARTIES

**Plaintiffs**

*Judy Calibuso*

8.      Plaintiff Judy Calibuso is a woman who lives in Miami-Dade County, in the State of Florida.  She is a citizen of the United States.

9.      Calibuso is presently employed by Defendants as a Financial Advisor. She has held this position since approximately 1995.

*Julie Moss*

10.      Plaintiff Julie Moss is a woman who lives in Leon County, in the State of Florida.  She is a citizen of the United States.

11.      Moss was employed by BofA as a Financial Advisor from approximately March 2003 through October 2006.

*Dianne Goedtel*

12.     Plaintiff Dianne Goedtel is a woman who lives in Suffolk County, in the State of New York.  She is a citizen of the United States.

13.     Goedtel was employed by BofA as a Financial Advisor from approximately February 2006 through September 2007.

*V. Katherine Aird*

14.     Plaintiff V. Katherine Aird is a woman who lives in San Mateo County, in the State of California.  She is a citizen of the United States.

15.     Aird is presently employed by Defendants as a Financial Advisor.  She has held this position since approximately 2006, when she was hired by Merrill.

*Jean Evans*

16.     Plaintiff Jean Evans is a woman who lives in St. Louis County, in the State of Missouri.  She is a citizen of the United States.

17.     Evans is presently employed by Defendants as a Financial Advisor.  She has held this position since approximately December 2007, when she was hired by Merrill.

**Defendants**

*Bank of America Corporation*

18.     Upon information and belief, Defendant Bank of America Corporation ("BofA") is a Delaware corporation doing business within Kings County in the State of New York and maintains corporate headquarters within the City and County of Charlotte-Mecklenburg at Bank of America Corporate Center, 100 N. Tryon St., Charlotte, North Carolina 28255.

887527.1

19.     Upon information and belief, Defendant BofA maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

20.     During all relevant times, Defendant BofA was Plaintiffs' employer within the meaning of all applicable statutes.

21.     On information and belief, at all times pertinent hereto, Defendant BofA has employed more than five hundred people.

*Merrill Lynch & Co., Inc.*

22.     Upon information and belief, Defendant Merrill Lynch & Co., Inc. ("ML") is a Delaware corporation doing business within Kings County in the State of New York and maintains corporate headquarters within the City and County of Charlotte-Mecklenburg at Bank of America Corporate Center, 100 N. Tryon St., Charlotte, North Carolina 28255.  ML is a wholly owned subsidiary of BofA Corp.

23.     Upon information and belief, Defendant ML maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

24.     Defendant ML has been Plaintiff Aird's employer within the meaning of all applicable statutes since she was hired in March 2006.  Similarly, Defendant ML has been Plaintiff Calibuso's employer since January 1, 2009.

25.     On information and belief, at all times pertinent hereto, Defendant ML has employed more than five hundred people.

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*

26.     Upon information and belief, Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S") is a Delaware corporation doing business within Kings County in the State of New York and maintains corporate headquarters within the City and County of New

York at 4 World Financial Center, New York, New York 10080.  MLPF&S is a wholly owned subsidiary of BofA and ML.

27.     Upon information and belief, Defendant MLPF&S maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

28.     Defendant MLPF&S has been Plaintiff Aird's employer within the meaning of all applicable statutes since she was hired in March 2006.  Likewise, Defendant MLPF&S has been Plaintiff Calibuso's employer since January 1, 2009.

29.     On information and belief, at all times pertinent hereto, Defendant MLPF&S has employed more than five hundred people.

## JURISDICTION AND VENUE

30.     This Court has original subject matter jurisdiction over the Federal EPA and Title VII claims pursuant to 29 U.S.C. § 206 and 28 U.S.C. §§ 1331 and 1343, respectively, because they arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.

31.     This Court has original jurisdiction over the NY EPA, CA EPA, NYSHRL, FCRA, FEHA, and MHRA claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This is a putative class action in which: (1) there are 100 or more members in the Class; (2) at least some members of the proposed class have a different citizenship from at least one Defendant; and (3) the claims of the proposed class members exceed $5,000,000.00 in the aggregate.

32.     In addition, this Court has supplemental jurisdiction over the NY EPA, CA EPA, NYSHRL, FCRA, FEHA, and MHRA claims under 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the

887527.1

federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

33.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3), because Defendants conduct business and can be found in this district and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and because the alleged unlawful employment practice was committed here, and employment records relevant to that practice are maintained and administered here.

34.     Plaintiffs have exhausted their administrative remedies and complied with all statutory prerequisites to their Title VII claims.  Calibuso filed a charge of discrimination individually and on behalf of all similarly situated female FAs with the Equal Employment Opportunity Commission ("EEOC") on January 10, 2007.  Pursuant to the EEOC's worksharing agreement with the Florida Commission on Human Rights ("FCHR"), her charge is considered dually filed with the FCHR.  She then filed a supplemental charge of retaliation on March 4, 2008.  By notice dated June 17, 2008, the EEOC dismissed Calibuso's case and issued a Notice of Right to Sue.  On August 19, 2008, the parties entered into a Tolling Agreement ("Tolling Agreement") that tolled Calibuso's right to sue through April 5, 2010.

35.     On or about April 5, 2007, Moss filed a charge of discrimination and retaliation with the EEOC individually and on behalf of all others similarly situated.  By notice dated June 17, 2008, the EEOC dismissed Moss's case and issued a Notice of Right to Sue.  The Tolling Agreement tolled Moss's right to sue through April 5, 2010.

36.     On or about November 12, 2007, Goedtel filed a charge of discrimination and retaliation with the EEOC individually and on behalf of all others similarly situated. Pursuant to the EEOC's worksharing agreement with the New York State Division of Human

Rights ("NYSDHR"), her charge is considered dually filed with the NYSDHR.  By notice dated May 21, 2008, the EEOC dismissed Goedtel's case and issued a Notice of Right to Sue.  The Tolling Agreement tolled Goedtel's right to sue through April 5, 2010.

37.     On or about May 4, 2010, Aird filed a charge of discrimination with the EEOC individually and on behalf of all similarly situated.  On or about June 26, 2010, Aird filed a charge of retaliation with the EEOC individually.  Pursuant to the EEOC's worksharing agreement with the California Department of Fair Employment and Housing ("DFEH"), her charges are considered dually filed with the DFEH.  On May 14, 2010 and June 30, 2010, Aird received Notices of Right to Sue from the DFEH for her discrimination and retaliation claims, respectively.  She has requested a Notice of Right to Sue from the EEOC.

38.     On or about June 17, 2010, Evans filed a charge of discrimination with the EEOC individually and on behalf of all similarly situated.  Pursuant to the EEOC's worksharing agreement with the Missouri Commission on Human Rights ("MCHR"), her charge is considered dually filed with the MCHR.  Evans has requested her Notice of Right to Sue.

39.     Plaintiffs have complied with the requirements for their EPA claim by filing their respective Consent to Sue forms, attached as Exhibit 6 to this Complaint.

40.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

41.     Female Financial Advisors employed by Defendants work under company-wide policies and practices that are set up to disadvantage them.  By unfairly relying on past performance as a basis for distributing current business opportunities, Defendants' company-wide policies and practices create a "cumulative advantage" effect, under which "the rich get richer" and "success breeds success."

42.     Defendants cause this "cumulative advantage" effect by intentionally (a) implementing company-wide policies and practices that have allowed and encouraged BofA and Merrill managers to favor male FAs over female FAs in distributing accounts and other business opportunities, which give male FAs greater opportunities to earn compensation; and (b) implementing company-wide policies and practices that perpetuate and widen gender-based earnings disparities by distributing greater business opportunities to men and compensating men more richly for having benefited from Defendants' discriminatory policies and practices, and penalizing female Financial Advisors for failing to catch up.

**BofA's Acquisition of Merrill**

43.     By way of background, on January 1, 2009, BofA completed its acquisition of Merrill.  The combination brought together BofA's retail brokerage unit, Banc of America Investment Services, Inc. ("BAI"), which employed over 2,000 Financial Advisors, with Merrill's powerhouse brokerage operations, MLPF&S, which employed over 15,000 Financial Advisors.  Upon information and belief, after the merger with Merrill, BofA kept intact MLPF&S as a wholly-owned subsidiary and swept its "legacy" Financial Advisors who had worked for BAI into MLPF&S.

**Defendants' Policies and Practices Create and Perpetuate Discrimination**

44.     Despite this corporate upheaval, Defendants' company-wide policies and practices, which discriminate against female Financial Advisors, have remained largely the same, or have become worse.

