**OUTTEN & GOLDEN LLP**
Adam T. Klein
Justin M. Swartz
Cara E. Greene
Mariko Hirose
Reena Arora
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000
Facsimile:  (212) 977-4005

**LIEFF, CABRASER, HEIMANN &**
  **BERNSTEIN, LLP**
Kelly M. Dermody, *admitted pro hac vice*
Heather H. Wong, *admitted pro hac vice*
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

**LIEFF, CABRASER, HEIMANN &**
  **BERNSTEIN, LLP**
Rachel Geman
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

---

JUDY CALIBUSO, JULIE MOSS,
DIANNE  GOEDTEL, JEAN EVANS, and
MARY DESALVATORE, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

        -against-

BANK OF AMERICA CORPORATION;
MERRILL LYNCH & CO., INC.; and
MERRILL LYNCH, PIERCE, FENNER &
SMITH, INC.,

        Defendants.

---

**THIRD AMENDED CLASS AND
COLLECTIVE ACTION COMPLAINT
(Trial by Jury Demanded)**

Individual and Representative Plaintiffs Judy Calibuso, Julie Moss, Dianne

Goedtel, Jean Evans, and Mary DeSalvatore (collectively "Plaintiffs"), on behalf of themselves

1

and all others similarly situated, allege, upon personal knowledge as to themselves and upon

information and belief as to other matters, as follows:

## NATURE OF THE CLAIM

1.      This case is about the gender disparities in compensation and in business

opportunities at the nation's largest bank and brokerage firm.  Measured by both equity and

assets, Defendant Bank of America Corporation ("BofA") is the largest bank company in the

United States and one of the largest financial institutions in the world.  Following its

combination with Merrill Lynch & Co., Inc. ("ML") and Merrill Lynch, Pierce, Fenner & Smith,

Inc. ("MLPF&S") (together with ML, "Merrill"), Defendants also have attained the status of

being the largest brokerage firm in the world.  Defendants' retail brokerage unit, now operating

under the banner of Merrill Lynch Global Wealth Management, employs over 15,000 Financial

Advisors (also referred to as "FAs" and "brokers") nationwide.  These Financial Advisors

provide financial and investment services to customers across the United States and manage over

$2 trillion in client assets.

2.      Beneath the veneer of a world-class financial institution, Defendants treat

their female Financial Advisors as second-class citizens.  Every year throughout the liability

period in this case, female FAs have earned substantially less than similarly-situated male FAs.

3.      This earnings disparity is a result of Defendants' unvalidated company-

wide policies and practices that govern compensation and the distribution of accounts and

business opportunities, and the lack of proper accountability measures to ensure fairness.

4.      These policies and practices existed at both BofA and Merrill before the

merger, and they continue to exist at the combined company today.

5.      Specifically, Defendants, through their conduct throughout the liability period, have caused these gender-based earnings disparities by (a) employing uniform, unvalidated procedures for determining employees' compensation that have a disparate impact on female Financial Advisors; (b) employing uniform, unvalidated procedures for allocating client accounts, leads, referrals and other business opportunities that have a disparate impact on female Financial Advisors; (c) intentionally implementing and retaining company-wide policies and practices relating to compensation, the distribution of client accounts from departing or retiring FAs, as well as other business opportunities, which give male FAs greater opportunities to earn compensation; (d) intentionally implementing and retaining company-wide policies and practices that have created a "cumulative advantage" effect by perpetuating and widening the gender-based earnings disparities that Defendants' discriminatory policies and practices have caused; and (e) utilizing a uniform, unvalidated quintile ranking procedure to measure performance that has a disparate impact on female FAs, as discussed below.

6.      When female Financial Advisors have complained about these discriminatory practices, Defendants have retaliated against them.

7.      Defendants' discrimination and retaliation violate the Equal Pay Act, 29 U.S.C. § 206 *et seq*. ("Federal EPA"), the New York Equal Pay Act, N.Y. Labor Law § 194 *et seq*. ("NY EPA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the New York State Human Rights Law, New York Executive Law § 296 *et seq*. ("NYSHRL"), the Florida Civil Rights Act of 1992, F.S.A. § 760.01 *et seq*. ("FCRA"), the Missouri Human Rights Act ("MHRA"), RSMo. § 213.010 *et seq*., and the New Jersey Law Against Discrimination ("NJ LAD"), N.J.S.A. § 10:5-1 *et seq*.

3

8.      Accordingly, in addition to bringing this action on their own behalf, Plaintiffs also bring this action on behalf of a class of similarly-situated current and former female Financial Advisors employed by Defendants ("the Rule 23 and Collective Action Class" or "the Class"), in order to end Defendants' discriminatory policies and/or practices and to make the Class whole.

## PARTIES

### Plaintiffs

#### *Judy Calibuso*

9.      Plaintiff Judy Calibuso is a woman who lives in Miami-Dade County, in the State of Florida.  She is a citizen of the United States.

10.      Calibuso is presently employed by Defendants as a Financial Advisor. She has held this position since approximately 1995.

#### *Julie Moss*

11.      Plaintiff Julie Moss is a woman who lives in Jefferson County, in the State of Louisiana.  She is a citizen of the United States.

12.      Moss was employed by BofA as a Financial Advisor from approximately March 2003 through October 2006.

#### *Dianne Goedtel*

13.      Plaintiff Dianne Goedtel is a woman who lives in Suffolk County, in the State of New York.  She is a citizen of the United States.

14.      Goedtel was employed by BofA as a Financial Advisor from approximately February 2006 through September 2007.

*Jean Evans*

15.     Plaintiff Jean Evans is a woman who lives in St. Louis County, in the State of Missouri.  She is a citizen of the United States.

16.     Evans was employed by Defendants as a Financial Advisor from approximately December 2007 through November 2010.

*Mary DeSalvatore*

17.     Plaintiff Mary DeSalvatore is a woman who lives in Monmouth County, in the State of New Jersey.  She is a citizen of the United States.

18.     DeSalvatore is presently employed by Defendants as a Financial Advisor. She has held this position since late 2006, when she joined Merrill's Paths of Achievement ("POA") program.  She graduated from the POA program in approximately August 2008.

**Defendants**

*Bank of America Corporation*

19.     Upon information and belief, Defendant Bank of America Corporation ("BofA") is a Delaware corporation doing business within Kings County in the State of New York and maintains corporate headquarters within the City and County of Charlotte-Mecklenburg at Bank of America Corporate Center, 100 N. Tryon St., Charlotte, North Carolina 28255.

20.     Upon information and belief, Defendant BofA maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

21.     During all relevant times, Defendant BofA was Plaintiffs' employer within the meaning of all applicable statutes.

22.    On information and belief, at all times pertinent hereto, Defendant BofA has employed more than five hundred people.

*Merrill Lynch & Co., Inc.*

23.    Upon information and belief, Defendant Merrill Lynch & Co., Inc. ("ML") is a Delaware corporation doing business within Kings County in the State of New York and maintains corporate headquarters within the City and County of Charlotte-Mecklenburg at Bank of America Corporate Center, 100 N. Tryon St., Charlotte, North Carolina 28255.  ML is a wholly owned subsidiary of BofA.

24.    Upon information and belief, Defendant ML maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

25.    Defendant ML has been Plaintiff DeSalvatore's employer within the meaning of all applicable statutes since she was hired in 2006.  Similarly, Defendant ML has been Plaintiff Calibuso's employer since January 1, 2009.

26.    On information and belief, at all times pertinent hereto, Defendant ML has employed more than five hundred people.

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*

27.    Upon information and belief, Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S") is a Delaware corporation doing business within Kings County in the State of New York and maintains corporate headquarters within the City and County of New York at 4 World Financial Center, New York, New York 10080.  MLPF&S is a wholly owned subsidiary of BofA and ML.

28.    Upon information and belief, Defendant MLPF&S maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

29.     Defendant MLPF&S has been Plaintiff DeSalvatore's employer within the meaning of all applicable statutes since she was hired in 2006.  Likewise, Defendant MLPF&S has been Plaintiff Calibuso's employer since January 1, 2009.

30.     On information and belief, at all times pertinent hereto, Defendant MLPF&S has employed more than five hundred people.

## JURISDICTION AND VENUE

31.     This Court has original subject matter jurisdiction over the Federal EPA and Title VII claims pursuant to 29 U.S.C. § 206 and 28 U.S.C. §§ 1331 and 1343, respectively, because they arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.

32.     This Court has original jurisdiction over the NY EPA, NYSHRL, FCRA, MHRA, and NJ LAD claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This is a putative class action in which: (1) there are 100 or more members in the Class; (2) at least some members of the proposed Class have a different citizenship from at least one Defendant; and (3) the claims of the proposed Class members exceed $5,000,000.00 in the aggregate.

33.     In addition, this Court has supplemental jurisdiction over the NY EPA, NYSHRL, FCRA, MHRA, and NJ LAD claims under 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

34.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because Defendants conduct business and can be found in this district

and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and because the alleged unlawful employment practice was committed here, and employment records relevant to that practice are maintained and administered here.

35.     Plaintiffs have exhausted their administrative remedies and complied with all statutory prerequisites to their Title VII claims.  Calibuso filed a charge of discrimination individually and on behalf of all similarly-situated female FAs with the Equal Employment Opportunity Commission ("EEOC") on January 10, 2007.  Pursuant to the EEOC's worksharing agreement with the Florida Commission on Human Rights ("FCHR"), her charge is considered dually filed with the FCHR.  She then filed a supplemental charge of retaliation on March 4, 2008.  By notice dated June 17, 2008, the EEOC dismissed Calibuso's case and issued a Notice of Right to Sue.  She also filed an additional supplemental charge of retaliation on November 19, 2010.  By notice dated September 30, 2011, the EEOC dismissed Calibuso's additional supplemental charge of retaliation and issued a Notice of Right to Sue.  On August 19, 2008, the parties entered into a Tolling Agreement ("Tolling Agreement") that tolled Calibuso's right to sue through April 5, 2010.  Her charge, supplemental charges, and Notices of Right to sue from the EEOC are attached to this Complaint as Exhibit 1 and are incorporated by reference.

