# EXHIBIT 3

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | AGENCY<br>□ FEPA<br>■ EEOC | CHARGE NUMBER<br>520 2008 00546 N |
|---|---|---|

New York State Division of Human Relations and EEOC
*State or local Agency, if any*

| NAME (indicate Mr., Ms. or Mrs.)<br>Ms. Dianne Goedtel | | HOME TELEPHONE (include area code)<br>REDACTED |
|---|---|---|
| STREET ADDRESS<br>REDACTED | CITY, STATE AND ZIP CODE | DATE OF BIRTH<br>REDAC |

**NAME OF THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** (If more than one, list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (*include area code)* |
|---|---|---|
| Bank of America Investment Services, Inc. | Cat. D (500+) | (800) 432-1000 |
| STREET ADDRESS / CITY, STATE AND ZIP CODE<br>Bank of America Corporate Center, 100 N. Tryon St., Charlotte, NC 28255 | | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (*Check appropriate box(es)*) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| □ RACE □ COLOR ■ SEX □ RELIGION □ NATIONAL ORIGIN<br>■ RETALIATION □ AGE □ DISABILITY □ OTHER (*specify*) | *EARLIEST* 2/3/06<br>*LATEST* 10/4/06<br>□ CONTINUING ACTION |

THE PARTICULARS ARE (*If additional space is needed, attach extra sheet(s)*):

Please see attached.

| ■ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedure. | NOTARY - (When necessary for State and Local Requirements)<br>Dianne Goedtel<br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br>11/12/07 Dianne Goedtel<br>Date (signature) Charging Party | SIGNATURE OF COMPLAINANT<br>Piper Hoffman<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year) 11/12/07 |

RECEIVED
NOV 20 2007
EEOC-NYDO-CRTIU

PIPER HOFFMAN
Notary Public, State of New York
Kings County, REG#02HO6089787
My Commission Expires March 31, 20 11




**Affidavit of Dianne Goedtel**
Goedtel v. Bank of America Investment Services, Inc.

1. This sex discrimination charge is filed on behalf of myself, Dianne Goedtel, and others similarly situated. Like other female employees of Bank of America Investment Services Inc. (hereafter "BofA"), I have been harmed by a continuing policy, pattern or practice of sex discrimination in violation of Title VII, 42 U.S.C. § 2000e[1] et seq., and the New York State Human Rights Law, New York Executive Law § 296 et seq. ("NYSHRL").

2. I began working at BofA as a Financial Adviser ("FA") on February 3, 2006, in the Melville, Long Island office. Apart from my first few months at BofA, I was the only female FA out of approximately 15 FA's in the Melville office. I believe I was also the only newly-hired FA in all of Long Island who was female.

3. Josh Nagel, who had been my manager at Smith Barney, recruited me from there to BofA. In his process of recruiting me to BofA from Smith Barney he said that BofA was offering a forgivable draw and would assign to me any assets that were not currently assigned to an FA, e.g. assets from departing FA's. BofA did not give me any "upfront" money because, according to Mr. Nagel, I had not been in the business long enough or accumulated enough assets to bring over from my previous firm.

4. While working at BofA I have seen the company give upfront money to four new male FA's, three of whom brought less in assets to BofA than I did and one of whom had been in the business for less time than I had when I came to BofA. I was the only one of all the newly-hired FAs on Long Island who did not get a check upfront.

5. Most firms in the financial industry use a software program called Reuters. I had access to Reuters while working at Smith Barney and requested it when I joined BofA. At first BofA gave me access to this program, which was necessary to my business. BofA also gave Reuters access to the four new male FA's.

6. The day after my six-month anniversary at BofA, in August 2006, Mr. Nagel and Frank Casali told me that BofA was revoking my access to Reuters. Instead it gave me generic software that lagged 20 minutes behind Reuters, which hurt my business.

7. Mr. Nagel told me that BofA provided Reuters to "new FA's" for only six months unless their commissions exceeded a certain level. BofA did not revoke any male FA's Reuters access. I told Mr. Nagel, Mr. Casali, and FA's Ira Katz, Jason Latorre, and Bob Mermin, among others, that this was not fair. Mr. Nagel said that my commissions were not high enough for me to access Reuters. I asked him why BofA did not revoke Reuters access for FA's Gary Leventhal, Robert Perconte, Mr. Latorre, or Mr. Mermin, all of whom had lower commissions than I did. Mr. Nagel responded that he was not looking at all commissions, just equity commissions. I asked Mr. Nagel's assistant, Mr. Casali, to show me the equity commissions of the other FA's,

and found that Messrs David Boliver, Leventhal, Latorre, and Mermin's equity commissions were all lower than mine.

8. A short time after BofA revoked my Reuters access, I walked into the office one morning and noticed that all the FAs' offices had new flat-screen TV's – except mine. I went to Mr. Casali and had asked where my TV was. He said they had forgotten about me. Still he did not order a TV for my office. Instead, I had to spend half of my work day getting my name on the list and contacting people to get a TV, as well as the technician and cable company to set it up.

9. BofA's compliance employees in the Melville office, Jim Bebry and Dana Brandes, discriminated against me based on my gender. Mr. Bebry and Ms. Brandes held me to higher standards and treated me more rudely than my male counterparts. This disparate treatment was apparent to others; Mr. Latorre even asked me why compliance treated me so differently and was tougher on me.