**Subjective Decision-Making**

45.     Defendants have implemented company-wide policies that allow and encourage their predominantly male management to discriminate against female Financial

-10-

Advisors in distributing accounts and business opportunities and providing support and training. These policies allow branch managers to distribute business opportunities on an arbitrary and subjective basis.  Unchecked by corporate oversight, Defendants' largely male branch managers systematically favor male brokers by entrusting them with their most plum business opportunities and otherwise grooming them for success.

46.     The business opportunities that Defendants distribute disproportionately to male FAs include, but are not limited to: (1) call-ins, walk-ins, leads, referrals, and client accounts from departing brokers' books (collectively "account distributions"); (2) partnership opportunities; (3) upfront money, pay-out rate, and other benefits in Defendants' compensation plan; and (4) sales, administrative, and professional support.

**The "Cumulative Advantage" Effect**

47.     Defendants further perpetuate this discrimination by using past performance as one of their primary criteria for handing out business opportunities and for compensating their brokers.  Defendants measure past performance by two primary metrics: "production" and "assets under management."  "Production" is the amount of revenue that an FA generates for Defendants, usually stated over a 12-month period.  "Assets under management" is the value of the assets in the client investment accounts that Defendants have assigned to the FA.

48.     BofA and Merrill also have common histories of discriminating against female employees, including female Financial Advisors.  Over many years, both before and during the liability period in this case, Defendants' gender discrimination has caused female brokers to accumulate fewer assets under management than similarly situated men, produce less than similarly situated men, and, therefore, earn less than similarly situated men.

49. Defendants compensate their FAs using a commission "grid" metric. The percentage payouts increase based on total production, which means that the higher producing FAs earn more money in commissions and bonuses and also earn the right to receive a larger percentage of their yearly production based on the grid targets.

50. Using past performance as a criterion for distributing business opportunities and setting compensation thus has the purpose and effect of discriminating against female FAs.

## Account Distribution

51. Defendants pay their Financial Advisors primarily on a commission basis, which they calculate based on the revenue FAs generate from the investment accounts assigned to them. Accounts typically come from one of four sources:

(a) when individuals call ("call-ins") or walk ("walk-ins") into the office to open a new account;

(b) through "leads" and "referrals" (e.g., when Defendants tell a Financial Advisor of a potential account opportunity and the Financial Advisor makes contact with the potential account holder);

(c) when a Financial Advisor departs from the firm (e.g., when a Financial Advisor retires, leaves the business, or moves to another firm); or

(d) through partnerships between Financial Advisors within an office or branch, whereby partnered Financial Advisors split the partnership's earned revenue according to a negotiated or predetermined ratio.

52. These accounts and potential accounts are not simply "acquired" by brokers in a vacuum. Defendants direct the distribution of accounts and business through a company-wide policy that delegates discretion to allocate or distribute accounts, as well as opportunities to gain new accounts, to their branch management. Because Financial Advisors

obtain so many accounts through the distribution process rather than on their own initiative, Defendants' account distribution policies and practices have a substantial impact on the number and quality of accounts a Financial Advisor ultimately manages.

53.     Defendants' company-wide policies and practices allow branch managers to consider their own preferences in making account distribution decisions.  This extraordinary discretion allows branch managers to distribute accounts and other business opportunities as they choose, allowing their gender stereotypes and the company-wide culture of gender discrimination to influence their decisions.  This policy and practice has the purpose and effect of systematically discriminating against female FAs by causing managers to distribute greater and more lucrative accounts and business opportunities to male FAs than to similarly situated female FAs.

54.     Defendants' company-wide policies and practices also direct branch management to consider past performance, as well as branch management's own preferences, in distributing accounts to FAs.

55.     When a male FA receives a client investment account, he gains much more than the value of the client investment account or the revenue that the client investment account can generate.  He also gains the growth potential of the assets in the client account and the growth potential of the account's production.  And not only do the accounts grow in value, but they spawn other accounts, as each client refers other individuals who have money to invest. As the accounts generate revenues, they also boost the FA's production numbers, which cause him to earn greater and more lucrative accounts and increase his commission grid entitlements. These mechanisms exponentially increase the broker's assets under management and production – and therefore also increase his compensation.

56.     Defendants' policies thus create a cumulative advantage.  By disproportionately giving a greater number of accounts and more lucrative accounts to male FAs, Defendants disproportionately groom male FAs to qualify for, and ultimately secure, additional accounts and other business opportunities under Defendants' company-wide account distribution policy.  These additional accounts and business opportunities directly and indirectly increase the male FAs' assets under management and production, and place male FAs in an even better position for the next round of account distributions.

57.     Because Defendants have historically favored male FAs for account distributions and other business opportunities, at both BofA and Merrill, male FAs have higher production and assets under management than female FAs.  Defendants' policies and practices that create the cumulative advantage effect thus discriminate against female FAs.  The disparity between the accounts allocated to male and female FAs grows wider and wider, and women cannot catch up.

**Partnerships**

58.     The ability to enter into partnerships with other FAs allows FAs to increase their earnings.  Defendants permit their branch managers to create partnerships that systematically and unlawfully disadvantage female FAs and that further perpetuate the cumulative advantage enjoyed by male FAs.

59.     In addition, pursuant to Defendants' company-wide policies and practices, Defendants' management often encourages male FAs to form lucrative partnership agreements to the exclusion of female FAs.  Defendants treat female FAs less favorably with respect to partnerships and the division of assets and production therein in relation to their male counterparts.  These discriminatory policies and practices have the purpose and effect of

-14-

systematically discriminating against female FAs who work for Defendants with respect to compensation and business opportunities.

60.     By excluding women from partnership opportunities, Defendants' policies and practices further perpetuate the cumulative advantage of men over women by precluding female FAs from the benefits of future business opportunities that are generated by these lucrative partnerships.

**Upfront Money**

61.     Defendants also allow their branch managers and upper management wide discretion to advance "upfront money" to new FAs.  "Upfront money" refers to forgivable loans that Defendants extend to new FAs when they join the company.  Defendants' branch managers systematically give more upfront money to male FAs than to female FAs, allowing new male FAs to gain a head start on their female peers both in terms of status within the company and compensation.

**Sales, Administrative, and Professional Support**

62.     The wide discretion that Defendants bestow upon branch management also allows branch managers to discriminate against female FAs by offering less sales, administrative, and professional support and fewer marketing dollars for business development than it offers to male FAs.  These company-wide policies set up female FAs to underperform as compared to their male peers by depriving them of critical resources to perform their jobs. Defendants' failure to provide female FAs with the same levels of support given to male FAs directly impacts their ability to generate revenue.

887527.1

**Compensation**

63.     Defendants' nationwide compensation plan also discriminates against women by causing the cumulative advantage effect to depress female FAs' earnings compared to those of their male counterparts.

64.     Defendants pay all of their FAs according to a two-tiered compensation grid set out in the nationwide compensation plan.  FAs with production below a certain threshold are paid in accordance with plan "FA1"; FAs above the threshold are paid in accordance with "FA2."

65.     The compensation grid determines the percentage of an FA's production that the FA takes home as earnings.

66.     The compensation grid is "progressive" – the higher an FA's production during the prior year, the higher the percentage of that production the FA receives as compensation.

67.     Because the production of female FAs are, on average, lower than that of their similarly situated male FAs due to Defendants' gender discrimination, the compensation grid dictates that Defendants pay male FAs at a higher rate than similarly situated female FAs for performing the same work.

68.     Defendants have known that their compensation plan has favored male FAs throughout the class period.  Defendants' compensation plan has the purpose and effect of favoring male FAs.

69.     Defendants' compensation plan, including the grid, has applied to all FAs in all of Defendants' branches throughout the liability period.

70.     In addition to the grid, other aspects of Defendants' compensation plan also have the purpose and effect of discriminating against female FAs including, but not limited to, bonuses, stock awards, recognition programs, deferred compensation, and other benefits because these benefits, in part, are the function of direct compensation.

71.     From even before the beginning of the liability period, pursuant to its longstanding discriminatory practices, Defendants distributed accounts, partnership opportunities, upfront money, and sales, administrative, and professional support on more favorable terms to male FAs than to similarly situated female FAs—both intentionally and pursuant to policies and practices that had an unlawful disparate impact on women.  These discriminatory account distributions and allocations of other business opportunities have continued to affect female Financial Advisors during the liability period.  Female Financial Advisors have earned less during the class period, and continue to earn less, as a result of these discriminatory policies and practices.