36.     On or about April 5, 2007, Moss filed a charge of discrimination and retaliation with the EEOC individually and on behalf of all others similarly situated.  Pursuant to the EEOC's worksharing agreement with the FCHR, her charge is considered dually filed with the FCHR.  By notice dated June 17, 2008, the EEOC dismissed Moss's case and issued a Notice of Right to Sue.  The Tolling Agreement tolled Moss's right to sue through April 5, 2010.  Her charge and Notice of Right to Sue from the EEOC are attached to this Complaint as Exhibit 2 and are incorporated by reference.

37.     On or about November 12, 2007, Goedtel filed a charge of discrimination and retaliation with the EEOC individually and on behalf of all others similarly situated. Pursuant to the EEOC's worksharing agreement with the New York State Division of Human Rights ("NYSDHR"), her charge is considered dually filed with the NYSDHR.  By notice dated May 21, 2008, the EEOC dismissed Goedtel's case and issued a Notice of Right to Sue.  The Tolling Agreement tolled Goedtel's right to sue through April 5, 2010.   Her charge and Notice of Right to Sue from the EEOC are attached to this Complaint as Exhibit 3 and are incorporated by reference.

38.     On or about June 17, 2010, Evans filed a charge of discrimination with the EEOC individually and on behalf of all others similarly situated.  Pursuant to the EEOC's worksharing agreement with the Missouri Commission on Human Rights ("MCHR"), her charge is considered dually filed with the MCHR.  By notice dated August 19, 2010, the EEOC dismissed Evans' case and issued a Notice of Right to Sue.  Evans also filed a supplemental charge of retaliation on or about October 15, 2010.  By notice dated September 27, 2011, the EEOC issued a Notice of Right to Sue for the supplemental charge of retaliation.     Her charge, supplemental charge, and Notices of Right to Sue from the EEOC are attached to this Complaint as Exhibit 4 and are incorporated by reference.

39.     On or about March 11, 2011, DeSalvatore filed a charge of discrimination with the EEOC individually and on behalf of all others similarly situated.  Pursuant to the EEOC's worksharing agreement with the New Jersey Division on Civil Rights ("NJ DCR"), her charge is considered dually filed with NJ DCR.  By notice dated September 16, 2011, the EEOC issued a Notice of Right to Sue.  Her charge and Notice of Right to Sue from the EEOC are attached to this Complaint as Exhibit 5 and is incorporated by reference.

40.     Plaintiffs have complied with the requirements for their EPA claims by filing their respective Consent to Sue forms, attached as Exhibit 6 to this Complaint.

41.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

42.     Female Financial Advisors employed by Defendants work under common and unvalidated company-wide policies and practices that are set up to disadvantage them.  As a consequence, female Financial Advisors have earned materially less money than their similarly-situated male counterparts in each year during the class-liability period.

**BofA's Acquisition of Merrill**

43.     By way of background, on January 1, 2009, BofA completed its acquisition of Merrill.  The combination brought together BofA's retail brokerage unit, Banc of America Investment Services, Inc. ("BAI"), which employed over 2,000 Financial Advisors, with Merrill's powerhouse brokerage operations, MLPF&S, which employed over 15,000 Financial Advisors.  Upon information and belief, after the merger with Merrill, BofA kept intact MLPF&S as a wholly owned subsidiary and swept its "legacy" Financial Advisors who had worked for BAI into MLPF&S.

44.     Defendants' common company-wide policies and practices relating to setting compensation and distributing client accounts, which discriminate against female Financial Advisors, have remained largely the same.

**Defendants' Compensation Policies and Practices Have Discriminatory Impact on Female Financial Advisors**

45.    Defendants' compensation policies and practices have applied to all Financial Advisors in all of Defendants' branches throughout the liability period.

46.    Defendants compensate their FAs through common express policies relating to commissions, upfront and backend payments to competitive lateral recruits, and other bonuses and awards.

47.    Female FAs have earned materially less than similarly-situated male FAs throughout every year of the class-liability period because Defendants' common and unvalidated company-wide compensation policies and practices have a discriminatory impact on female FAs.

48.    All FAs perform substantially the same duties of prospecting for new clients and managing client accounts.  Female FAs, however, earn significantly less in compensation than similarly-situated male FAs, for performing work requiring equal skill, effort, and responsibility.

*Commissions*

49.    Defendants pay their Financial Advisors commissions according to commission grids set out in the nationwide compensation plan.  The percentage payout schedule for the commission grid is based in large part on production credits associated with each FA.  A production credit is based on the value of commissions or fees associated with a particular transaction or service charge relating to a particular client account.

50.    The operation of the commission grids also depends in part on the FA's length of service in the industry ("LOS") based on registration information maintained by the Financial Industry Regulatory Authority ("FINRA").

51.     The commission grids are far from mechanical in their operation.

52.     LOS impacts FA compensation because the longer FAs are in the industry, the more they are expected to earn in production credits to maintain their income.  Management, however, adjusts LOS for various reasons and does so in favor of male FAs over female FAs. Defendants' determination of FAs' LOS is based on unreliable, unvalidated criteria.

53.     Production credits impact FA compensation because the higher an FA's production, the higher the FA's overall percentage payout from the grid.  Production credits can be generated by the accounts that the FA manages.  Management can also assign production credits to FAs of their own choosing from "house accounts" (accounts not managed by specific advisors) or from other FAs through a uniform, systematically documented, and unvalidated company-wide procedure that has an adverse impact on the compensation of female Financial Advisors.

54.     The accounts that Financial Advisors manage and that generate production credits are not simply "acquired" by FAs in a vacuum.  Defendants direct the distribution of accounts and business opportunities through uniform, systematically documented, and unvalidated company-wide procedures described below that favor male FAs over female FAs.

55.     Defendants further cause and compound the discriminatory effects of the commission grids by permitting deviations from the grid in favor of male FAs.  These deviations result from, among other things, adjustments to payments, forgiveness of excess compensation (compensation paid in anticipation of unrealized production), and negotiation with lateral recruits of guaranteed payout from the grid for a certain amount of time.  These common, systematically documented, permitted deviations from the compensation plan are unvalidated and have an adverse impact on the compensation of female FAs.

*Upfront and Backend Bonuses for Lateral Recruits*

56.     Defendants offer compensation packages to lateral recruits that include "upfront money" and "backend bonuses."  "Upfront money" refers to forgivable loans that Defendants extend to new FAs.  "Backend bonuses" are bonuses that new FAs may earn after joining the company if the FAs meet certain targets.

57.     Defendants offer these packages to lateral recruits using systematically documented and unvalidated criteria that have an adverse impact on the compensation of female FAs.

*Bonuses*

58.     Defendants pay bonuses to their FAs through a uniform, systematically documented, and unvalidated company-wide procedure using criteria that have an adverse impact on the compensation of female FAs.

**Defendants' Account Distribution Policies and Practices Have Discriminatory Impact on Female Financial Advisors**

59.     Defendants direct the distribution of accounts and business opportunities through a uniform, systematically documented, and unvalidated company-wide procedure that favors male Financial Advisors in the allocation and distribution of accounts, as well as in opportunities to gain new accounts.

60.     The accounts and business opportunities that Defendants distribute typically come from one of four sources:

> (a)     when individuals call ("call-ins") or walk ("walk-ins") into the office to open a new account;

> (b)     through "leads" and "referrals" (e.g., when Defendants tell a Financial Advisor of a potential account opportunity and the Financial Advisor makes contact with the potential account holder);

(c)     when a Financial Advisor departs from the firm (i.e., when a Financial Advisor retires, leaves the business, or moves to another firm); or

(d)     through company-permitted partnerships or teams, in which a Financial Advisor partners or teams with other FAs and splits the partnership's earned revenue according to a negotiated or predetermined ratio, or in which a Financial Advisor partnered with a BAI employee in another line of business, whereby the partner referred accounts to the FA.

61.     According to Defendants' uniform, systematically documented, and unvalidated company-wide account distribution policy, accounts are distributed through an FA ranking system that is based on a series of criteria including past revenue and quintile ranking.[1] Quintile ranking is the FA's ranking in that category compared to other FAs within the same LOS.

62.     The loopholes built into the system operate in a common and systematic way to allow Defendants to bypass the ostensible criteria, a further unvalidated practice that has an adverse impact on female FAs.

63.     The company-wide teaming or partnership policies also permit FAs to partner with each other and transfer accounts to each other without going through the account distribution policy.  This common practice is unvalidated and has an adverse impact on female FAs.

64.     Financial Advisors obtain many of their accounts through Defendants' account distribution policies and practices.  When a FA receives an account, the FA gains not only the value of the account and the production credits it generates, but also the opportunity to grow that client's account to increase the value and generate more revenue and the opportunity to gain new clients through that client's referrals.  These policies and practices therefore have a

---

[1] Pre-merger BAI also used unvalidated criteria to distribute accounts, but did not employ quintile ranking.

substantial impact on the number and quality of accounts a FA manages, and in turn, on the FA's compensation.

65.     Defendants' account distribution policies use common, systematically documented, and unvalidated criteria that have a discriminatory impact on the number of and type of accounts that female FAs receive from Defendants, and therefore, a discriminatory impact on compensation.

**Defendants Perpetuate the Discriminatory Impact of the Compensation and Account Distribution Policies and Practices By Using the Tainted Variable of Past Performance as Criteria for Compensation and Account Distribution**

66.     By using the tainted variable of past performance as a criterion for compensation and account distribution, Defendants further perpetuate the gender-based compensation disparities and create a cumulative advantage for male FAs based on systematically documented and unvalidated criteria that has an adverse impact on female FAs.

67.     The account distribution policy rewards FAs who have generated more revenue in the past by ranking them higher on the distribution list to receive accounts.   This means that when a male FA receives an account, the revenue generated by that account allows him to earn greater and more lucrative accounts in the future.  By disproportionately giving a greater number of accounts and more lucrative accounts to male FAs, Defendants use unvalidated criteria that advantage male FAs and enable them to secure additional accounts and other business opportunities under the account distribution policy.  These additional accounts and business opportunities, as well as house account production credits, directly and indirectly increase the male FAs' production and place male FAs in an even better position for the next round of account distributions based on systematically documented and unvalidated criteria.