10. In or around January 2007 Bill Bellow took over as my manager. In or around June 2007, Mr. Bellow told me that he had to write me up pursuant to instructions from the compliance department because I had handed in an internal breakpoint worksheet one day late. I knew from conversations with other FA's that many of them routinely handed in the same form much later than one day. Mr. Bellow said that he thought it was harsh to write me up for this, but said he had no choice. I told Mr. Bellow that I would not sign the write-up unless he wrote up all the male FA's who handed in internal breakpoint worksheets late. Mr. Bellow said that the compliance workers told him they felt that I always handed papers in late and made excessive errors. This was false. I asked that compliance and Mr. Bellow review all of my forms and trades, and if after that review they still felt that I made excessive errors, then I would sign the write-up. Compliance and Mr. Bellow spent about one month reviewing my forms and transactions and found no basis to write me up.

11. Nevertheless, the compliance workers continued to treat me more harshly than the male FA's. This created a very tense environment that made me anxious.

12. Around this time two FA's, John Abrams and Chris Affinita, left BofA and Mr. Bellow distributed their assets to the remaining FA's. He gave me some of their accounts, but I received fewer assets than many male FA's did and I received almost no fee-based accounts, which are the most lucrative.

13. A few months later, FA Gary Leventhal departed. Mr. Bellow said that he would distribute Mr. Leventhal's accounts to the five FA's who produced the highest revenues from fee-based accounts. Before the distribution of Messrs Abrams and Affinita's accounts I was among the top five fee-based producers. By handing over a number of fee-based accounts to male FA's David Morrissey and Chris Axelson, however, Mr. Bellow pushed me out of the top five fee-based producers. He did not give me any of Mr. Leventhal's accounts.

14. As soon as I learned of this distribution I complained to Mr. Bellow that it was his assignment of fee-based accounts to Messrs. Morrissey and Axelson that pushed me out of the top five fee-based producers. I also complained about how few accounts he distributed to me from Messrs. Abrams and Affinita.

15. After I complained to Mr. Bellow, he criticized me to Mr. Katz, saying that I was a "spitfire" because I complained. BofA did assign me some accounts the next time an FA left.

16. On or around September 20, 2007, Mr. Bellow told me to resign because of an error in judgment that I made in completing a form for compliance. I followed his orders. The form in question was a disclosure form for a mutual fund. I had a disclosure form that my client had completed and signed. We were allowed to use copies of signed disclosure forms as long as the client knew about it. I used a copy of a form and changed the date, but I did not discuss it with my client because I had not yet placed a trade based on that form.

17. Mr. Bellow said that the worst language BofA would put on my U5 would be that I resigned "pending an investigation." He said that BofA would not mention anything about falsification of documents, because that would be excessive given the error I made.

18. BofA wrote on my U5: "internal investigation was ongoing at time of termination regarding management being made aware of one instance of falsification of documentation. Internal investigation completed on 9/26/2007. Confirmed that this incident as well as one additional incident did involve falsification of documentation." By tarnishing my U5 with this excessive and misleading language, BofA caused me severe anxiety. I was out of work for six weeks because potential employers were put off by the language on my U5 – several told me that they could not hire me because of the language BofA put on my U5. During an interview with one potential employer, the interviewer said they could not understand why BofA would put such harsh language on my U5. I believe that BofA put this language on my U5 in retaliation for my complaints about compliance treating me more harshly than male FAs.

19. BofA withheld 25% of FAs' commissions until three months after they were earned; because of this policy, when my employment ended BofA failed to pay me $10,000 that I had earned, and in addition did not pay me any of the commissions I earned in September.

20. As a result of the termination of my employment with BofA I have lost clients, and have to start over to build my business. BofA's treatment of me and the resulting damage to my business has caused me severe emotional distress.

21. I believe that the conduct described above is part of a pattern and practice of discrimination against female FA's at BofA. I believe that BofA routinely discriminates against female FA's with respect to pay, business opportunities, and other terms and conditions of employment.

22. By engaging in the conduct described herein, BofA has violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and other laws by intentionally discriminating against me and other women and implementing policies and practices that had a disparate impact on me and other women.

23. The above description is a short summary of the circumstances of my employment and is not intended to be an exhaustive recitation of the facts.

24. This charge is representative and is intended to put BofA on notice of class-wide allegations of gender discrimination throughout BofA.

Dianne Goedtel — Date: 11/12/07

Notary Public — Date: 11/12/07



EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (*ISSUED ON REQUEST*)

To: **Dianne Goedtel**
REDACTED

From: **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2008-00546** | **Peter Holland, Investigator** | **(212) 336-3781** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X] More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

[signature]

**Spencer H. Lewis, Jr.,**
**Director**

5/21/08
*(Date Mailed)*

Enclosures(s)

cc:

**Jerry Demone**
**Senior VP, H.R. Case Managemen**
**BANK OF AMERICA**
**1 Federal Street**
**Mail Code MA5-503-06-04**
**Boston, MA 02110**

**Piper Hoffman**
**3 Park Avenue, 29th Floor**
**New York, NY 10016**