**Titles**

72.     According to its company-wide policies and practices, Defendants award corporate titles to Financial Advisors at the discretion of branch managers and as a function of Financial Advisors' production.  Because Defendants permit their branch managers to favor male FAs and because the production of female FAs are, on average, lower than that of their similarly situated male FAs due to Defendants' gender discrimination, these policies and practices discriminate against female FAs by awarding disproportionately more corporate titles to male FAs than to female FAs.  The disproportionately lower rate of corporate titles awarded to female FAs further disadvantages them because the use of corporate titles is helpful for external marketing to prospective clients and for other purposes.

**Defendants Refuse to Change Policies and Practices They Know Discriminate Against Women**

73.     As troubling as these discriminatory policies and practices are, more disturbing still is the cavalier way in which Defendants have treated the subject of sex discrimination or harassment against their female FAs.  Defendants have responded with indifference to complaints from female FAs about the various ways in which they have been subjected to inferior terms and conditions of employment as compared to their male counterparts.

74.     Worse, Defendants have retaliated against female FAs who have complained of gender discrimination.  After female FAs have complained about Defendants' unfair allocation of business opportunities and compensation, Defendants have retaliated against them in various ways, including, but not limited to:  denying them necessary resources and support to perform their jobs, subjecting them to harsher discipline, constructively discharging them, placing negative and misleading language on their U-5 forms, and even bringing legal proceedings against them.

75.     Moreover, BofA's merger with Merrill has only worsened its treatment of female FAs.  Prior to its acquisition by BofA Corp., Merrill maintained company-wide policies and practices that discriminated against female FAs with respect to business opportunities, compensation, professional support, and other terms and conditions of employment that had the same purpose and effect as those found at BofA.  Both companies treated women unfairly, and the merger of the two companies has only exacerbated the discriminatory treatment of female FAs.  The discriminatory policies and practices that plagued BofA and Merrill before the merger continue to persist at the company today.

76.     Accordingly, this class action is brought by Calibuso, Moss, Goedtel, Aird, and Evans on behalf of themselves individually and all similarly situated female FAs in the

United States. This action seeks to end Defendants' discriminatory policies and/or practices and retaliation, and to make the Plaintiff class whole by requesting the following remedies: injunctive relief to remedy systemic sex discrimination; an award of back pay and front pay; compensatory and punitive damages; and attorneys' fees.

## COLLECTIVE ACTION ALLEGATIONS

77. Plaintiffs bring the First Claim for Relief for violation of the Equal Pay Act ("Federal EPA") as a collective action pursuant to 29 U.S.C. § 206 *et seq*., on behalf of all Federal EPA Collective Plaintiffs ("Federal EPA Class").

78. Plaintiffs and Federal EPA Collective Plaintiffs are similarly situated in that they have substantially similar job requirements and pay provisions, and are subject to Defendants' common practice, policy, or plan of failing to pay Federal EPA Collective Plaintiffs equal pay for work requiring equal skill, effort, and responsibility, in violation of the Equal Pay Act.

79. The First Claim for Relief for violation of the Equal Pay Act may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), since the claims of the Plaintiffs are similar to the claims of the Federal EPA Collective Plaintiffs.

## CLASS ACTION ALLEGATIONS

80. Plaintiffs bring the Fourth and Fifth Claims for Relief pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a Class of all female Financial Advisors employed by Bank of America Corporation and its predecessors; Merrill Lynch & Co., Inc. and its predecessors; and Merrill Lynch, Pierce, Fenner & Smith, Inc., and its predecessors; in the United States at any time from March 16, 2006, through the resolution of this action pursuant to Title VII ("Title VII Class"). Plaintiffs bring the remaining Claims for Relief

-19-

pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a Subclass of all female Financial Advisors employed by BofA, ML, MLPF&S, and its predecessors in New York at any time (a) from August 19, 2002, through the resolution of this action for claims under the New York Equal Pay Act relating to BofA, and (b) from January 1, 2003 through the resolution of this action for claims under the NY EPA relating to ML and MLPF&S (together, the "NY EPA Subclass"); a Subclass of all female Financial Advisors employed by BofA, ML, MLPF&S, and its predecessors in California at any time (a) from August 19, 2005 through the resolution of this action for claims under the California Equal Pay Act relating to BofA, and (b) from January 1, 2006, through the resolution of this action for claims under the CA EPA relating to ML and MLPF&S (together, the "CA EPA Subclass"); a Subclass of all female Financial Advisors employed by BofA, ML, MLPF&S, and its predecessors in New York at any time (a) from August 19, 2005, through the resolution of this action for claims under the NYSHRL relating to BofA, and (b) from January 1, 2006, through the resolution of this action for claims under the NYSHRL relating to ML and MLPF&S (together, the "New York Subclass"); a Subclass of all Female Financial Advisors employed by BofA, ML, MLPF&S, and its predecessors in Florida at any time from January 10, 2006, through the resolution of this action for claims under the FCRA ("Florida Subclass"); a Subclass of all Female Financial Advisors employed by BofA, ML, MLPF&S, and its predecessors in California at any time (a) from August 19, 2007, through the resolution of this action for claims under the FEHA relating to BofA, and (b) from January 1, 2008, through to the resolution of this action for claims under the FEHA relating to ML and MLPF&S (together, the "California Subclass"); and a Subclass of all Female Financial Advisors employed by BofA, ML, MLPF&S, and its predecessors in Missouri at any time (a) from August 19, 2006, through to the resolution of this action for claims under the

MHRA, and (b) from January 1, 2007, through to the resolution of this action for claims under

the MHRA relating to ML and MLPF&S (together, the "Missouri Subclass").  Plaintiffs reserve

the right to amend the definitions of the Class and Subclasses based on discovery or legal

developments.

81.     Plaintiffs are members of the Class they seek to represent.  Plaintiff

Goedtel is a member of the NY EPA Subclass and the New York Subclass, Plaintiff Calibuso is a

member of the Florida Subclass, Plaintiff Moss is a member of the Florida Subclass, Plaintiff

Aird is a member of the California EPA Subclass and the California Subclass, and Plaintiff

Evans is a member of the Missouri Subclass.

82.     The members of the Class identified herein are so numerous that joinder of

all members is impracticable.  As of the filing of this Complaint, Defendants have approximately

15,000 Financial Advisors.  Although the precise number of female Financial Advisors is

currently unknown, it is far greater than can be feasibly addressed through joinder.

83.     There are questions of law and fact common to the Class, and these

questions predominate over any questions affecting only individual members.  Common

questions include, among others:

(a)     whether Defendants' policies or practices discriminate against
         female FAs;

(b)     whether Defendants have failed to implement policies and
         procedures to prevent retaliation against employees who challenge
         perceived bias in the workplace and failed to addressed complaints
         and conduct proper investigations;

(c)     whether Defendants' policies and practices violate the NY EPA,
         CA EPA, Title VII, the NYSHRL, the FCRA, the FEHA, and/or
         the MHRA; and

887527.1

(d)     whether equitable remedies, injunctive relief, compensatory damages, and punitive damages for the Class are warranted.

84.     The Representative Plaintiffs' claims are typical of the claims of the Class.

85.     The Representative Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

86.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole.  The Class members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and discriminatory policies and practices.

87.     Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The Class members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, unfair, and discriminatory policies and practices.  Defendants have computerized account data, payroll data, and personnel data that will make calculation of damages for specific Class members relatively simple.  The propriety and amount of punitive damages are based on Defendants' conduct, making these issues common to the Class.

## CLAIMS OF REPRESENTATIVE PLAINTIFFS

### Judy Calibuso

88.     In June 1995, Plaintiff Judy Calibuso began working as an FA for Barnett Bank, which was acquired by BofA's predecessor firm in or around January 1998. Since January 1998, Calibuso has been employed by BofA as an FA and currently works in the Brickell Avenue office of Merrill in Miami, Florida.

89.     During the course of her employment, Defendants denied Calibuso compensation, extra bonuses, business opportunities, titles, and other conditions of employment made available to similarly situated male FAs.

90.     During the course of her employment, Defendants have not provided Calibuso equal pay to the pay of males for work requiring equal skill, effort, and responsibility, and which has been performed under similar working conditions.

91.     BofA, and later Merrill as well, routinely distributed business opportunities, including accounts from departing and retiring brokers, referrals, leads, and potential clients, and more advantageous partnerships with different departments within the firm, to male FAs rather than to Calibuso or other female FAs. As a result of the inequitable and discriminatory distribution of accounts and account prospects, Calibuso and female FAs generally have less income potential and less actual income than similarly situated male employees.