68.     The commission grid provides higher percentage payouts for higher production credits in the previous year.  This means that FAs with more production credits not only earn more money in commissions and bonuses but also earn the right to receive a larger percentage of their yearly production based on the grid targets.

69.     Revenue and production credits of female FAs are, on average, lower than that of their similarly-situated male FAs due to the discriminatory operation of Defendants' account and business distribution policies and practices described above.  As a result, the unvalidated account distribution policy provides more business opportunities to men than to similarly-situated women.

70.     Similarly, the commission grids dictate that Defendants pay male FAs at a higher rate than similarly-situated female FAs for performing the same work, i.e., work at the same level of production.

71.     From even before the beginning of the liability period, pursuant to its longstanding discriminatory practices, Defendants distributed accounts, partnership opportunities, upfront money, and sales, administrative, and professional support on more favorable terms to male FAs than to similarly-situated female FAs—based on systematically documented and unvalidated policies and practices that had an adverse impact on the compensation of female FAs.

72.     Indeed, through a past class-action lawsuit and subsequent finding of gender discrimination concerning the distribution of client accounts in a related arbitration, Defendants have known that Merrill had a pattern and practice of discriminating against female FAs.  Nevertheless, they continued to use the results of that past discriminatory system as a variable for awarding further compensation and business opportunities.

73.     Using past performance as an unvalidated criterion for distributing business opportunities and setting compensation thus has the purpose and effect of discriminating against female FAs.  The disparity between the accounts allocated to male and female FAs grows wider and wider, and women cannot catch up.

**Defendants' Compensation and Account Distribution Systems Are Not Bona Fide Merit or Production Systems**

74.     Defendants' compensation system is not a bona fide merit or production system because, as described above, it is unvalidated and does not have predetermined criteria for measuring merit or productivity, it is not adequately communicated to employees, and it is not consistently and/or even-handedly applied.

75.     Defendants' account distribution system is not a bona fide merit or production system because, as described above, it is unvalidated and does not have predetermined criteria for measuring merit or productivity, it is not adequately communicated to employees, and it is not consistently and/or even-handedly applied.

76.     There is no bona fide merit or production system that accounts for the compensation disparities between male and female FAs.

**Defendants' Compensation and Account Distribution Systems Are Not Justified By Business Necessity and Alternative Practices Are Available**

77.     Defendants' compensation and account distribution systems are not justified by business necessity.  They cannot be justified by business necessity because they do not compensate FAs based on actual measures of performance.

78.     Defendants implemented complex compensation and account distribution systems that are not validated and that have a discriminatory effect on women.  Defendants could

have chosen alternative compensation and account distribution systems that measure and compensate FAs based on accurate performance measures.

**Defendants Intentionally Discriminate Against Women In Their Compensation and Account and Business Opportunities**

79.     BofA and Merrill have common histories of discriminating against female employees, including female FAs.  Over many years, both before and during the liability period in this case, Defendants' gender discrimination has caused female FAs to manage less valuable assets than similarly-situated men, produce less revenue than similarly-situated men, and, therefore, earn less than similarly-situated men.

80.     Defendants have known that their compensation and account distribution systems have favored male FAs throughout the class period through such vehicles as audit results, employee surveys, and employee complaints.  Nevertheless, Defendants have refused to change policies and practices that they know discriminate against women and instead re-ratify the policies every year.

81.     Defendants further compound the discriminatory effects of their uniform, unvalidated procedures through the award of corporate titles and provision of sales, administrative, and professional support.

(a)     According to its company-wide policies and practices, Defendants award corporate titles to FAs based on inconsistently applied criteria, including FAs' production.  Because Defendants' policies and practices favor male FAs and because the production of female FAs are, on average, lower than that of similarly-situated male FAs due to Defendants' gender discrimination, these policies and practices discriminate against female FAs by awarding disproportionately more or higher corporate titles to male FAs than to female FAs.  The disproportionately lower rate of corporate titles awarded to female FAs further disadvantages them because the use of corporate titles is helpful for external marketing to prospective clients and for other purposes.

(b)     Defendants offer female FAs less sales, administrative, and professional support, and fewer marketing dollars for business development, than they offer to male FAs.  These company-wide policies set up female FAs to underperform as compared to their male peers by depriving them of critical resources to perform their jobs.  Defendants' failure to provide female FAs with the same levels of support given to male FAs directly impacts their ability to generate revenue, and therefore results in diminished compensation for female FAs as compared to their male counterparts.

82.     Defendants also do not have an adequate policy against discrimination. This is evidenced by the cavalier way that Defendants have treated complaints of sex discrimination or harassment from their female FAs, including their failure to institute adequate policies and guidelines for the investigation of complaints.  Defendants respond with indifference to complaints from female FAs about the various ways in which they have been subjected to inferior terms and conditions of employment as compared to their male counterparts.

83.     Defendants have also retaliated against female FAs who have complained of gender discrimination.  After female FAs have complained about Defendants' unfair allocation of business opportunities and compensation, Defendants have retaliated against them in various ways, including, but not limited to:  denying them necessary resources and support to perform their jobs, subjecting them to harsher discipline, constructively discharging them, placing negative and misleading language on their U-5 forms, and even bringing legal proceedings against them.

84.     Both BofA and Merrill have treated women unfairly.  Prior to its acquisition by BofA, Merrill maintained company-wide policies and practices that discriminated against female FAs with respect to business opportunities, compensation, professional support, and other terms and conditions of employment that had the same purpose and effect as those found at BofA.  The discriminatory policies and practices that plagued BofA and Merrill before the merger continue to persist at the company today.

85.     Accordingly, this class and collective action is brought by Calibuso, Moss, Goedtel, Evans, and DeSalvatore on behalf of themselves individually and all similarly-situated female FAs in the United States.  This action seeks to end Defendants' discriminatory policies and/or practices and retaliation, and to make the Plaintiff Class whole by requesting the following remedies: injunctive relief to remedy systemic sex discrimination; an award of back pay and front pay; compensatory and punitive damages; and attorneys' fees.

## COLLECTIVE ACTION ALLEGATIONS

86.     Plaintiffs bring the First Claim for Relief for violation of the Equal Pay Act ("Federal EPA") as a collective action pursuant to 29 U.S.C. § 206 *et seq*., on behalf of all Federal EPA Collective Plaintiffs ("Federal EPA Class").

87.     Plaintiffs and the Federal EPA Class are similarly situated in that they have substantially similar job requirements and pay provisions, and are subject to Defendants' common practice, policy, or plan of failing to pay Federal EPA Collective Plaintiffs equal pay for work requiring equal skill, effort, and responsibility, in violation of the Equal Pay Act.

88.     The First Claim for Relief for violation of the Equal Pay Act may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), since the claims of the Plaintiffs are similar to the claims of the Federal EPA Collective Plaintiffs.

## CLASS ACTION ALLEGATIONS

89.     Plaintiffs bring the Third and Fourth Claims for Relief pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (c)(4) seeking liability-phase injunctive and declaratory relief on behalf of a Class of all female Financial Advisors employed by BofA and its predecessors in the United States at any time from March 16, 2006, through the resolution of this action, and all female Financial Advisors employed by Merrill and its predecessors in the United

States at any time from March 7, 2008, through the resolution of this action, pursuant to Title VII

("Title VII Class").   Plaintiffs also bring this Class Action pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3) seeking monetary damages and other make-whole relief on behalf of

the Title VII Class.

        90.     Plaintiffs bring the Second, Fifth, Sixth, Seventh, Eighth, and Ninth

Claims for Relief pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (c)(4) seeking

liability-phase injunctive and declaratory relief on behalf of:

        (a)     a Subclass of all female Financial Advisors employed by BofA and its predecessors in New York at any time from November 10, 2004, through the resolution of this action for claims under the New York Equal Pay Act (the "NY EPA Subclass");

        (b)     a Subclass of all female Financial Advisors employed by BofA and its predecessors in New York at any time from November 10, 2004, through the resolution of this action for claims under the NYSHRL (the "New York Subclass");

        (c)     a Subclass of all Female Financial Advisors employed by BofA and its predecessors in Florida at any time from January 10, 2006, through the resolution of this action for claims under the FCRA ("Florida Subclass");

        (d)     a Subclass of all Female Financial Advisors employed by post-merger BofA and Merrill and its predecessors in Missouri at any time from January 1, 2007, through the resolution of this action for claims under the MHRA (together, the "Missouri Subclass"); and

        (e)     a Subclass of all Female Financial Advisors employed by post-merger BofA and Merrill and its predecessors in New Jersey at any time from January 1, 2007, through the resolution of this action for claims under the NJ LAD (together, the "New Jersey Subclass").

        91.     Plaintiffs also bring this Class Action pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3) seeking monetary damages and other make-whole relief on behalf of

the NY EPA Subclass, the New York Subclass, the Florida Subclass, the Missouri Subclass, and

the New Jersey Subclass.  Plaintiffs reserve the right to amend the definitions of the Class and

Subclasses based on discovery or legal developments.

92.     Plaintiffs are members of the Class and Subclasses they seek to represent.

Plaintiff Goedtel is a member of the NY EPA Subclass and the New York Subclass, Plaintiff

Calibuso is a member of the Florida Subclass, Plaintiff Moss is a member of the Florida

Subclass, Plaintiff Evans is a member of the Missouri Subclass, and Plaintiff DeSalvatore is a

member of the New Jersey Subclass.

93.     The members of the Class identified herein are so numerous that joinder of

all members is impracticable.  As of the filing of this Complaint, Defendants have approximately

15,000 Financial Advisors.  Although the precise number of female Financial Advisors is

currently unknown, it is far greater than can be feasibly addressed through joinder.