92.     In September 2006, Calibuso met with her then-manager and asked for fee-based accounts because BofA had not given her any earlier that year when several FAs within her office departed BofA. Her manager told her that he did not have any fee-based accounts to give her, but that even if he did, he would give them all to a specific male FA.

Several weeks later, Calibuso learned that her manager had distributed fee-based accounts from the departed FAs to three male FAs.

93.     By denying compensation or the opportunity for compensation to Calibuso that it made available to similarly situated male FAs, Defendants denied her the opportunity to form partnerships, to earn discretionary bonuses and stock options, and to earn corporate titles, which are awarded based on a Financial Adviser's level of compensation.  Moreover, Calibuso would have earned a higher grid payout if she had received these accounts.

94.     In February 2007, Calibuso notified her current manager that she had filed a discrimination charge with the Equal Employment Opportunity Commission.

95.     Following the filing of her charge, Defendants engaged in a constant campaign of retaliation.

96.     Upon information and belief, in or around March 2007, BofA designated several FAs to form partnerships with BofA's lucrative private banking business in order to help both FAs and Private Bank Relationship Managers grow their respective businesses, thereby increasing each partnered FA's total compensation and production.  BofA designated several male FAs who were no more qualified, or who were less qualified, than Calibuso to form these partnerships, but did not designate Calibuso.

97.     Calibuso's manager also excluded Calibuso from meetings involving her own accounts.  In October 2007, her manager did not invite her to a lunch that the manager organized for one of BofA's Commercial Banking relationship managers and several FAs from their office to promote cross referrals for investments.  The manager invited other FAs who serviced accounts covered by the relationship manager, yet did not invite Calibuso, even though Calibuso and the relationship manager shared a major client.

887527.1

98.     On several different occasions, BofA retaliated against Calibuso by requiring her to get approvals before performing routine activities that it did not require male FAs to get and that it had not required Calibuso to get before she filed her discrimination charge.

99.     In April 2007, in order to develop potential sources of referrals, Calibuso planned a luncheon with several select relationship managers from different lines of business and advisors from Private Bank and Commercial Banking to meet with a BofA insurance specialist. When Calibuso's manager learned about the luncheon the night before, she told Calibuso to cancel it because she had not requested pre-approval. The luncheon, scheduled for 12:30 the next day, did not happen.

100.    In contrast, on the same day as Calibuso's scheduled luncheon, two male FAs organized two separate group luncheons with wholesalers without pre-approval.

101.    In October 2007, her manager issued Calibuso an undeserved reprimand letter, her first in her 12-year tenure with the company.  The manager claimed that Calibuso had not followed the proper procedure for a client referral to BofA's Private Bank.  When Calibuso asked her manager to approve a shared revenue partnership with the Private Bank client manager, her manager did not approve it.  Instead, BofA took away these high value accounts from Calibuso and gave them to a male FA.  Calibuso's manager also required Calibuso to attend a "coaching session" with management.

102.    In or around March 2008, Calibuso received a referral from Commercial Banking to a high net worth client.  Calibuso successfully serviced the account and brought two of the client's partners as new clients.  After Calibuso had serviced these new accounts for several months, BofA stripped these accounts from her and gave them to a male FA because Calibuso had not been designated to work with Private Bank clients.

-25-

103.    In or around November 2008, Calibuso requested reimbursement for continuing education classes for her Certified Financial Planner designation. BofA denied her request for reimbursement, although it approved reimbursements as well as additional travel expenses to male FAs taking similar courses.

104.    On or about January 10, 2007, Calibuso filed a charge of discrimination with the Florida Commission on Human Relations and the Equal Employment Opportunity Commission ("EEOC"). On or about March 4, 2008, Calibuso filed a supplemental charge of retaliation. On June 17, 2008, she received a Notice of Right to Sue from the EEOC. The Tolling Agreement tolled Calibuso's right to sue through April 5, 2010. Her charge, supplemental charge, and Notice of Right to Sue from the EEOC are attached to this Complaint as Exhibit 1 and are incorporated by reference.

**Julie Moss**

105.    Julie Moss was hired by BofA on March 15, 2003, as an Assistant Vice President/Financial Advisor.

106.    BofA denied Moss compensation, extra bonuses, and corporate titles that it made available to similarly situated male employees.

107.    During the course of her employment, BofA has not provided Moss equal pay to the pay of males for work requiring equal skill, effort, and responsibility, and which has been performed under similar working conditions.

108.     BofA routinely distributed business opportunities, including accounts from departing brokers, referrals, leads, and potential clients to male FAs rather than to Moss or other female FAs. For instance, when another female FA left (as a result of harassment and discrimination by her supervisor, a male), BofA allowed a male broker to choose the accounts he

887527.1

wanted from her book of business.  When a different female broker transferred back to the bank side of the business, she made a spreadsheet of her clients and who she thought would be the best FA for each one.  The Market Director, a male, disregarded her recommendations and gave almost all the fee-based clients and the annuity clients with large commission trails to one male FA.

109.    In March 2006, the Market Director hired a male FA who, on information and belief, had been a very small producer at a prior brokerage firm.  When the new male FA arrived, the Market Director forced Moss to move out of her primary downtown office and buy her own furniture to move into a smaller office at another location.  At the time, she held first place with the highest revenue in the Tallahassee market.  When Moss left BofA in October 2006, she was still number one in the Tallahassee market.

110.    On June 13, 2006, Moss contacted BofA's human resources department ("HR") and filed a claim of gender discrimination and hostile work environment.  She told HR that she feared for her job, that the Market Director was intentionally harassing her and interfering with her production, and that the resulting stress was making her physically ill.  HR arranged a meeting for July 11, 2006 in Jacksonville, but HR did not attend this meeting – instead Moss found herself meeting with her boss, the Market Director, and his boss, a Senior Vice President.  On information and belief, this ambush meeting was in retaliation for her complaint of discrimination.

111.    Subsequent to the meeting on July 11, Moss suffered other instances of discrimination and retaliation, including:

887527.1

(a)     The Market Director questioned Moss's trades and required her to call him for preapproval for trades.  Moss had seven years experience in the brokerage business at that point, with no customer complaints, no questionable trades, and a clean U-4.  On information and belief, BofA did not require other similarly situated FAs to obtain preapproval for trades.

(b)     The Market Director did not require male FAs to repay BofA for the balance of start-up money advanced to them at the start of their employment as he required of Moss.  Upon information and belief, the Market Director did not seek repayment from two male FAs for over $100,000 each – more than twice what Moss owed.  In contrast, BofA initiated arbitration proceedings against Moss for the money she was advanced.

(c)     She was told she would have to call the Market Director for preapproval to expense office lunches.  On information and belief, no male FAs had to call for preapproval to expense office lunches.

(d)     On Moss's last day of employment with BofA, Moss received a "letter of education" from the Market Director reprimanding her for failing to get manager pre-approval for an advertisement she had placed in a local paper.  He copied several senior managers at BofA.  Contrary to the Market Director's assertion, Moss had followed all BofA procedures for placing the advertisement.

112.    BofA required Financial Advisers opening accounts for clients who had more than a certain net worth to go through the firm's Private Bank.  Male FAs were told to circumvent this rule by falsifying documents to open accounts without going through the Private Bank, and did not suffer negative consequences for falsifying the documents and violating BofA's official policy.  In contrast, Moss completed such documents truthfully and did not try to circumvent the Private Bank; nonetheless, the Market Director investigated her, yelled at her, and threatened to take away the production that she generated from one particular high-value account.

113.    Through this misconduct, BofA constructively discharged Moss, forcing her to resign effective October 27, 2006.

114.    BofA would not permit Moss to repay her start-up loan without obtaining a release of her discrimination claims.  After she refused to release her discrimination claims and informed BofA of the possibility that she would file an EEOC charge, BofA continued to retaliate against Moss by commencing a claim against her in arbitration.

115.    On or about April 5, 2007, Moss filed a charge of discrimination and retaliation with the Florida Commission on Human Relations and the EEOC.

116.    On June 17, 2008, Moss received a Notice of Right to Sue from the EEOC.  Her charge and Notice of Right to Sue from the EEOC are attached to this Complaint as Exhibit 2 and are incorporated by reference.  The Tolling Agreement tolled Moss's right to sue through April 5, 2010.

**Dianne Goedtel**

117.    Plaintiff Dianne Goedtel worked as a Financial Advisor in the Melville, Long Island, New York office of BofA from February 3, 2006 to September 20, 2007.  During the course of her employment, BofA denied Goedtel business opportunities, compensation, and corporate titles that it made available to similarly situated male FAs, disciplined her more harshly than similarly situated males for similar infractions, and retaliated against her when she complained about gender discrimination.