94.     There are questions of law and fact common to the Class, and these

questions predominate over any questions affecting only individual members.  Common

questions include, among others:

    (a)    whether Defendants' policies or practices discriminate against
female FAs;

    (b)    whether Defendants' policies and practices violate Title VII, the
Federal EPA, the NY EPA, the NYSHRL, the FCRA, the MHRA,
and/or the NJ LAD;

    (c)    whether Defendants' compensation system has a disparate impact
on female FAs;

    (d)    whether Defendants' compensation system is not justified by
business necessity;

    (e)    whether Defendants could have chosen an alternative
compensation system that measures and compensates FAs based
on accurate performance measures;

    (f)    whether Defendants' account distribution system has a disparate
impact on female FAs;

(g)    whether Defendants' account distribution system is not justified by business necessity;

(h)    whether Defendants could have chosen an alternative account distribution system that measures FAs based on accurate performance measures;

(i)    whether equitable remedies, injunctive relief, compensatory damages, and punitive damages for the Class are warranted; and

(j)    whether Defendants have failed to implement policies and procedures to prevent retaliation against employees who challenge perceived bias in the workplace and failed to address complaints and conduct proper investigations.

95.    The Representative Plaintiffs' claims are typical of the claims of the Class.

96.    The Representative Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

97.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole.  The Class members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and discriminatory policies and practices.

98.    Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The Class members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, unfair, and discriminatory policies and practices.  Defendants have computerized account data,

payroll data, and personnel data that will make calculation of damages for specific Class members relatively simple.  The propriety and amount of punitive damages are based on Defendants' conduct, making these issues common to the Class.

99.    Alternatively, class certification with respect to particular issues is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4).

## CLAIMS OF REPRESENTATIVE PLAINTIFFS

### Judy Calibuso

100.    In June 1995, Plaintiff Judy Calibuso began working as an FA for Barnett Bank, which was acquired by BofA's predecessor firm in or around January 1998.  Since January 1998, Calibuso has been employed by BofA as an FA and currently works in the Brickell Avenue office of Merrill in Miami, Florida.

101.    During the course of her employment, Defendants have denied Calibuso compensation, extra bonuses, business opportunities, corporate titles, and other conditions of employment made available to similarly-situated male FAs.

102.    During the course of her employment, Defendants have not provided Calibuso equal pay to the pay of males for work requiring equal skill, effort, and responsibility, and which has been performed under similar working conditions.

103.    BofA, and later Merrill as well, routinely distributed business opportunities, including accounts from departing and retiring brokers, referrals, leads, and potential clients, and more advantageous partnerships with different departments within the firm, to male FAs rather than to Calibuso or other female FAs.  As a result of the inequitable and discriminatory distribution of accounts and account prospects, Calibuso and female FAs

generally have less income potential and less actual income than similarly-situated male employees.

104.    In September 2006, Calibuso met with her then-manager and asked for fee-based accounts because BofA had not given her any earlier that year when several FAs within her office departed BofA.  Her manager told her that he did not have any fee-based accounts to give her, but that even if he did, he would give them all to a specific male FA. Several weeks later, Calibuso learned that her manager had distributed fee-based accounts from the departed FAs to three male FAs.

105.    By denying compensation or the opportunity for compensation to Calibuso that they made available to similarly-situated male FAs, Defendants denied her the opportunity to form partnerships, to earn discretionary bonuses and stock options, and to earn corporate titles, which are awarded based on a Financial Adviser's level of compensation.  Moreover, Calibuso would have earned a higher grid payout if she had received these accounts.

106.    In February 2007, Calibuso notified her then- manager that she had filed a discrimination charge with the EEOC.

107.    Following the filing of her charge, Defendants engaged in a constant campaign of retaliation.

108.    Upon information and belief, in or around March 2007, BofA designated several FAs to form partnerships with BofA's lucrative private banking business in order to help both FAs and Private Bank Relationship Managers grow their respective businesses, thereby increasing each partnered FA's total compensation and production.  BofA designated several male FAs who were no more qualified, or who were less qualified, than Calibuso to form these partnerships, but did not designate Calibuso.

109.     Calibuso's manager also excluded Calibuso from meetings involving her own accounts.  In October 2007, her then-manager did not invite her to a lunch that the manager organized for one of BofA's Commercial Banking relationship managers and several FAs from their office to promote cross referrals for investments.  The manager invited other FAs who serviced accounts covered by the relationship manager, yet did not invite Calibuso, even though Calibuso and the relationship manager shared a major client.

110.     On several different occasions, BofA retaliated against Calibuso by requiring her to get approvals before performing routine activities that it did not require male FAs to get and that it had not required Calibuso to get before she filed her discrimination charge.

111.     In April 2007, in order to develop potential sources of referrals, Calibuso planned a luncheon with several select relationship managers from different lines of business and advisors from Private Bank and Commercial Banking to meet with a BofA insurance specialist. When Calibuso's manager learned about the luncheon the night before, she told Calibuso to cancel it because she had not requested pre-approval.  The luncheon, scheduled for 12:30 the next day, did not happen.

112.     In contrast, on the same day as Calibuso's scheduled luncheon, two male FAs organized two separate group luncheons with wholesalers without pre-approval and were permitted to proceed with their luncheons as planned.

113.     In October 2007, her then-manager issued Calibuso an undeserved reprimand letter, her first in her 12-year tenure with the company.  Her manager claimed that Calibuso had not followed the proper procedure for a client referral to BofA's Private Bank. When Calibuso asked her manager to approve a shared revenue partnership with the Private Bank client manager, her manager did not approve it.  Instead, BofA took away these high value

accounts from Calibuso and gave them to a male FA.  Calibuso's manager also required Calibuso to attend a "coaching session" with management.

114.    In or around March 2008, Calibuso received a referral from Commercial Banking to a high net worth client.  Calibuso successfully serviced the account and brought in two of the client's partners as new clients.  After Calibuso had serviced these new accounts for several months, BofA stripped these accounts from her and gave them to a male FA because Calibuso had not been designated to work with Private Bank clients.

115.    In or around November 2008, Calibuso requested reimbursement for continuing education classes for her Certified Financial Planner designation.  BofA denied her request for reimbursement, although it approved reimbursements as well as additional travel expenses to male FAs taking similar courses.

116.    On June 28, 2010, Calibuso completed a trade reconciliation for her assistant when her assistant could not come to work.  Her manager had told her it could wait until the assistant returned, but Calibuso believed it to be in the best interest of her manager and her assistant to do so before then.  When her manager learned that Calibuso had completed the reconciliation, she informed her and her assistant that they would be reprimanded because Calibuso had used her assistant's credentials in order to post the trade.  When Defendants learned that several other employees had used their co-worker's credentials without being reprimanded, however, they decided instead to issue Calibuso a "first and final written warning" for allegedly failing to follow management instructions.  The discipline was unwarranted and disproportionate as Calibuso had not manifested a disregard for her manager's directive.

117.    On or about January 10, 2007, Calibuso filed a charge of discrimination with the FCHR and the EEOC.  On or about March 4, 2008, Calibuso filed a supplemental

charge of retaliation.  On June 17, 2008, she received a Notice of Right to Sue from the EEOC.

On or about November 19, 2010, Calibuso filed an additional supplemental charge of retaliation.

On October 3, 2011, she received a Notice of Right to Sue for her additional supplemental

charge of retaliation from the EEOC.  The Tolling Agreement tolled Calibuso's right to sue

through April 5, 2010.

**Julie Moss**

118.    Plaintiff Julie Moss was hired by BofA on March 15, 2003, as an Assistant

Vice President/Financial Advisor.

119.    BofA denied Moss compensation, extra bonuses, business opportunities,

corporate titles, and other conditions of employment that it made available to similarly-situated

male employees.

120.    During the course of her employment, BofA did not provide Moss equal

pay to the pay of males for work requiring equal skill, effort, and responsibility, and which was

performed under similar working conditions.

121.    BofA routinely distributed business opportunities, including accounts

from departing brokers, referrals, leads, and potential clients to male FAs rather than to Moss or

other female FAs.  For instance, when another female FA left (as a result of harassment and

discrimination by her supervisor, a male), BofA allowed a male broker to choose the accounts he

wanted from her book of business.  When a different female broker transferred back to the bank

side of the business, she made a spreadsheet of her clients and who she thought would be the best

FA for each one.  The Market Director, a male, disregarded her recommendations and gave

almost all the fee-based clients and the annuity clients with large commission trails to one male

FA.

122.    In March 2006, the Market Director hired a male FA who, on information and belief, had been a very small producer at a prior brokerage firm.  When the new male FA arrived, the Market Director forced Moss to move out of her primary downtown office and buy her own furniture to move into a smaller office at another location.  At the time, she held first place with the highest revenue in the Tallahassee market.  When Moss left BofA in October 2006, she was still number one in the Tallahassee market.

123.    On June 13, 2006, Moss contacted BofA's human resources department ("HR") and filed a claim of gender discrimination and hostile work environment.  She told HR that she feared for her job, that the Market Director was intentionally harassing her and interfering with her production, and that the resulting stress was making her physically ill.  HR arranged a meeting for July 11, 2006 in Jacksonville, but HR did not attend this meeting – instead Moss found herself meeting with her boss, the Market Director, and his boss, a Senior Vice President.  On information and belief, this ambush meeting was in retaliation for her complaint of discrimination.

124.    Subsequent to the meeting on July 11, Moss suffered other instances of discrimination and retaliation, including:

(a)    The Market Director questioned Moss's trades and required her to call him for pre-approval for trades.  Moss had seven years experience in the brokerage business at that point, with no customer complaints, no questionable trades, and a clean U-4.  On information and belief, BofA did not require other similarly-situated male FAs to obtain preapproval for trades.

(b)    The Market Director did not require male FAs to repay BofA for the balance of upfront money advanced to them at the start of their employment as he required of Moss.  Upon information and belief, the Market Director did not seek repayment from two male FAs for over $100,000 each – more than twice what Moss owed.  In contrast, BofA initiated arbitration proceedings against Moss for the money she was advanced.

(c)    Moss was told she would have to call the Market Director for preapproval to expense office lunches.  On information and belief, no male FAs had to call for preapproval to expense office lunches.

(d)    On Moss's last day of employment with BofA, Moss received a "letter of education" from the Market Director reprimanding her for failing to get manager pre-approval for an advertisement she had placed in a local paper.  He copied several senior managers at BofA.  Contrary to the Market Director's assertion, Moss had followed all BofA procedures for placing the advertisement.