118.    During the course of her employment, BofA has not provided Goedtel equal pay to the pay of males for work requiring equal skill, effort, and responsibility, and which has been performed under similar working conditions.

119.    From the start of her employment, BofA discriminated against Goedtel on the basis of her gender by denying her start-up support and business opportunities that it provided to similarly situated men, which directly impacted her compensation.  For example,

BofA denied Goedtel upfront money when she first began working for BofA that it offered to similarly situated males when they began working.

120.     On multiple occasions in or around the summer of 2007, BofA distributed accounts of departing FAs to similarly situated male FAs that it did not offer to Goedtel.  Her manager distributed fewer assets to Goedtel than to male FAs and distributed to her almost no fee-based accounts, which are among the most lucrative.  Ms. Goedtel's production had been in the top five for her office, but as a result of these discriminatory distributions, she dropped out of the top five.

121.     BofA also engaged in gender discrimination and/or retaliation against Goedtel in other ways, including applying compliance standards more rigidly to Goedtel than to similarly situated males.  For example, BofA compliance officers attempted to write her up on the grounds that she regularly submitted required paperwork later than her male colleagues.  A comparative review, done at Goedtel's request, showed that this accusation was false.  When Goedtel complained about the discriminatory account distributions, her manager was hostile and took no steps to remedy her complaints.  In retaliation, a few weeks later her manager told her to resign after a minor compliance violation and placed excessive and misleading language on her form U-5, which all prospective employers in the financial industry obtain from FINRA.

122.     As a result of this discrimination and retaliation, BofA constructively discharged Goedtel from her employment with BofA on September 20, 2007.  The constructive discharge caused Goedtel to lose income, including her earned commissions for her last month of employment.  Goedtel also lost clients and had to start over to build her business.

123.     BofA has discriminated against Goedtel on the basis of her gender by denying her upfront money, business opportunities that directly impacted her compensation,

887527.1

subjecting her to excessive discipline and inferior terms and conditions of employment, constructively discharging her, and retaliating against her for her complaints of gender discrimination.

124.     On or about November 12, 2007, Goedtel filed a charge of discrimination and retaliation with the EEOC.  On May 27, 2008, Goedtel received a Notice of Right to Sue from the EEOC.  The Tolling Agreement tolled Goedtel's right to sue through April 5, 2010. Her charge and Notice of Right to Sue are attached to this Complaint as Exhibit 3 and are incorporated by reference.

**V. Katherine Aird**

125.     Plaintiff V. Katherine Aird was hired by Merrill as an FA in March 2006. She continues to work as an FA in Merrill's San Mateo, California office.

126.     During the course of her employment, Merrill has denied Aird compensation, extra bonuses, corporate titles, business opportunities, and other conditions of employment made available to similarly situated male FAs.

127.     During the course of her employment, Merrill has not provided Aird equal pay to the pay of males for work requiring equal skill, effort, and responsibility, and which has been performed under similar working conditions.

128.     Merrill has routinely distributed business opportunities, including accounts from departing brokers, referrals, leads, and potential clients, and more advantageous partnerships with other brokers, to male FAs rather than to Aird or other female FAs.  As a result of the inequitable and discriminatory distribution of accounts and partnerships by Merrill, Aird and female FAs generally have diminished income potential and diminished actual income as compared to similarly situated male FAs.

129.    In or around April 2010, Aird learned that a male FA with approximately the same length of employment and same assets under management as her had obtained an advantageous partnership with a high producer.  Merrill did not make this or similar other partnerships opportunities available to Aird.  This denial of partnership opportunities has caused Aird to earn less compensation than the male FA.

130.    Merrill has also denied Aird accounts from departing brokers, referrals, leads, and potential clients, which Merrill distributed to similarly situated male FAs.

131.    By denying account distributions and partnership opportunities to Aird that were made available to similarly situated male FAs, Merrill has also denied Aird promotions, extra bonuses, and stock options, which are awarded based on an FA's level of compensation.  Furthermore, Aird would have earned a higher grid payout if she had received these accounts.

132.    When Aird filed a gender discrimination charge with the EEOC, Merrill retaliated against her.  On or around June 7, 2010, Aird received an email from her Resident Director requesting that she meet with him, his manager, and someone from Compliance the next day.  On or around June 8, 2010, Aird met with her Resident Director, the Director of Menlo Park Complex, and the Vice President/Administrative Manager for an in-person meeting.  The tone of the meeting was adversarial, and the managers threatened Aird that they could terminate her at the end of the month.  Aird's managers instructed her that she was expected to bring in two new clients per month, 10 new prospects per month, five new meetings per week, and $500,000 in new assets per month.  These unrealistic expectations and the in-person meeting were in retaliation for Aird's complaint of gender discrimination.

133.     On or about May 4, 2010, Aird filed a charge of discrimination with the DFEH and the EEOC.  On or about June 26, 2010, Aird filed a charge of retaliation with the DFEH and the EEOC.   On May 14, 2010 and June 30, 2010, Aird received Notices of Right to Sue from the DFEH for her discrimination and retaliation claims, respectively.  She has requested a Notice of Right to Sue from the EEOC.  Aird's class claims are encompassed by the class charges filed by Calibuso, Moss, and Goedtel.  Her charges and Notices of Right to Sue from the DFEH are attached to this Complaint as Exhibit 4 and are incorporated by reference.

**Jean Evans**

134.     Plaintiff Jean Evans was hired by Merrill as an FA on or about December 17, 2007.  She continues to work as an FA in Merrill's Chesterfield, Missouri office.

135.     During the course of her employment, Merrill has denied Evans compensation, extra bonuses, corporate titles, business opportunities, and other conditions of employment made available to similarly situated male FAs.

136.     During the course of her employment, Merrill has not provided Evans equal pay to the pay of males for work requiring equal skill, effort, and responsibility, and which has been performed under similar working conditions.

137.     Merrill has routinely distributed business opportunities -- including accounts from departing and retiring brokers, and more advantageous partnerships with other brokers -- to male Financial Advisors rather than to female Financial Advisors.  As a result of the inequitable and discriminatory distribution of accounts and partnerships, female Financial Advisors have diminished income potential and diminished actual income as compared to similarly-situated male employees.

887527.1

138.    For example, when brokers departed the firm in January, March, and July 2009, Evans did not receive any high-value accounts.  Moreover, she was only assigned one small account from the book of business of the departing broker who left in July 2009.  Her immediate supervisor, the Resident Director for her office, took that account away from her without any explanation.  In addition, a broker retired from the firm in Summer 2009 and another broker passed away in March 2010.  Merrill did not assign Evans any accounts from those brokers' books of business.

139.    Similarly, Merrill has denied Evans the opportunity to be part of a team or partnership.  In or around March 2010, Evans requested to be put on a team or partnership by submitting a written request in person to the Managing Director/Complex Manager, Sales Manager, and Director.  They did not grant her request.  In or around April 2010, a senior broker approached Evans about forming a partnership but Evans' Resident Director would not approve the partnership.  On or about April 29, 2010, Evans orally asked her Resident Director to put her on a team or partnership.  The Resident Director declined her request.  On or about June 8, 2010, Evans met with the Managing Director/Complex Manager and Director again and repeated her request to be put on a team or partnership.  Again, they denied her request.

140.    Repeatedly since April 2010, a senior broker has offered to assign some accounts to Evans so that she could meet the $10 million annuitized assets and $15 million total assets thresholds required for her Paths of Achievement ("POA") graduation, which would entitle her to a $20,000 bonus.  Her Resident Director did not allow the senior broker to do this for her.  The Resident Director told Evans that the Resident Director could not sign off on the senior broker giving Evans any accounts because it was "unethical."  However, on information and belief, both the Managing Director/Complex Manager and the Resident Director have

-34-

allowed, and have even asked, senior brokers to assign accounts to junior male brokers so they
could graduate from the POA training program.  In or around July 2010, Evans learned that a
junior male broker graduated from the POA program early because a senior broker transferred
assets to him.

141.    Evans has also been subjected to a hostile work environment and quid pro
quo sexual harassment.  During the course of her employment, Evans was subjected to
unwelcome sexual advances and other physical and verbal conduct of a sexual nature.  The
harassment that she suffered was severe or pervasive enough to affect the terms and/or
conditions of her employment.  The conduct was severe in that it involved physical touching.
Alternatively, the conduct was pervasive in that it occurred daily.  In addition, her refusal to
submit to the sexual advances, as described more fully below, resulted in the tangible adverse
action of not being assigned or transferred accounts.