125.    BofA required Financial Advisors opening accounts for clients who had more than a certain net worth to go through the firm's Private Bank.  Male FAs were told to circumvent this rule by falsifying documents to open accounts without going through the Private Bank, and did not suffer negative consequences for falsifying the documents and violating BofA's official policy.  In contrast, Moss completed such documents truthfully and did not try to circumvent the Private Bank; nonetheless, the Market Director investigated her, yelled at her, and threatened to take away the production that she generated from one particular high-value account.

126.    Through this misconduct, BofA constructively discharged Moss, forcing her to resign effective October 27, 2006.

127.    BofA would not permit Moss to repay her upfront loan without obtaining a release of her discrimination claims.  After she refused to release her discrimination claims and informed BofA of the possibility that she would file an EEOC charge, BofA continued to retaliate against Moss by commencing a claim against her in arbitration.

128.    On or about April 5, 2007, Moss filed a charge of discrimination and retaliation with the FCHR and the EEOC.

129.    On June 17, 2008, Moss received a Notice of Right to Sue from the EEOC.  The Tolling Agreement tolled Moss's right to sue through April 5, 2010.

**Dianne Goedtel**

130.     Plaintiff Dianne Goedtel worked as a Financial Advisor in the Melville, Long Island, New York office of BofA from February 3, 2006 to September 20, 2007.

131.     During the course of her employment, BofA denied Goedtel business opportunities, compensation, corporate titles, and other conditions of employment that it made available to similarly-situated male FAs, disciplined her more harshly than similarly-situated males for similar infractions, and retaliated against her when she complained about gender discrimination.

132.     During the course of her employment, BofA did not provide Goedtel equal pay to the pay of males for work requiring equal skill, effort, and responsibility, and which was performed under similar working conditions.

133.     From the start of her employment, BofA discriminated against Goedtel on the basis of her gender by denying her start-up support and business opportunities that it provided to similarly-situated men, which directly impacted her compensation.  For example, BofA denied Goedtel upfront money when she first began working for BofA that it offered to similarly-situated males when they began working.

134.     On multiple occasions in or around the summer of 2007, BofA distributed accounts of departing FAs to similarly-situated male FAs that it did not offer to Goedtel.  Her manager distributed fewer assets to Goedtel than to male FAs and distributed to her almost no fee-based accounts, which are among the most lucrative.  Ms. Goedtel's production had been in the top five of her office, but as a result of these discriminatory distributions, she dropped out of the top five.

135.     BofA also engaged in gender discrimination and/or retaliation against Goedtel in other ways, including applying compliance standards more rigidly to Goedtel than to similarly-situated males.  For example, BofA compliance officers attempted to write her up on the grounds that she regularly submitted required paperwork later than her male colleagues.  A comparative review, done at Goedtel's request, showed that this accusation was false.  When Goedtel complained about the discriminatory account distributions, her manager was hostile and took no steps to remedy her complaints.  In retaliation, a few weeks later her manager told her to resign after a minor compliance violation and placed excessive and misleading language on her form U-5, which all prospective employers in the financial industry obtain from FINRA.

136.     As a result of this discrimination and retaliation, BofA constructively discharged Goedtel from her employment with BofA on September 20, 2007.  The constructive discharge caused Goedtel to lose income, including her earned commissions for her last month of employment.  Goedtel also lost clients and had to start over to build her business.

137.     BofA discriminated against Goedtel on the basis of her gender by denying her upfront money and business opportunities that directly impacted her compensation, subjecting her to excessive discipline and inferior terms and conditions of employment, constructively discharging her, and retaliating against her for her complaints of gender discrimination.

138.     On or about November 12, 2007, Goedtel filed a charge of discrimination and retaliation with the NYSDHR and the EEOC.  On May 27, 2008, Goedtel received a Notice of Right to Sue from the EEOC.  The Tolling Agreement tolled Goedtel's right to sue through April 5, 2010.

**Jean Evans**

139.    Plaintiff Jean Evans worked for Merrill as an FA from about December 17, 2007 to November 5, 2010 in Merrill's Chesterfield, Missouri office.

140.    During the course of her employment, Merrill denied Evans compensation, extra bonuses, corporate titles, business opportunities, and other conditions of employment made available to similarly-situated male FAs, subjected her to sexual harassment, retaliated against her for making complaints of gender discrimination, and constructively discharged her.

141.    During the course of her employment, Merrill did not provide Evans equal pay to the pay of males for work requiring equal skill, effort, and responsibility, and which was performed under similar working conditions.

142.    Merrill routinely distributed business opportunities -- including accounts from departing and retiring brokers, and partnership opportunities -- to male FAs rather than to Evans or other female FAs.  As a result of the inequitable and discriminatory distribution of accounts and partnerships, Evans and other female FAs had diminished income potential and diminished actual income as compared to similarly-situated male Financial Advisors.

143.    For example, when brokers departed the firm in January, March, and July 2009, Evans did not receive any high-value accounts.  Moreover, she was only assigned one small account from the book of business of the departing broker who left in July 2009.  Her immediate supervisor, the Resident Director for her office, took that account away from her without any explanation.  In addition, a broker retired from the firm in Summer 2009 and another broker passed away in March 2010.  Merrill did not assign Evans any accounts from those brokers' books of business.

144.    Similarly, Merrill denied Evans the opportunity to be part of a team or partnership.  In or around March 2010, Evans requested to be put on a team or partnership by submitting a written request in person to the Managing Director/Complex Manager, Sales Manager, and Director.  They did not grant her request.  In or around April 2010, a senior broker approached Evans about forming a partnership, but Evans' Resident Director would not approve the partnership.  On or about April 29, 2010, Evans orally asked her Resident Director to put her on a team or partnership.  The Resident Director declined her request.  On or about June 8, 2010, Evans met with the Managing Director/Complex Manager and Director again and repeated her request to be put on a team or partnership.  Again, they denied her request.

145.    On information and belief, Evans' Resident Director repeatedly encouraged a senior FA to form a partnership.  When the senior FA told the Resident Director in the Summer of 2010 that she wanted to partner with Evans, the Resident Director asked the senior FA why she would want to partner with Evans, and instead suggested that the senior FA partner with two male FAs who were more junior than Evans.  Despite the senior FA's eagerness to partner with Evans, Evans' Resident Director did not sign off on the partnership between Evans and the senior FA.

146.    Repeatedly after April 2010, a senior broker offered to assign some accounts to Evans so that she could meet the $10 million annuitized assets and $15 million total assets thresholds required for her Paths of Achievement ("POA") graduation, which would entitle her to a $20,000 bonus.  Her Resident Director did not allow the senior broker to do this for her.  The Resident Director told Evans that the Resident Director could not sign off on the senior broker giving Evans any accounts because it was "unethical."  However, on information and belief, both the Managing Director/Complex Manager and the Resident Director had

allowed, and had even asked, senior brokers to assign accounts to junior male brokers so they could graduate from the POA training program. In or around July 2010, Evans learned that a junior male broker graduated from the POA program early because a senior broker transferred assets to him.

147.    Evans was also subjected to a hostile work environment and quid pro quo sexual harassment. During the course of her employment, Evans was subjected to unwelcome sexual advances and other physical and verbal conduct of a sexual nature. The harassment that she suffered was severe or pervasive enough to affect the terms and/or conditions of her employment. The conduct was severe in that it involved physical touching. Alternatively, the conduct was pervasive in that it occurred daily. In addition, her refusal to submit to the sexual advances, as described more fully below, resulted in the tangible adverse action of not being assigned or transferred accounts.

148.    When Evans went into production in or around March 2008, Merrill assigned a male Financial Advisor to serve as her mentor. Her mentor's role was to help her build her book of business by, among other things, assigning her leads or prospects he had and transferring accounts to her. He also provided feedback on her performance to her Resident Director and Sales Manager/POA Coach. Despite his intended role of helping her build her book of business, Evans' mentor repeatedly made inappropriate comments to her, sent her inappropriate emails, told inappropriate jokes, and made sexual advances toward her. For example, on several occasions, Evans asked her mentor what she should do to prepare for an appointment with a client. He responded by telling her that she should wear short skirts, wear a push-up bra, and unbutton one more button on her blouse and lean over, among other things. When Evans' client was a female, her mentor asked Evans if the client was "hot" and if he could

come to the appointment with her so they could "have a three-way."  In addition, Evans' mentor

told crude jokes to her and to others in her presence.  Evans asked him to stop doing so, but he

continued nonetheless.  Evans' mentor sometimes asked her if she wanted accounts.  When she

responded that she did, he leaned over, looked down her blouse, and asked "What are you going

to give me?" and said "Quid pro quo."  Evans' mentor also sent her emails attaching ads for bras.

Evans later learned from a co-worker that her management had been aware of her mentor's

sexually inappropriate behavior, yet Merrill failed to do anything about it and assigned him to be

her mentor nonetheless.

149.    Evans was also sexually harassed by her male Sales Manager/POA Coach,

who Merrill had designated as her go-to person.  On or about December 19, 2009, when Evans

arrived for the firm's holiday party, her Sales Manager/POA Coach hugged her and leaned in to

kiss her.  When Evans turned away, he grabbed her face and kissed her on the mouth.  The

following Monday, December 21, 2009, Evans' mentor called her into his office and

reprimanded her for rejecting the Sales Manager's sexual advances.  Her mentor told her that she

was not very nice to the Sales Manager, that he had a fragile ego, that she was rejecting him, and

threatened that if she was not nicer to him, it could negatively affect her career.  Her mentor then

told her that she had to apologize to her Sales Manager/POA Coach.  Evans told her mentor that

she was not going to apologize for refusing his sexual advances.  Evans' relationships with her

mentor and Sales Manager/POA Coach took a dramatic turn for the worse after that, and neither

helped her with her business.  Her Sales Manager/POA Coach lied to her Resident Director about

her work performance, and neither her mentor nor her Sales Manager/POA Coach assigned

accounts or leads to her.  This resulted in Evans having lower production (and therefore

compensation) than similarly-situated male FAs, which in turn deprived her of the opportunity to

earn bonuses, graduate from the POA program early, be awarded corporate titles, and receive
higher payouts. Her Sales Manager/POA Coach, on the other hand, was promoted to Resident
Director of another office despite sexually harassing her.