142.    When Evans went into production in or around March 2008, Merrill
assigned a male Financial Advisor to serve as her mentor.  Her mentor's role was to help her
build her book of business by, among other things, assigning her leads or prospects he had and
transferring accounts to her.  He also provided feedback on her performance to her Resident
Director and Sales Manager/POA Coach.  Despite his intended role of helping her build her book
of business, Evan's mentor repeatedly made inappropriate comments to her, sent her
inappropriate emails, told inappropriate jokes, and made sexual advances toward her.  On several
occasions, Evans asked her mentor what she should do to prepare for an appointment with a
client.  He responded by telling her that she should wear short skirts, wear a push-up bra, and
unbutton one more button on her blouse and lean over, among other things.  When Evans' client
was a female, her mentor asked Evans if the client was "hot" and if he could come to the

appointment with her so they could "have a three-way."  In addition, Evans' mentor has told

crude jokes to her and to others in her presence.  Evans has asked him to stop doing so, but he

has continued nonetheless.  Evans' mentor has also asked her if she want accounts.  When she

responded that she did, he leaned over, looked down her blouse, and asked "What are you going

to give me?" and said "Quid pro quo."  More recently, Evans' mentor has sent her emails

attaching ads for bras.  Evans later learned from a co-worker that her management has been

aware of her mentor's sexually inappropriate behavior, yet Merrill assigned him to be her mentor

nonetheless.

143.    Evans has also been sexually harassed by her male Sales Manager/POA

Coach, who Merrill has designated as her go-to person.  On or about December 19, 2009, when

Evans arrived for the firm's holiday party, her Sales Manager/POA Coach hugged her and leaned

in to kiss her.  When Evans turned away, he grabbed her face and kissed her on the mouth.  The

following Monday, December 21, 2009, Evans' mentor called her into his office and

reprimanded her for rejecting the Sales Manager's sexual advances.  Her mentor told her that she

was not very nice to the Sales Manager, that he had a fragile ego, that she was rejecting him, and

threatened that if she was not nicer to him, it could negatively affect her career.  Her mentor then

told her that she had to apologize to her Sales Manager/POA Coach.  Evans told her mentor that

she was not going to apologize for refusing his sexual advances.  Evans' relationships with her

mentor and Sales Manager/POA Coach took a dramatic turn for the worse after that, and neither

have helped her with her business.  Her Sales Manager/POA Coach lied to her Resident Director

about her work performance, and neither her mentor nor her Sales Manager/POA Coach have

assigned accounts or leads to her.  This has resulted in Evans having lower production (and

therefore compensation) than similarly situated male FAs, which in turn has deprived her of the

-36-

opportunity to earn bonuses, graduate from the POA program early, be awarded corporate titles, and receive higher payouts.

144.    On or about April 30, 2010, Evans called Merrill's Advice and Counsel to make a formal complaint.  Evans told the Advice and Counsel representative who returned her call that her Sales Manager/POA Coach had kissed her and that her mentor regularly made inappropriate comments to her.  Although the Advice and Counsel representative said that she would investigate Evans' complaint, the representative told Evans that her Sales Manager/POA Coach was her go-to person and that she still needed to go to him for information and help.  The Advice and Counsel representative also told her that they were investigating her complaints but if they could not corroborate her story with witnesses, there was nothing they could do.  On information and belief, the Advice and Counsel representative did not interview the witnesses that Evans identified.  When Evans asked for a different mentor and/or POA Coach, the Advice and Counsel representative rejected her request.

145.    On or about June 9, 2010, the Advice and Counsel representative asked Evans for any inappropriate emails that her mentor had sent her.  The Advice and Counsel representative then called Evans to ask Evans to explain what Evans found offensive about the emails.  Evans explained that whenever her mentor saw her talking to other male brokers or to male clients or prospects, he would ask her in front of them, "Are you guys f*cking?" or "Are you doing him?"  Without basis, the Advice and Counsel representative responded by interrogating Evans about her sexual activity and whether or not she was flirting with co-workers.  On information and belief, Defendants have taken no steps to stop the harassment.

146.    On or about June 17, 2010, Evans filed a charge of discrimination with the MCHR and the EEOC.  She has requested a Notice of Right to Sue from the EEOC.  Evans'

class claims are encompassed by the class charges filed by Calibuso, Moss, and Goedtel.  Her

charge is attached to this Complaint as Exhibit 5 and is incorporated by reference.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
#### Sex Discrimination in Wages
#### (Equal Pay Act, 29 U.S.C. § 206, *et seq*.)
#### (On Behalf of All Plaintiffs and the Federal EPA Class)

147.    Plaintiffs incorporate the preceding paragraphs as alleged above.

148.    This Claim is brought by all Representative Plaintiffs on behalf of

themselves and the Federal EPA Class.

149.    At all relevant times, each Defendant has been, and continues to be, an

"employer" within the meaning of 29 U.S.C. § 203.  At all relevant times, Defendants have

employed, and continue to employ, "employee[s]," including Plaintiffs and each of the Federal

EPA Collective Plaintiffs, within the meaning of 29 U.S.C. § 203.

150.    Attached hereto as Exhibit 6 are the Consent to Sue forms signed by

Plaintiffs in this action pursuant to 29 U.S.C. §§ 216(b) and 256.  It is likely that other similarly

situated individuals will sign consent forms and join as Plaintiffs on this claim in the future.

151.    The claims of the collective action plaintiffs should be tolled such that

they all date back to August 2, 2007, rather than three years back from the time they file their

respective consents to sue.  The parties had entered into a tolling agreement providing for the

tolling of all claims relating to Plaintiffs' work for Defendants.   In addition, Plaintiffs did not

know, and could not through reasonable diligence have known, of Defendants' pattern and

practices of paying women less than men for work of equal skill, effort, and/or responsibility.

152.    The Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. § 206 *et*

*seq*., makes it unlawful for an employer to discriminate between employees on the basis of sex

887527.1

by paying wages to employees at a rate less than the rate paid to employees of the opposite sex for equal work.

153.    Plaintiffs and the Federal EPA Collective Plaintiffs were paid lower wages than male FAs for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

154.    Defendants willfully paid Plaintiffs and the Federal EPA Collective Plaintiffs less than they paid male FAs who were performing substantially equal work.

155.    The foregoing conduct, as alleged, constitutes a willful violation of the Equal Pay Act within the meaning of 29 U.S.C. § 255(a).

156.    Plaintiffs request relief as hereinafter described.

**SECOND CLAIM FOR RELIEF**
**Rate of Pay Differential Because of Sex**
**(New York Equal Pay Act, N.Y. Labor Law § 194, *et seq*.)**
**(On Behalf of Dianne Goedtel and the NY EPA Class)**

157.    Plaintiff Goedtel incorporates the preceding paragraphs as alleged above.

158.    This Claim is brought on behalf of Plaintiff Goedtel and the NY EPA Class.

159.    New York's Equal Pay Act, N.Y. Labor Law § 194 *et seq*., makes it unlawful for an employee to be paid a wage at a rate less than the rate at which an employee of the opposite sex is paid for equal work.

160.    Plaintiff and the NY EPA Class were paid lower wages than male FAs for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

161.    Defendants intentionally paid Plaintiff and the NY EPA Class less than they paid male FAs who were performing substantially equal work.

-39-

887527.1

162.     The foregoing conduct constitutes sex discrimination with respect to wages in violation of the New York Equal Pay Act.

163.     Plaintiff requests relief as hereinafter described.

## THIRD CLAIM FOR RELIEF
### Rate of Pay Differential Because of Sex
**(California Equal Pay Act, Cal. Labor Law § 1197.5, *et seq*.)**
**(On Behalf of V. Katherine Aird and the CA EPA Class)**

164.     Plaintiff Aird incorporates the preceding paragraphs as alleged above.

165.     This Claim is brought on behalf of Plaintiff Aird and the CA EPA Class.

166.     California's Equal Pay Act, Cal. Labor Law § 1197.5 *et seq*., makes it unlawful for an employee to be paid a wage at a rate less than the rate at which an employee of the opposite sex is paid for equal work.

167.     Plaintiff and the CA EPA Class were paid lower wages than male FAs for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

168.     Defendants intentionally paid Plaintiff and the CA EPA Class less than they paid male FAs who were performing substantially equal work.

169.     The foregoing conduct constitutes sex discrimination with respect to wages in violation of the California Equal Pay Act.