150. On or about April 30, 2010, Evans called Merrill's Advice and Counsel to
make a formal complaint. Evans told the Advice and Counsel representative who returned her
call that her Sales Manager/POA Coach had kissed her and that her mentor regularly made
inappropriate comments to her. Although the Advice and Counsel representative said that she
would investigate Evans' complaint, the representative told Evans that her Sales Manager/POA
Coach was her go-to person and that she still needed to go to him for information and help. The
Advice and Counsel representative also told her that they were investigating her complaints but
if they could not corroborate her story with witnesses, there was nothing they could do. On
information and belief, the Advice and Counsel representative did not interview the witnesses
that Evans identified. When Evans asked for a different mentor and/or POA Coach, the Advice
and Counsel representative rejected her request.

151. Following the filing of her formal complaint to Merrill, Defendants
engaged in a constant campaign of retaliation. The Advice and Counsel representative who was
supposed to be investigating Evans' complaints of gender discrimination and sexual harassment
interrogated Evans about her sexual activity, informed Evans that Defendants were investigating
*her*, and questioned her about her work performance. When the representative asked Evans
about her legal claims, Evans advised her that she would need to answer those questions through
her attorneys, but the representative insisted that Evans answer the questions without consulting
with her attorneys.

152.     More specifically, on or about June 9, 2010, the Advice and Counsel

representative asked Evans for any inappropriate emails that her mentor had sent her.  The

Advice and Counsel representative then called Evans to ask Evans to explain what Evans found

offensive about the emails.  Evans explained that whenever her mentor saw her talking to other

male brokers or to male clients or prospects, he would ask her in front of them, "Are you guys

f*cking?" or "Are you doing him?"  Without basis, the Advice and Counsel representative

responded by interrogating Evans about her sexual activity and whether or not she was flirting

with co-workers.

153.     In addition, following the filing of her complaint to Merrill, Defendants

put obstacles in Evans' way, which prevented her from continuing to grow her business.  For

example, Evans and the senior FA with whom she wanted to partner both requested a joint

production number in July 2010.  On information and belief, the approval process should only

take 24 hours, but Evans' Resident Director refused to approve the request submitted by Evans

and the senior FA.  When Evans last checked on the status of the request, it had still not been

approved, even though at least three months had passed since Evans and the senior FA submitted

their requests.  Also in July 2010, Evans paid a vendor out of her own pocket to send an email

newsletter to her clients as a marketing tool.  This service required Evans' Resident Director's

approval.  Despite Evans' request that her Resident Director approve this in July, her Resident

Director did not approve it until two months later.

154.     Through this misconduct, BofA constructively discharged Evans, forcing

her to resign effective November 5, 2010.

155.     On or about June 17, 2010, Evans filed a charge of discrimination with the

MCHR and the EEOC.  On August 19, 2010, she received a Notice of Right to Sue for her

charge of discrimination from the EEOC. On or about October 15, 2010, Evans filed a

supplemental charge of retaliation. On September 30, 2011, she received a Notice of Right to

Sue for her supplemental charge of retaliation from the EEOC. Evans' class claims are

encompassed by the class charges filed by Calibuso, Moss, and Goedtel.

**Mary DeSalvatore**

156. Plaintiff Mary DeSalvatore currently works as an FA in Merrill's office in

Red Bank, New Jersey. She joined the Paths of Achievement ("POA") program as a Financial

Advisor in late 2006, and graduated from the program in August 2008.

157. During the course of her employment, Merrill has denied DeSalvatore

compensation, extra bonuses, business opportunities, and other conditions of employment made

available to similarly-situated male FAs.

158. During the course of her employment, Merrill has not provided

DeSalvatore equal pay to the pay of males for work requiring equal skill, effort, and

responsibility, and which has been performed under similar working conditions.

159. Merrill has routinely distributed business opportunities -- including

accounts from departing and retiring brokers, and more advantageous partnerships with other

brokers -- to male Financial Advisors rather than to DeSalvatore or other female FAs. As a

result of the inequitable and discriminatory distribution of accounts and partnerships,

DeSalvatore and other female FAs have diminished income potential and diminished actual

income as compared to similarly-situated male employees.

160. For instance, DeSalvatore has repeatedly asked her managers to partner

her with senior FAs, as a means to grow her book of business and increase her compensation

potential. However, her male managers have discouraged such partnerships and have failed to

encourage senior FAs to team with her, although they have done so for male FAs.  For example, a senior male FA recently invited a junior male FA in the POA program to partner with him and transferred many accounts to him.  Although DeSalvatore had sought to partner with that same senior male FA in 2008, after she graduated from the POA program, she was told that she could join his team only if she became a Client Associate.  At that point, DeSalvatore was already a full-fledged FA, and becoming a Client Associate would have been a demotion and lowered her earnings potential.  She therefore declined.

161.    DeSalvatore is the top producer in her office, and among the top in the country, within the group of FAs with LOS of less than three years.  In October 2010, however, DeSalvatore was bumped down from being first in line within that group in her office to receive an account distribution, according to Defendants' official account redistribution policy, because of account distributions to two junior male FAs that circumvented the account redistribution policy.  These two junior male FAs were allowed to join partnerships (otherwise known as "teams") with more senior FAs.  Although the junior male FAs had lower production numbers than DeSalvatore, they received dozens of account transfers through the partnerships, consisting of millions of dollars in assets.  Because of the account transfers, these two junior male FAs had priority over DeSalvatore in the account distribution system for a quarter.

162.    DeSalvatore also has witnessed other examples of account transfers to male FAs outside the "official" account distribution process.  On multiple occasions, senior male FAs have given accounts to junior male FAs or male FAs in the POA program, but not to junior female FAs like DeSalvatore or female FAs in the POA program.

163.    Management also often transfers accounts to male FAs under the "exceptions" to the account distribution process.  These "exceptions" swallow the official policy

because they are abused and not limited in the way they are used.  The account distributions that DeSalvatore has received generally have been characterized as "per ranking," which means they purportedly have been distributed according to her ranking, but account transfers to the male FAs in her office are often made because of "Client FA Request" or "FA Expertise/Niche" -- exceptions to the account distribution ranking.  This has been true even when DeSalvatore knows or has good reason to believe that there has been no client request or when the FA is more junior than DeSalvatore and does not have an expertise different from DeSalvatore's.

164.    Management also uses partnerships as a way to further benefit male FAs. On several occasions, management encouraged struggling FAs to partner with particular senior male FAs.  The senior male FAs received all of the struggling FAs' accounts under the partnership rules when the struggling FAs left the firm.  This allowed managers to transfer accounts to male FAs outside of the account distribution policy.  DeSalvatore has never received accounts this way.

165.    Other business opportunities also are distributed unfairly to the benefit of male FAs over female FAs.  For example, when DeSalvatore inquired in the Fall of 2010 about initial public offering ("IPO") opportunities, she was told that they had been previously distributed to only three male FAs.   Even after her inquiry, she initially received only a small share even though DeSalvatore has a larger client than other male FAs who received larger shares of the IPOs.

166.    DeSalvatore has rarely received any call-ins or walk-ins during the time that she has worked for Merrill.  However, one junior male FA regularly receives call-ins and walk-ins.  This junior male FA is friendly with many of the senior male FAs and managers in the

office, and he is often invited to go on golf outings with them.  DeSalvatore has rarely been invited to join them on such outings.

168.    Management has made modifications to a male FA's LOS to benefit the male FA within DeSalvatore's branch.  When a male FA who has been with Merrill for over 20 years was struggling to meet his minimum production requirements, management promoted him to a non-producing role for a limited amount of time and re-set his LOS to zero when he returned to a producing role.  Re-setting the LOS in this way qualified the male FA for higher grid payouts for the same level of production he would have been able to receive if his LOS accurately reflected his over 20 years of experience.  DeSalvatore has never witnessed management make such an adjustment for a female FA returning to the producing side of the business.

168.    There is also no transparency as to who is chosen for leadership positions. For example, a male FA who is more junior to DeSalvatore and who has lower production than DeSalvatore was recently chosen to be a POA Coach, which helps his production and gives him extra compensation.  DeSalavatore has never been chosen to be a POA coach.

169.    DeSalvatore also has been discriminated against on the basis of her sex with respect to office assignments.  Office assignments are supposed to be made according to production levels.  However, DeSalvatore was not given an office until February 2010, despite requesting one from management.  Other male FAs with lower production numbers than hers were given offices much earlier.  Not having an office forced DeSalvatore to work from home more often than she wanted because of the constant unprofessional language and comments used in the area where she was sitting.  Recently, management asked her to move to a smaller office,

although male FAs with lower production than DeSalvatore's have larger offices and were not asked to move offices.

170. DeSalvatore has had only sporadic sales assistant coverage as an FA despite repeated requests to management for more consistent coverage. The inadequate assistance has made it difficult for her to service her clients, as she often did not have a sales assistant to take her calls while she was at client meetings and her manager at the time forbid her from giving her cell phone number to clients. By comparison, more junior male FAs with lower production numbers were receiving consistent coverage during the same time period and were allowed to use their cell phones for client calls. To this date, DeSalvatore still receives inferior sales assistant coverage relative to similarly-situated male FAs, and receives inferior coverage even relative to male FAs with lower production numbers than her.

171. Merrill has discriminated against DeSalvatore on the basis of her gender by denying her business opportunities that directly impact her compensation and by subjecting her to inferior terms and conditions of employment. DeSalvatore has been a top performer despite this discrimination, but she could have excelled further if Merrill had given her the same opportunities that it gives to male FAs. In fact, instead of encouraging her development as it does with other male FAs, management has been attempting to reach out to DeSalvatore's largest client without her and threatening to limit her business in a way it never does with male FAs.