170.     Plaintiff requests relief as hereinafter described.

## FOURTH CLAIM FOR RELIEF
### Intentional Discrimination
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.)**
**(On Behalf of All Plaintiffs and the Title VII Class)**

171.     Plaintiffs incorporate the preceding paragraphs as alleged above.

172.     This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Title VII Class they represent.  Plaintiffs have timely filed charges with the

EEOC making classwide claims of discrimination as well as individual claims and have thus exhausted their administrative remedies.

173.    Defendants have engaged in an intentional company-wide systematic pattern or practice of discrimination against female FAs.  The discriminatory acts that constitute Defendants' pattern or practice of discrimination occurred both within and outside the liability period in this case.

174.    Defendants have intentionally maintained a system that perpetuates and increases discrimination against female Financial Advisors by implementing company-wide policies and practices that rely heavily on past performance as a criterion for account distributions, partnership opportunities, compensation, titles, and other terms and conditions of employment, and by implementing company-wide policies and practices that are discriminatory, subjective, standardless, and/or arbitrary, and by encouraging branch management and senior management to rely on their personal preferences and stereotypes to favor male FAs with respect to the above-mentioned business opportunities.  Defendants' discriminatory policies or practices described above have denied female FAs business opportunities and compensation, in the form of lost past and future wages and other job benefits, as compared to similarly situated male Financial Advisors.

175.    Defendants have intentionally discriminated against Plaintiffs and the Title VII Class by maintaining a pattern or practice of denying business opportunities that directly affect compensation to qualified female FAs on the basis of sex.  The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by 42 U.S.C. §§ 2000e *et seq*.

176.    Plaintiffs request relief as hereinafter described.

887527.1

**FIFTH CLAIM FOR RELIEF**
**Disparate Impact Discrimination**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.)**
**(On Behalf of All Plaintiffs and the Title VII Class)**

177.    Plaintiffs incorporate the preceding paragraphs as alleged above.

178.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Title VII Class they represent.  Plaintiffs have timely filed charges with the EEOC making classwide claims of discrimination as well as individual claims, and have thus exhausted their administrative remedies.

179.    Defendants' discriminatory, subjective, standardless, and/or arbitrary policies and practices with respect to account distributions, partnership opportunities, compensation, titles, and other terms and conditions of employment have an adverse impact on female FAs in violation of Title VII and are not, and cannot be, justified by business necessity.  Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

180.    Defendants' company-wide policies and practices of distributing accounts and other business opportunities, determining upfront money and compensation, awarding titles, and setting other terms and conditions of employment based on FAs' past performance also have an adverse impact on female FAs in violation of Title VII and are not, and cannot be, justified by business necessity.  Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

181.    Plaintiffs request relief as hereinafter described.

887527.1

**SIXTH CLAIM FOR RELIEF**
**Intentional Discrimination**
**(NYSHRL, New York Executive Law § 296 *et seq.*)**
**(On Behalf of Dianne Goedtel and the New York Subclass)**

182.     Plaintiff Goedtel incorporates by reference each allegation of each

preceding paragraph.

183.     Defendants have maintained a system that discriminates on the basis of

gender with respect to upfront money, account distributions, partnerships, other business

opportunities, compensation, titles, and other terms and conditions of employment.

184.     Defendants have intentionally discriminated against Plaintiff Goedtel and

the New York Subclass in violation of NYSHRL by, among other things:

> (a)     treating them in a discriminatory manner based on their gender;
>
> (b)     denying them other opportunities for advancement because of their gender;
>
> (c)     denying them opportunities for increased compensation because of their gender;
>
> (d)     providing them with less favorable compensation because of their gender;
>
> (e)     providing disparate terms and conditions of employment because of their gender; and
>
> (f)     failing to examine their workplace to correct gender-biased and discriminatory policies and failing to address problems of disparate treatment on the basis of gender.

185.     The foregoing conduct constitutes illegal, intentional discrimination

prohibited by New York Executive Law § 296 *et seq.*

**SEVENTH CLAIM FOR RELIEF**
**Disparate Impact Discrimination**
**(NYSHRL, New York Executive Law § 296 *et seq.*)**
**(On Behalf of Dianne Goedtel and the New York Subclass)**

186.     Plaintiff Goedtel incorporates the preceding paragraphs as alleged above.

887527.1

187.     Defendants' discriminatory, subjective, standardless, and/or arbitrary policies and practices with respect to upfront money, account distributions, partnerships, other business opportunities, compensation, titles, and other terms and conditions of employment have an adverse impact on female employees in violation of the NYSHRL and are not, and cannot be, justified by business necessity.  Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

188.     Defendants' company-wide policies and practices of distributing accounts and other business opportunities, determining compensation, awarding titles, and setting other terms and conditions of employment based on brokers' past performance also have an adverse impact on female FAs in violation of the NYSHRL and are not, and cannot be, justified by business necessity.  Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

189.     The foregoing conduct constitutes illegal discrimination prohibited by New York Executive Law § 296 *et seq.*

### EIGHTH CLAIM FOR RELIEF
#### Gender Discrimination
#### (Florida Civil Rights Act of 1992, F.S.A. § 760.01 *et seq.*)
#### (On Behalf of Judy Calibuso and Julie Moss and the Florida Subclass)

190.     Plaintiffs Calibuso and Moss incorporate the preceding paragraphs as alleged above.

191.     This Claim is brought on behalf of Plaintiffs Calibuso and Moss and the Florida Subclass.

192.     As described herein, Defendants' actions constitute gender discrimination in violation of the Florida Civil Rights Act of 1992 ("FCRA").  Plaintiffs Judy Calibuso and

887527.1

Julie Moss have both timely complied with all prerequisites to sue.  They have both filed charges

of gender discrimination with the EEOC and the Florida Commission on Human Relations.

193.    Plaintiffs request relief as hereinafter provided.

### NINTH CLAIM FOR RELIEF
### Gender Discrimination
**(California Fair Employment and Housing Act, Cal. Gov't Code §§ 12940 *et seq.*)**
**(On Behalf of V. Katherine Aird and the California Subclass)**

194.    Plaintiffs incorporate the preceding paragraphs as alleged above.

195.    This Claim is brought on behalf of Plaintiff Aird and the California

Subclass.

196.    As described herein, Defendants' actions constitute gender discrimination

in violation of the California Fair Employment and Housing Act ("FEHA").  Plaintiff V.

Katherine Aird has timely complied with all prerequisites to sue.  She has filed charges of gender

discrimination with the EEOC and the California Department of Fair Employment and Housing.

197.    Plaintiffs request relief as hereinafter provided.

### TENTH CLAIM FOR RELIEF
### Gender Discrimination
**(Missouri Human Rights Act, RSMo. § 213.010  *et seq.*)**
**(On Behalf of Jean Evans and the Missouri Subclass)**

198.    Plaintiff Evans incorporates the preceding paragraphs as alleged above.

199.    This Claim is brought on behalf of Plaintiff Evans and the Missouri

Subclass.

200.    As described herein, Defendants' actions constitute gender discrimination

in violation of the Missouri Human Rights Act ("MHRA").  Plaintiff Evans has timely complied

with all prerequisites to sue.  She has filed a charge of gender discrimination with the EEOC and

the Missouri Commission on Human Rights.

201.    Plaintiff requests relief as hereinafter provided.

887527.1

## ELEVENTH CLAIM FOR RELIEF
### Sexual Harassment
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.)**
<u>**(On Behalf of Plaintiff Evans Individually)**</u>

202.    Plaintiff Evans incorporates by reference each allegation of each

preceding paragraph.

203.    Defendants illegally sexually harassed Evans in violation of Title VII.

204.    As a result of Defendants illegal actions, Evans has suffered damages.

205.    Plaintiff requests relief as hereinafter described.

## TWELFTH CLAIM FOR RELIEF
### Sexual Harassment
**(Missouri Human Rights Act, RSMo. § 213.010  *et seq*.)**
<u>**(On Behalf of Jean Evans Individually)**</u>

206.    Plaintiff Evans incorporates by reference each allegation of each

preceding paragraph.

207.    Defendants illegally sexually harassed Evans in violation of the Missouri

Human Rights Act.

208.    As a result of Defendants illegal actions, Evans has suffered damages.

209.    Plaintiff requests relief as hereinafter described.

## THIRTEENTH CLAIM FOR RELIEF
### Retaliation
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.)**
<u>**(On Behalf of Plaintiffs Calibuso, Moss, Goedtel, and Aird Individually)**</u>

210.    Plaintiffs incorporate the preceding paragraphs as alleged above.

211.    This Claim is brought by Plaintiffs Calibuso, Moss, and Goedtel, and Aird

individually.  Plaintiffs have timely filed charges with the EEOC alleging retaliation claims and

have thus exhausted their administrative remedies.