172. On or about March 11, 2011, DeSalvatore filed a charge of discrimination with the NJDCR and EEOC. On September 19, 2011, she received a Notice of Right to Sue for her charge of discrimination from the EEOC.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Sex Discrimination in Wages**
**(Equal Pay Act, 29 U.S.C. § 206, *et seq*.)**
**(On Behalf of All Plaintiffs and the Federal EPA Class)**

173.    Plaintiffs incorporate the preceding paragraphs as alleged above.

174.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Federal EPA Class.

175.    At all relevant times, each Defendant has been, and continues to be, an "employer" within the meaning of 29 U.S.C. § 203.  At all relevant times, Defendants have employed, and continue to employ, "employee[s]," including Plaintiffs and each of the Federal EPA Collective Plaintiffs, within the meaning of 29 U.S.C. § 203.

176.    Attached hereto as Exhibit 6 are the Consent to Sue forms signed by Plaintiffs in this action pursuant to 29 U.S.C. §§ 216(b) and 256.  It is likely that other similarly-situated individuals will sign consent forms and join as Plaintiffs on this claim in the future.

177.    The claims of the collective action plaintiffs should be tolled such that they all date back to August 2, 2007, rather than three years back from the time they file their respective consents to sue.  The parties had entered into a tolling agreement providing for the tolling of all claims relating to Plaintiffs' work for Defendants.   In addition, Plaintiffs did not know, and could not through reasonable diligence have known, of Defendants' pattern and practices of paying women less than men for work of equal skill, effort, and/or responsibility.

178.    The Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. § 206 *et seq*., makes it unlawful for an employer to discriminate between employees on the basis of sex by paying wages to employees at a rate less than the rate paid to employees of the opposite sex for equal work.

179.    Plaintiffs and the Federal EPA Class were paid lower wages than male FAs for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

180.    Defendants willfully paid Plaintiffs and the Federal EPA Class less than they paid male FAs who were performing substantially equal work.

181.    The foregoing conduct, as alleged, constitutes a willful violation of the Federal Equal Pay Act within the meaning of 29 U.S.C. § 255(a).

182.    Plaintiffs request relief as hereinafter described.

**SECOND CLAIM FOR RELIEF**
**Rate of Pay Differential Because of Sex**
**(New York Equal Pay Act, N.Y. Labor Law § 194, *et seq*.)**
**<u>(On Behalf of Dianne Goedtel and the NY EPA Class)</u>**

183.    Plaintiff Goedtel incorporates the preceding paragraphs as alleged above.

184.    This Claim is brought on behalf of Plaintiff Goedtel and the NY EPA Class.

185.    New York's Equal Pay Act, N.Y. Labor Law § 194 *et seq*., makes it unlawful for an employee to be paid a wage at a rate less than the rate at which an employee of the opposite sex is paid for equal work.

186.    Plaintiff and the NY EPA Class were paid lower wages than male FAs for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

187.    Defendants intentionally paid Plaintiff and the NY EPA Class less than they paid male FAs who were performing substantially equal work.

188.    The foregoing conduct constitutes sex discrimination with respect to wages in violation of the NY EPA.

189.    Plaintiff requests relief as hereinafter described.

### THIRD CLAIM FOR RELIEF
### Intentional Discrimination
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.)
### (On Behalf of All Plaintiffs and the Title VII Class)

190.    Plaintiffs incorporate the preceding paragraphs as alleged above.

191.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Title VII Class they represent.  Plaintiffs have timely filed charges with the EEOC making classwide claims of discrimination as well as individual claims, and have thus exhausted their administrative remedies.

192.    Defendants have engaged in an intentional, company-wide, and systematic pattern or practice of discrimination against female FAs.  The discriminatory acts that constitute Defendants' pattern or practice of discrimination occurred both within and outside the liability period in this case.

193.    Defendants have engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against its female FAs by, among other things:

(a)    intentionally maintaining and utilizing a compensation system that perpetuates and increases discrimination against female Financial Advisors;

(b)    implementing company-wide policies and practices that rely heavily on past performance as a criterion for account distributions, compensation, corporate titles, and other terms and conditions of employment;

(c)    implementing company-wide policies and practices that are discriminatory,  unvalidated, standardless, and/or arbitrary;

(d)    allowing managers to make decisions affecting FA compensation on an ad hoc basis and based on inconsistently applied criteria;

(e)    permitting deviations to the compensation and account distribution systems that unfairly favor male FAs; and

(f)    failing and refusing to take reasonable and adequate steps to

46

prevent and correct the use of standardless, unvalidated, and/or illegitimate criteria to determine the terms and conditions of employment.

194.    Defendants' discriminatory policies or practices described above have denied female FAs business opportunities and compensation, in the form of lost past and future wages and other job benefits, as compared to similarly-situated male Financial Advisors.

195.    Defendants have intentionally discriminated against Plaintiffs and the Title VII Class by maintaining a pattern or practice of denying business opportunities that directly affect compensation to qualified female FAs on the basis of sex.  The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by 42 U.S.C. §§ 2000e *et seq.*

196.    Plaintiffs request relief as hereinafter described.

**FOURTH CLAIM FOR RELIEF**
**Disparate Impact Discrimination**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*)**
**(On Behalf of All Plaintiffs and the Title VII Class)**

197.    Plaintiffs incorporate the preceding paragraphs as alleged above.

198.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Title VII Class they represent.  Plaintiffs have timely filed charges with the EEOC making classwide claims of discrimination as well as individual claims, and have thus exhausted their administrative remedies.

199.    Defendants' reliance on illegitimate and unvalidated procedures and criteria to compensate FAs and distribute accounts and business opportunities have an adverse impact on female FAs in violation of Title VII and are not, and cannot be, justified by business necessity.  Even if such systems and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

200.     Plaintiffs request relief as hereinafter described.

**FIFTH CLAIM FOR RELIEF**
**Intentional Discrimination**
**(NYSHRL, New York Executive Law § 296 *et seq*.)**
**(On Behalf of Dianne Goedtel and the New York Subclass)**

201.     Plaintiff Goedtel incorporates by reference each allegation of each preceding paragraph.

202.     Defendants have maintained a system that discriminates on the basis of gender with respect to upfront money, account distributions, partnerships, other business opportunities, compensation, corporate titles, and other terms and conditions of employment.

203.     Defendants have intentionally discriminated against Plaintiff Goedtel and the New York Subclass in violation of NYSHRL by, among other things:

>   (a)     intentionally maintaining and utilizing a compensation system that perpetuates and increases discrimination against female Financial Advisors;

>   (b)     implementing company-wide policies and practices that rely heavily on past performance as a criterion for account distributions, compensation, corporate titles, and other terms and conditions of employment;

>   (c)     implementing company-wide policies and practices that are discriminatory,  unvalidated, standardless, and/or arbitrary;

>   (d)     allowing managers to make decisions affecting FA compensation on an ad hoc basis and based on inconsistently applied criteria;

>   (e)     permitting deviations to the compensation and account distribution systems that unfairly favor male FAs; and

>   (f)     failing and refusing to take reasonable and adequate steps to prevent and correct the use of standardless, unvalidated, and/or illegitimate criteria to determine the terms and conditions of employment.

204.     The foregoing conduct constitutes illegal, intentional discrimination prohibited by New York Executive Law § 296 *et seq*.

205.    Plaintiff requests relief as hereinafter described.

### SIXTH CLAIM FOR RELIEF
**Disparate Impact Discrimination**
**(NYSHRL, New York Executive Law § 296 *et seq.*)**
**(On Behalf of Dianne Goedtel and the New York Subclass)**

206.    Plaintiff Goedtel incorporates the preceding paragraphs as alleged above.

207.    Defendants' reliance on illegitimate and unvalidated systems and criteria to compensate FAs and distribute accounts and business opportunities have an adverse impact on female FAs in violation of the NYSHRL and are not, and cannot be, justified by business necessity.  Even if such systems and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity. The foregoing conduct constitutes illegal discrimination prohibited by New York Executive Law § 296 *et seq.*

208.    Plaintiff requests relief as hereinafter described.

### SEVENTH CLAIM FOR RELIEF
**Gender Discrimination**
**(Florida Civil Rights Act of 1992, F.S.A. § 760.01 *et seq.*)**
**(On Behalf of Judy Calibuso and Julie Moss and the Florida Subclass)**

209.    Plaintiffs Calibuso and Moss incorporate the preceding paragraphs as alleged above.

210.    This Claim is brought on behalf of Plaintiffs Calibuso and Moss and the Florida Subclass.

211.    As described herein, Defendants' actions constitute gender discrimination in violation of the Florida Civil Rights Act of 1992 ("FCRA").  Plaintiffs Judy Calibuso and Julie Moss have both timely complied with all prerequisites to sue.  They have both filed charges of gender discrimination with the FCHR and the EEOC.

212.    Plaintiffs request relief as hereinafter provided.

**EIGHTH CLAIM FOR RELIEF**
**Gender Discrimination**
**(Missouri Human Rights Act, RSMo. § 213.010  *et seq.*)**
**(On Behalf of Jean Evans and the Missouri Subclass)**

213.     Plaintiff Evans incorporates the preceding paragraphs as alleged above.

214.     This Claim is brought on behalf of Plaintiff Evans and the Missouri

Subclass.

215.     As described herein, Defendants' actions constitute gender discrimination

in violation of the Missouri Human Rights Act ("MHRA").  Plaintiff Evans has timely complied

with all prerequisites to sue.  She has filed a charge of gender discrimination with the MCHR and

the EEOC.

216.     Plaintiff requests relief as hereinafter provided.

**NINTH CLAIM FOR RELIEF**
**Gender Discrimination**
**(New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 *et seq.*)**
**(On Behalf of Mary DeSalvatore and the New Jersey Subclass)**

217.     Plaintiff DeSalvatore incorporates the preceding paragraphs as alleged

above.

218.     This Claim is brought on behalf of Plaintiff DeSalvatore and the New

Jersey Subclass.

219.     As described herein, Defendants' actions constitute gender discrimination

in violation of the New Jersey Law Against Discrimination ("NJ LAD").  Plaintiff DeSalvatore

has timely complied with all prerequisites to sue.  She has filed charges of gender discrimination

with the NJDCR and the EEOC.