212.     Plaintiffs engaged in protected activities, including making internal complaints of unlawful discrimination and filing charges with the EEOC complaining of Defendants' discriminatory policies and practices.

213.     Defendants took adverse actions against the Plaintiffs with the purpose of retaliating against them because of their participation in protected activities, and Plaintiffs suffered damages as a result of that conduct.

214.     Plaintiffs request relief as hereinafter described.

**FOURTEENTH CLAIM FOR RELIEF**
**Retaliation**
**(NYSHRL, New York Executive Law § 296 *et seq.*)**
<u>**(On Behalf of Dianne Goedtel Individually)**</u>

215.     Plaintiff Goedtel incorporates by reference each allegation of each preceding paragraph.

216.     This Claim is brought by Plaintiff Goedtel individually.

217.     Goedtel engaged in protected activities, including making internal complaints of unlawful discrimination and filing a charge with the EEOC complaining of Defendants' discriminatory policies and practices.

218.     Defendants took adverse actions against Goedtel with the purpose of retaliating against her because of her participation in protected activities, and Goedtel suffered damages as a result of that conduct.

219.     Plaintiffs request relief as hereinafter described.

**FIFTEENTH CLAIM FOR RELIEF**
**Retaliation**
**(Florida Civil Rights Act of 1992, F.S.A. § 760.01 *et seq.*)**
<u>**(On Behalf of Judy Calibuso and Julie Moss Individually)**</u>

220.     Plaintiffs Calibuso and Moss incorporate the preceding paragraphs as alleged above.

-47-

221.    This Claim is brought on behalf of Plaintiffs Calibuso and Moss individually.

222.    Calibuso and Moss engaged in protected activities, including making internal complaints of unlawful discrimination and filing charges with the EEOC complaining of Defendants' discriminatory policies and practices.

223.    Defendants took adverse actions against Calibuso and Moss with the purpose of retaliating against them because of their participation in protected activities, and Calibuso and Moss suffered damages as a result of that conduct.

224.    Plaintiffs request relief as hereinafter provided.

### SIXTEENTH CLAIM FOR RELIEF
#### Retaliation
#### (California Fair Employment and Housing Act, Cal. Gov't Code §§ 12940 *et seq.*)
#### (On Behalf of V. Katherine Aird Individually)

225.    Plaintiff Aird incorporates the preceding paragraphs as alleged above.

226.    This Claim is brought on behalf of Plaintiff Aird individually.

227.    Aird engaged in protected activities, including filing charges with the EEOC complaining of Defendants' discriminatory policies and practices.

228.    Defendants took adverse actions against Aird with the purpose of retaliating against her because of her participation in protected activities, and Aird suffered damages as a result of that conduct.

229.    Plaintiff requests relief as hereinafter provided.

### ALLEGATIONS REGARDING RELIEF

230.    Plaintiffs and the Classes they seek to represent have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief they seek in this action is the only means of securing complete and adequate relief.  Plaintiffs and the

887527.1

Classes they seek to represent are now suffering, and will continue to suffer, irreparable injury from Defendants' discriminatory acts and omissions.

231.    Defendants' actions have caused and continue to cause Plaintiffs and all Class members substantial losses in earnings and other employment benefits.

232.    In addition, Representative Plaintiffs and the Class suffer and continue to suffer humiliation, embarrassment, and anguish, all to their damage in an amount according to proof.

233.    Defendants performed the acts herein alleged with malice or reckless indifference.  Plaintiffs and Class members are thus entitled to recover punitive and/or double damages in an amount according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and all members of the Federal EPA Class, pray for relief as follows:

(a)    Designation of this action as a collective action on behalf of the Federal EPA Collective Plaintiffs (asserting federal Equal Pay Act claims) and prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the Federal EPA Opt-In Class, apprising them of the pendency of this action, and permitting them to assert timely Equal Pay Act claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b);

(b)    Designation of Plaintiffs as Representatives of the Federal EPA Class;

(c)    A declaratory judgment that the practices complained of herein are unlawful under the Equal Pay Act;

887527.1

(d)     An award of damages, according to proof, including liquidated

damages, to be paid by Defendants;

(e)     Costs of action incurred herein, including expert fees;

(f)     Attorneys' fees, including fees pursuant to 29 U.S.C. § 216;

(g)     Post-Judgment interest, as provided by law; and

(h)     Such other legal equitable relief as this Court deems necessary,

just, and proper.

WHEREFORE, Plaintiffs on behalf of themselves and the Class, pray for relief as

follows:

(a)     Certification of the case as a class action on behalf of the proposed
Class and the proposed Subclasses;

(b)     Designation of Representative Plaintiffs Judy Calibuso, Julie
Moss, Dianne Goedtel, V. Katherine Aird, and Jean Evans as
representatives of the Title VII Class; designation of Plaintiff
Goedtel as representative of the NY EPA Subclass and the New
York Subclass; designation of Plaintiffs Calibuso and Moss as
representatives of the Florida Subclass; designation of Plaintiff
Aird as representative of the CA EPA Subclass and the California
Subclass; and designation of Plaintiff Evans as representative of
the Missouri Subclass;

(c)     Designation of Representative Plaintiffs' counsel of record as
Class counsel;

(d)     A declaratory judgment that the practices complained of herein are
unlawful and violate 42 U.S.C. §§ 2000e, *et seq*., and, with respect
to Plaintiff Goedtel and the NY EPA Subclass and the New York
Subclass, the New York Equal Pay Act, N.Y. Labor Law § 194, *et
seq*. and New York Executive Law § 296 *et seq*., with respect to
Plaintiffs Calibuso and Moss and the Florida Subclass, the Florida
Civil Rights Act of 1992, F.S.A. §§ 760.01, *et seq*.,  with respect to
Plaintiff Aird and the CA EPA Subclass and the California
Subclass, the California Equal Pay Act, Cal. Labor Code § 1197.5,
*et seq*. and the California Fair Employment and Housing Act, Cal.
Gov't Code § 12940 *et seq*., and, with respect to Plaintiff Evans
and the Missouri Subclass, the Missouri Human Rights Act,
RSMo. § 213.010 *et seq*;

887527.1

(e)     A preliminary and permanent injunction against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

(f)     An order that Defendants institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender, and that it eradicate the effects of their past and present unlawful employment practices;

(g)     An order restoring Plaintiffs and Class members to their rightful positions at BofA, or in lieu of reinstatements, an order for front pay benefits;

(h)     Back pay (including interest and benefits) for the Representative Plaintiffs and Class and Subclass members;

(i)     All damages sustained as a result of Defendants' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof;

(j)     Full wages, benefits, and wage supplements, as well as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due, pursuant to N.Y. Labor Law §§ 194 and 198;

(k)     Exemplary and punitive damages in an amount commensurate with Defendants' ability to pay and to deter future conduct;

(l)     Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(m)    Pre-judgment and post-judgment interest, as provided by law; and

(n)     Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

WHEREFORE, Plaintiffs on behalf of themselves individually, pray for relief as follows:

887527.1

(a)     Injunctive relief and equitable remedies, including front pay and

back pay;

(b)     Damages for retaliation and sexual harassment, including damages

for emotional distress, humiliation, embarrassment, and anguish, to be determined

according to proof; and

(c)     Such other relief as the Court may deem necessary, just, and

proper.

## JURY DEMAND

234.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs

demand a trial by jury in this action.


Dated: New York, New York
       August 2, 2010

                                        Respectfully submitted,

                                        By:  /s/ Adam T. Klein
                                            Adam T. Klein

                                            OUTTEN & GOLDEN LLP
                                            Adam T. Klein
                                            Justin M. Swartz
                                            Cara E. Greene
                                            3 Park Avenue, 29th Floor
                                            New York, New York 10016
                                            Telephone: (212) 245-1000
                                            Facsimile:  (212) 977-4005

                                            LIEFF, CABRASER, HEIMANN &
                                               BERNSTEIN, LLP
                                            Kelly M. Dermody, *admitted pro hac vice*
                                            Heather H. Wong, *admitted pro hac vice*
                                            275 Battery Street, 29th Floor
                                            San Francisco, CA 94111-3339
                                            Telephone: (415) 956-1000
                                            Facsimile:  (415) 956-1008

887527.1

LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
Rachel Geman
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

*Attorneys for Plaintiffs and the Putative Class*

887527.1