220.     Plaintiff requests relief as hereinafter provided.

### TENTH CLAIM FOR RELIEF
### Sexual Harassment
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.)
### (On Behalf of Plaintiff Evans Individually)

221.    Plaintiff Evans incorporates by reference each allegation of each

preceding paragraph.

222.    This Claim is brought by Plaintiff Evans individually.

223.    Defendants illegally sexually harassed Evans in violation of Title VII.

224.    As a result of Defendants' illegal actions, Evans has suffered damages.

225.    Plaintiff requests relief as hereinafter described.

### ELEVENTH CLAIM FOR RELIEF
### Sexual Harassment
### (Missouri Human Rights Act, RSMo. § 213.010  *et seq*.)
### (On Behalf of Jean Evans Individually)

226.    Plaintiff Evans incorporates by reference each allegation of each

preceding paragraph.

227.    This Claim is brought by Plaintiff Evans individually.

228.    Defendants illegally sexually harassed Evans in violation of the MHRA.

229.    As a result of Defendants' illegal actions, Evans has suffered damages.

230.    Plaintiff requests relief as hereinafter described.

### TWELFTH CLAIM FOR RELIEF
### Retaliation
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.)
### (On Behalf of Plaintiffs Calibuso, Moss, Goedtel, and Evans Individually)

231.    Plaintiffs incorporate the preceding paragraphs as alleged above.

232.    This Claim is brought by Plaintiffs Calibuso, Moss, Goedtel, and Evans

individually.  Plaintiffs have timely filed charges with the EEOC alleging retaliation claims and

have thus exhausted their administrative remedies.

233.    Plaintiffs engaged in protected activities, including making internal complaints of unlawful discrimination and filing charges with the EEOC complaining of Defendants' discriminatory policies and practices.

234.    Defendants took adverse actions against the Plaintiffs with the purpose of retaliating against them because of their participation in protected activities, and Plaintiffs suffered damages as a result of that conduct.

235.    Plaintiffs request relief as hereinafter described.

### THIRTEENTH CLAIM FOR RELIEF
**Retaliation**
**(NYSHRL, New York Executive Law § 296 *et seq.*)**
**<u>(On Behalf of Dianne Goedtel Individually)</u>**

236.    Plaintiff Goedtel incorporates by reference each allegation of each preceding paragraph.

237.    This Claim is brought by Plaintiff Goedtel individually.

238.    Goedtel engaged in protected activities, including making internal complaints of unlawful discrimination and filing a charge with the EEOC complaining of Defendants' discriminatory policies and practices.

239.    Defendants took adverse actions against Goedtel with the purpose of retaliating against her because of her participation in protected activities, and Goedtel suffered damages as a result of that conduct.

240.    Plaintiff requests relief as hereinafter described.

### FOURTEENTH CLAIM FOR RELIEF
**Retaliation**
**(Florida Civil Rights Act of 1992, F.S.A. § 760.01 *et seq.*)**
**<u>(On Behalf of Judy Calibuso and Julie Moss Individually)</u>**

241.    Plaintiffs Calibuso and Moss incorporate the preceding paragraphs as alleged above.

242.     This Claim is brought on behalf of Plaintiffs Calibuso and Moss individually.

243.     Calibuso and Moss engaged in protected activities, including making internal complaints of unlawful discrimination and filing charges with the EEOC complaining of Defendants' discriminatory policies and practices.

244.     Defendants took adverse actions against Calibuso and Moss with the purpose of retaliating against them because of their participation in protected activities, and Calibuso and Moss suffered damages as a result of that conduct.

245.     Plaintiffs request relief as hereinafter provided.

**FIFTEENTH CLAIM FOR RELIEF**
**Retaliation**
**(Missouri Human Rights Act, RSMo. § 213.010 *et seq.*)**
**(On Behalf of Jean Evans Individually)**

246.     Plaintiff Evans incorporates the preceding paragraphs as alleged above.

247.     This Claim is brought on behalf of Plaintiff Evans individually.

248.     Evans engaged in protected activities, including making internal complaints of unlawful discrimination and filing charges with the EEOC complaining of Defendants' discriminatory policies and practices.

249.     Defendants took adverse actions against Evans with the purpose of retaliating against her because of her participation in protected activities, and Evans suffered damages as a result of that conduct.

250.     Plaintiff requests relief as hereinafter provided.

**ALLEGATIONS REGARDING RELIEF**

251.     Plaintiffs and the Classes they seek to represent have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief they

seek in this action is the only means of securing complete and adequate relief.  Plaintiffs and the

Classes they seek to represent are now suffering, and will continue to suffer, irreparable injury

from Defendants' discriminatory acts and omissions.

252.    Defendants' actions have caused and continue to cause Plaintiffs and all

Class members substantial losses in earnings and other employment benefits.

253.    In addition, Representative Plaintiffs and the Class suffer and continue to

suffer humiliation, embarrassment, and anguish, all to their damage in an amount according to

proof.

254.    Defendants performed the acts herein alleged with malice or reckless

indifference.  Plaintiffs and Class members are thus entitled to recover punitive and/or double

damages in an amount according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and all members of the Federal

EPA Class, pray for relief as follows:

(a)    Designation of this action as a collective action on behalf of the
Federal EPA Collective Plaintiffs (asserting federal Equal Pay Act
claims) and prompt issuance of notice pursuant to 29 U.S.C.
§ 216(b) to all similarly-situated members of the Federal EPA Opt-
In Class, apprising them of the pendency of this action, and
permitting them to assert timely Equal Pay Act claims in this
action by filing individual Consent to Sue forms pursuant to
29 U.S.C. § 216(b);

(b)    Designation of Plaintiffs as Representatives of the Federal EPA
Class;

(c)    A declaratory judgment that the practices complained of herein are
unlawful under the Federal Equal Pay Act;

(d)    An award of damages, according to proof, including liquidated
damages, to be paid by Defendants;

(e)    Costs of action incurred herein, including expert fees;

(f)     Attorneys' fees, including fees pursuant to 29 U.S.C. § 216;

(g)     Post-Judgment interest, as provided by law; and

(h)     Such other legal equitable relief as this Court deems necessary, just, and proper.

WHEREFORE, Plaintiffs on behalf of themselves and the Class, pray for relief as follows:

(a)     Certification of the case as a class action on behalf of the proposed Class and the proposed Subclasses;

(b)     Designation of Representative Plaintiffs Judy Calibuso, Julie Moss, Dianne Goedtel, Jean Evans, and Mary DeSalvatore as representatives of the Title VII Class; designation of Plaintiff Goedtel as representative of the NY EPA Subclass and the New York Subclass; designation of Plaintiffs Calibuso and Moss as representatives of the Florida Subclass; designation of Plaintiff Evans as representative of the Missouri Subclass; and designation of Plaintiff DeSalvatore as representative of the New Jersey Subclass;

(c)     Designation of Representative Plaintiffs' counsel of record as Class counsel;

(d)     A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. §§ 2000e, et seq. and, with respect to Plaintiff Goedtel and the NY EPA Subclass and the New York Subclass, the New York Equal Pay Act, N.Y. Labor Law § 194, et seq. and New York Executive Law § 296 et seq., with respect to Plaintiffs Calibuso and Moss and the Florida Subclass, the Florida Civil Rights Act of 1992, F.S.A. §§ 760.01, et seq., with respect to Plaintiff Evans and the Missouri Subclass, the Missouri Human Rights Act, RSMo. § 213.010 et seq; and with respect to Plaintiff DeSalvatore and the New Jersey Subclass, the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 et seq.;

(e)     A preliminary and permanent injunction against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

(f)     An order that Defendants institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender, and that it eradicate the effects of

their past and present unlawful employment practices;

(g)      An order requiring Defendants to develop and institute accurate and validated standards for determining compensation, assigning accounts, assigning job opportunities, and determining other terms and benefits of employment;

(h)      An order appointing a monitor to ensure that Defendants comply with the injunction provisions of any decree that the Court orders;

(i)      An order retaining jurisdiction over this action to ensure that Defendants comply with such a decree;

(j)      An order restoring Plaintiffs and Class members to their rightful positions at BofA, or in lieu of reinstatements, an order for front pay benefits;

(k)      Back pay (including interest and benefits) for the Representative Plaintiffs and Class and Subclass members;

(l)      All damages sustained as a result of Defendants' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof;

(m)      Full wages, benefits, and wage supplements, as well as liquidated damages found to be due, pursuant to N.Y. Labor Law §§ 194 and 198;

(n)      Exemplary and punitive damages in an amount commensurate with Defendants' ability to pay and to deter future conduct;

(o)      Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(p)      Pre-judgment and post-judgment interest, as provided by law; and

(q)      Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

WHEREFORE, Plaintiffs on behalf of themselves individually, pray for relief as follows:

(a)      Injunctive relief and equitable remedies, including front pay and back pay;

     (b)     Damages for retaliation and sexual harassment, including damages for emotional distress, humiliation, embarrassment, and anguish, to be determined according to proof; and

     (c)     Such other relief as the Court may deem necessary, just, and proper.

## JURY DEMAND

255.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action, for those claims so triable.

Dated: New York, New York
       October 5, 2011

                                  Respectfully submitted,

                                By:   /s/ Adam T. Klein        
                                   Adam T. Klein

                                 OUTTEN & GOLDEN LLP
                               Adam T. Klein
                               Justin M. Swartz
                               Cara E. Greene
                               Mariko Hirose
                               Reena Arora
                               3 Park Avenue, 29th Floor
                               New York, New York 10016
                               Telephone:  (212) 245-1000
                               Facsimile:  (212) 977-4005

                               LIEFF, CABRASER, HEIMANN &
                                 BERNSTEIN, LLP
                               Kelly M. Dermody, *admitted pro hac vice*
                               Heather H. Wong, *admitted pro hac vice*
                               275 Battery Street, 29th Floor
                               San Francisco, CA  94111-3339
                               Telephone:  (415) 956-1000
                               Facsimile:  (415) 956-1008

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Rachel Geman
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

*Attorneys for Plaintiffs and the Putative Class*