**OUTTEN & GOLDEN LLP**
Adam T. Klein
Cara E. Greene
Mariko Hirose
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000
Facsimile:   (212) 977-4005

**LIEFF CABRASER HEIMANN &**
 **BERNSTEIN, LLP**
Kelly M. Dermody, *admitted pro hac vice*
Heather H. Wong, *admitted pro hac vice*
Alison M. Stocking, *admitted pro hac vice*
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

**LIEFF CABRASER HEIMANN &**
 **BERNSTEIN, LLP**
Rachel Geman
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JUDY CALIBUSO, JULIE MOSS, DIANNE GOEDTEL, JEAN EVANS, and MARY DESALVATORE, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    -against-<br><br>BANK OF AMERICA CORPORATION; MERRILL LYNCH & CO., INC.; and MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,<br><br>    Defendants. | **10 Civ. 1413 (JFB) (ETB)**<br><br><br><br>**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY RELEVANT TO MOTION TO DISMISS AND/OR STRIKE CLASS CLAIMS IN PLAINTIFFS' THIRD AMENDED COMPLAINT** |

965090.1

## NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs respectfully submit *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 11-3639,  -- F.3d -- (7th Cir. Feb. 24, 2012) ("*McReynolds*") as relevant supplemental authority relating to the pending Motion to Dismiss and/or Strike Class Claims in Plaintiffs' Third Amended Complaint.  *McReynolds* reversed the denial of certification of a class of African American Financial Advisors at Merrill Lynch.

Like the class of female Financial Advisors here, the *McReynolds* plaintiffs allege that the defendant's specific account distribution and other policies cause a disparate impact by the cumulative negative effect of using past performance, measured unfairly, as a basis for the allocation of compensation and present business opportunities.  *Id.* at 12-18.  As the Seventh Circuit explained, "prescribing criteria for account distributions that favor the already successful -- those who may owe their success to having been invited to join a successful or promising team -- *are practices of Merrill Lynch*, rather than practices that local managers can choose or not at their whim."  *Id.* at 17 (emphasis added).   Therefore, "the incremental causal effect (overlooked by the district judge) of those company-wide policies -- which is the alleged disparate impact -- could be most efficiently determined on a class-wide basis."  *Id.* at 17-18.

In addition to the factual similarity between Plaintiffs' case and the present version of the *McReynolds* case (a similarity that Defendants repeatedly have emphasized),[1] the opinion is instructive in its general differentiation between a specific challenge to specific policies (such as account distribution policies), and an overall, amorphous challenge to a company's practice of

---

[1] As Plaintiffs' counsel explained at oral argument, *McReynolds* was originally a broader case than the one Plaintiffs in this lawsuit have brought here.  However, where *McReynolds* and this case overlap, the Seventh Circuit squarely supports the certifiability of the narrower claims brought here.

delegating all pay and promotion decisions to local decision-makers. Under Seventh Circuit (and Supreme Court) authority, the former challenge remains fully amenable to class treatment. *Id.* at 11-12 (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011)).

Finally, the Seventh Circuit confirmed that issue classes under Fed.R.Civ.P. 23(c)(4) are appropriate to resolve common liability questions of whether challenged policies have a disparate impact and whether such impact is justified by business necessity. *Id.* at 18-19. In concrete terms as applied to this case, that "the exercise of discretion at the local level is undoubtedly a factor in the differential success of brokers" -- even if true -- is *not* a reason to deny certification, and in fact has nothing to do with the liability stage of the proceeding. *Id.* at 18. As Plaintiffs here have set forth in the briefing, the use of issue classes, among other well-established manageability and class structure tools, will facilitate the orderly and efficient litigation of this case.

For these reasons, although *McReynolds* was based on a full evidentiary record, it makes clear that *Dukes* does not somehow void these types of claims.

Dated: February 24, 2012                    Respectfully submitted,

                                            By:____/s/ Rachel Geman_____
                                                     Rachel Geman


                                            LIEFF CABRASER HEIMANN &
                                              BERNSTEIN, LLP
                                            Rachel Geman
                                            250 Hudson Street, 8th Floor
                                            New York, NY  10013-1413
                                            Telephone:  (212) 355-9500
                                            Facsimile:  (212) 355-9592

965090.1

LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
Kelly M. Dermody, *admitted pro hac vice*
Heather H. Wong, *admitted pro hac vice*
Alison M. Stocking, *admitted pro hac vice*
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

OUTTEN & GOLDEN LLP
Adam T. Klein
Cara E. Greene
Mariko Hirose
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000
Facsimile:   (212) 977-4005

*Attorneys for Plaintiffs and the Proposed Class*

965090.1

## <u>CERTIFICATE OF SERVICE</u>

   I, Alison M. Stocking, under penalties of perjury, certify the following as true and correct:  I am not a party to this action, and I am over 18 years of age.  On this 24th day of February, 2012, pursuant to Local Civil Rule 5.2, I served a true and correct copy of Plaintiffs' Notice of Supplemental Authority, by causing same to be filed electronically with this Court by using the ECF system.  All counsel in this action are registered ECF users.

   Executed this 24th day of February, 2012 at San Francisco, California.


           <u>*/s/ Alison M. Stocking*</u>
            Alison M. Stocking

965090.1

# EXHIBIT A

In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3639

GEORGE MCREYNOLDS, *et al.*, on behalf
of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

*v.*

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 6583—**Robert W. Gettleman**, *Judge.*

ARGUED JANUARY 13, 2012—DECIDED FEBRUARY 24, 2012

Before POSNER, WOOD, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.*  The plaintiffs have filed a class
action suit that charges Merrill Lynch with racial dis-
crimination in employment in violation of Title VII of
the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The
plaintiffs ask that a class be certified for two purposes:
deciding a common issue, Fed. R. Civ. P. 23(c)(4)—whether

the defendant has engaged and is engaging in practices that have a disparate impact (that is, a discriminatory effect, though it need not be intentional) on the members of the class, in violation of federal antidiscrimination law; and providing injunctive relief. Fed. R. Civ. P. 23(b)(2). They also want damages. But while they asked the district court to certify the class for purposes of seeking compensatory and punitive damages, see Rule 23(b)(3), at argument the plaintiffs' lawyer said she wasn't asking—not yet anyway—for such certification, though her opening brief had suggested that if we found that the district court had erred in refusing to certify for class treatment the disparate impact issue and injunctive relief, we should order the court to "consider [on remand] the extent to which damages issues also could benefit from class treatment, consistent with *Allen v. International Truck & Engine Corp.*, 358 F.3d 469 (7th Cir. 2004)." We defer that question to the end of our opinion. But we note here that without proof of intentional discrimination, which is not an element of a disparate impact claim, the plaintiffs cannot obtain damages, whether compensatory or punitive, but only equitable relief (which might however include backpay, and thus have a monetary dimension). 42 U.S.C. § 1981a(a)(1); *Kolstad v. American Dental Association*, 527 U.S. 526, 534 (1999). Section 1981a(a)(1) is explicit that damages cannot be awarded in respect of "an employment practice that is unlawful because of its disparate impact."

The district court denied certification, and the plaintiffs asked this court for leave to appeal the denial. A motions panel granted leave, but the defendant argues

that the panel erred—that the appeal is untimely. We begin with that question.

Rule 23(f) of the civil rules permits appeals from orders granting or denying class certification despite the general policy (though one with many exceptions) against allowing interlocutory appeals in the federal court system. A denial of class certification often dooms the suit—the class members' claims may be too slight to justify the expense of individual suits. Conversely, because of the astronomical damages potential of many class action suits, a grant of certification may place enormous pressure on the defendant to settle even if the suit has little merit. See, e.g., *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011). And because class actions are cumbersome and protracted, an early appellate decision on whether a suit can be maintained as a class action can speed the way to termination of the litigation by abandonment, summary judgment, or settlement. E.g., *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 834-35 (7th Cir. 1999); *Newton v. Merrill Lynch*, 259 F.3d 154, 162-65 (3d Cir. 2001).

But Rule 23(f) requires that leave to appeal be sought from the court of appeals within 14 days of the entry of the order granting or denying certification. The district court denied the plaintiffs' initial motion for class certification in August 2010. In July 2011 the plaintiffs filed an amended motion for class certification, which the district judge denied in September, and within 14 days of *that* denial the plaintiffs sought our leave to appeal. The defendant asks us to treat the request for

Case 2:10-cv-01413-PKC-AKT   Document 123   Filed 02/24/12   Page 10 of 27 PageID #: 2130

leave to appeal as an untimely request to appeal the
August 2010 denial of certification. That would amount
to treating the plaintiffs' second motion for certification
as an untimely motion to reconsider the denial of
the first motion.

The question of timeliness may seem to be about juris-
diction, since most deadlines for appeals from a district
court have been held to be jurisdictional. But as we
noted recently in *In re IFC Credit Corp.*, 663 F.3d 315, 319-
20 (7th Cir. 2011), the Supreme Court has been moving
toward a definition of the subject-matter jurisdiction of
the federal courts that includes all cases that these courts
are "competent," in the sense of legally empowered, to
decide. This implies that deadlines for appealing are not
jurisdictional, since they regulate the movement upward
through the judicial hierarchy of litigation that by def-
inition is within federal jurisdiction. Yet appeal dead-
lines either found in statutes or adopted by courts by
direction of a statute continue to be treated as jurisdic-
tional—though not all of them; the Supreme Court re-
cently rejected such a "bright line" rule in favor of re-
quiring a "clear indication" that the deadline was
intended by Congress to be jurisdictional. *Henderson v.
Shinseki*, 131 S. Ct. 1197, 1203 (2011). (The power of Con-
gress to impose such limits on the jurisdiction of the
federal courts is not questioned.) But because no "clear
indication" is to be found in the pertinent statutory texts,
see, e.g., 28 U.S.C. §§ 2101(c), 2107(a), (c), the Court has
found itself saying such things as that Congress is not
required to "use magic words in order to speak clearly
on this point" and that "context, including [the Supreme

Court's] interpretation of similar provisions in many years past, is relevant." *Henderson v. Shinseki, supra*, 131 S. Ct. at 1203, quoting *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1248 (2010).

What we take away from this formula is that if the Court has traditionally treated a particular statutory deadline as jurisdictional it will go on doing so, *id*. at 1203-06; *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008); *Bowles v. Russell*, 551 U.S. 205, 209-10 and n. 2 (2007); *In re Caterbone*, 640 F.3d 108, 111-13 (3d Cir. 2011), even though doing so doesn't comport with the new "competence" standard. Deadlines for appealing are just a type of statute of limitations, as acknowledged in *John R. Sand & Gravel v. United States, supra*, 552 U.S. at 133, and statutes of limitations ordinarily are affirmative defenses rather than jurisdictional bars. A deadline for bringing or appealing a federal case presupposes that the case is within the competence of federal courts to decide.

We declined in *Asher v. Baxter Int'l Inc*., 505 F.3d 736, 741 (7th Cir. 2007), to rule on whether the deadline in Rule 23(f), though it is promulgated by the Supreme Court under the authority of the Rules Enabling Act, 29 U.S.C. § 2072, rather than found in or directed to be adopted by a statute, is jurisdictional. But by now it is clear that it is not jurisdictional—that the exception to the "competence" standard is limited to statutory deadlines, *United States v. Neff*, 598 F.3d 320, 322-23 (7th Cir. 2010), for how can a court contract or expand its jurisdiction except by force of a constitutional

or statutory provision? If the deadline was made by Congress, then whether it is jurisdictional depends on congressional intent, and, the Supreme Court appears to be saying, in the absence of any clues to that intent on whether the courts traditionally have treated the deadline as jurisdictional. The time limit in Rule 23(f), having been created by the Court rather than by Congress (no time limits are specified in the Rules Enabling Act—the Act is an enabler, not a specifier), is governed by the "competence" standard and therefore is not jurisdictional, for obviously the suit from which the appeal is sought to be taken is within the jurisdiction of the federal courts.

But suppose our understanding of the evolving Supreme Court doctrine is wrong, and the deadline in Rule 23(f) *is* jurisdictional. The only difference between a deadline that is jurisdictional and one that is not is that a litigant cannot lose the benefit of the former type (until judgment becomes final after exhaustion of appellate remedies) by failing to assert it, or because the other party's failure to comply would in nonjurisdictional settings be excused by such doctrines as equitable estoppel or equitable tolling. The defendant has from the outset vigorously contested the timeliness of the appeal, and the plaintiffs are not arguing that they should be excused for having missed the deadline. Even if not jurisdictional, a deadline is mandatory in the sense that if invoked by a party in timely fashion the court is bound by it. *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam); *Asher v. Baxter Int'l Inc.*, *supra*, 505 F.3d at 741; *Maxwell v. Dodd*, 662 F.3d 418, 421 (6th Cir. 2011); *Wilburn v. Robinson*, 480 F.3d 1140, 1146-47 (D.C. Cir. 2007).

Rather, the plaintiffs' argument is that their 14 days to seek leave to appeal ran anew from the denial of their amended motion for class certification. The defendant points out that a deadline for appealing cannot be extended by a motion for reconsideration of a previous appealable order, *Asher v. Baxter Int'l Inc.*, *supra*, 505 F.3d at 739-40; *Gary v. Sheahan*, 188 F.3d 891 (7th Cir. 1999); *Jenkins v. BellSouth Corp.*, 491 F.3d 1288, 1290-92 (11th Cir. 2007); *McNamara v. Felderhof*, 410 F.3d 277, 280-81 and n. 8 (5th Cir. 2005), unless the motion is made within the time allowed for taking the appeal, *Blair v. Equifax Check Services, Inc.*, *supra*, 181 F.3d at 837, and this rule applies to appeals under Rule 23(f). *Id.* Otherwise the deadline for taking the appeal would be eviscerated. And this is so even if the motion for reconsideration doesn't just say "and for the reasons stated in our original motion we ask the court to reverse its ruling" but adds "and by the way we have thought of some clever new arguments for why our motion should have been granted." *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1190-91 (10th Cir. 2006). For it is easy to think up new arguments.

But it doesn't follow that the failure to take a timely appeal from one interlocutory order operates as a forfeiture, jurisdictional or otherwise, of the right to appeal a subsequent order. For the later motion may not be, either in form or, more important, in substance, a motion to reconsider the previous denial. A rule limiting parties to one interlocutory appeal from a grant or denial of class certification would disserve Rule 23(f). It is important that the question whether the case is to

proceed as a class action be resolved sooner rather than later. So if it becomes clear in the course of the lawsuit, as a result of new law or newly learned facts, that the denial of certification was erroneous, and if years of litigation lie ahead before a final judgment can be expected, and if therefore an appeal from the denial of certification may either end the litigation or at least place it on a path to swift resolution, the court of appeals should have discretion to allow the appeal.

The fact that the appellate court has a discretionary jurisdiction over Rule 23(f) appeals is important. Appellate jurisdiction in the federal system ordinarily is mandatory. With few exceptions, we have to decide all appeals that we have jurisdiction to hear; we do not have a discretionary appellate jurisdiction like the Supreme Court. But because our jurisdiction to hear interlocutory appeals under Rule 23(f) *is* discretionary, there is little danger that the filing in the district court of a second motion for certification based on altered circumstances, followed if it is denied by a motion in this court for leave to appeal, will either delay the district court proceedings (Rule 23(f) provides that "an appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders") or burden us or the opposing party. If the movant is playing a delay game, prompt denial by the motions panel of leave to appeal probably will end it; if he persists he will be courting sanctions in both the district court and this court for filing frivolous pleadings. And by the way, we do not permit a party to circumvent the 14-day deadline in Rule 23(f) by appealing a denial of

Case 2:10-cv-01413-PKC-AKT   Document 123   Filed 02/24/12   Page 15 of 27 PageID #: 2135

class certification under 28 U.S.C. § 1292(b) (authorizing interlocutory appeals that present a controlling issue of law on which there is substantial room for disagreement and prompt resolution would expedite the litigation), *Richardson Electronics, Ltd. v. Panache Broadcasting*, 202 F.3d 957, 959 (7th Cir. 2000), which has no deadline.

Dicta in the Tenth Circuit's opinion in *Carpenter v. Boeing Co.*, *supra*, go beyond the unexceptionable proposition that merely presenting "new arguments" does not change a motion for reconsideration of a grant or denial of class certification into a motion that if denied is appealable under Rule 23(f). The opinion states (456 F.3d at 1191) that

> given the multifactor analysis that courts must apply in deciding the propriety of class certification, [even appellate review limited to whatever changed circumstances had given rise to the fresh motion for certification] would often require contorted thinking that exceeds the capacities of even appellate courts. How can an appellate court say that one particular new factor would require a different result regardless of how the district court weighed the factors presented originally? In stating that the new factor required a different result, the appellate court must engage in weighing the factors weighed by the district court in its original ruling but cannot know precisely how much weight the district court granted to each. In particular, what if the district court clearly erred in giving dispositive weight to one factor? How is the appellate court to

ignore such error (in keeping with the presumption that the original decision was correct) even when it addresses a motion for reconsideration that raises only a rather inconsequential new factor?. . . We are not inclined to adopt a construction of Rule 23(f) that would regularly require mental gymnastics just for the purpose of giving litigants a second bite at the interlocutory-appellate-review apple. We note that the very absence of a prompt appeal by the party aggrieved by the decision on certification suggests that the concerns justifying Rule 23(f) are, at the least, less significant in the particular case. If the decision whether or not to certify the class was truly outcome determinative, one would not expect the losing party to continue the litigation for months before launching a new challenge to the ruling. Any value in permitting a belated interlocutory appeal is overridden by the desirability of the district court's proceeding expeditiously.

A court of appeals is never obliged to engage in "contorted thinking" about a Rule 23(f) appeal, for it can always deny leave to appeal, and should do so if it would have to do mental contortions in order to make up its collective mind whether appeal should be allowed. And if the new motion for certification "raises only a rather inconsequential new factor," then the failure of the plaintiffs to have sought interlocutory review of the denial of the original motion for certification becomes a reason to deny leave to appeal out of hand, without any "mental gymnastics." As

for "not expect[ing] the losing party to continue the
litigation for months before launching a new challenge
to the ruling," the new challenge is timely if filed as
soon as the development warranting a new motion for
certification occurs, but untimely if the plaintiff dawdles.
And if the appeal is not "belated," but based on develop-
ments that may warrant certification, allowing the
appeal may very well speed up rather than slow down
the litigation. In effect the court held in *Carpenter* that
the new motion for certification was in substance an
untimely motion for reconsideration. The holding is
unexceptionable, but the dicta are not persuasive.

The basis of the plaintiffs' renewed motion for class
certification in the present case was the Supreme Court's
decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541
(2011), handed down a month earlier. That was an im-
portant development in the law governing class certifica-
tion in employment discrimination cases—possibly a
milestone. It may seem a perverse basis for a renewed
motion for class certification, since the Supreme Court
reversed a grant of certification in what the defendant
in our case insists is a case just like this one. But the
district judge, though he again denied certification,
didn't think the plaintiffs were perverse in basing their
new motion on *Wal-Mart*. On the contrary, he said
that "*Wal-Mart* does add a lot to the landscape under
Rule 23 . . . . I think this really cries out for a 23(f) appeal,
and I would support it. And I'm going to put that in
my order [denying the renewed motion for certifica-
tion—and he did] . . . . [T]his is one [case] that really cries
out for [a Rule 23(f) appeal] with the change in the land-

scape by the *Wal-Mart* opinion. Of course, you know, most defendants think that the change is in their interest, not in the plaintiffs'. But you've [the judge was addressing the plaintiffs' lawyer] made a good argument, and I think it deserves to be put to rest one way or the other." The judge was right.

*Wal-Mart* holds that if employment discrimination is practiced by the employing company's local managers, exercising discretion granted them by top management (granted them as a matter of necessity, in Wal-Mart's case, because the company has 1.4 million U.S. employees), rather than implementing a uniform policy established by top management to govern the local managers, a class action by more than a million current and former employees is unmanageable; the incidents of discrimination complained of do not present a common issue that could be resolved efficiently in a single proceeding. Fed. R. Civ. P. 23(a)(2). Not that the employer would be immune from liability even in such a case; if the local managers are acting within the scope of their employment in discriminating against their underlings on a forbidden ground (sex, alleged in *Wal-Mart*, race in our case), the employer is liable for their unlawful conduct under the doctrine of respondeat superior. But because there was no company-wide policy to challenge in *Wal-Mart*—the only relevant corporate policies were a policy *forbidding* sex discrimination and a policy of delegating employment decisions to local managers—there was no common issue to justify class treatment.

The district judge thought this case like *Wal-Mart* because Merrill Lynch, accused of discriminating against

700 black brokers currently or formerly employed by it, delegates discretion over decisions that influence the compensation of all the company's 15,000 brokers ("Financial Advisors" is their official title) to 135 "Complex Directors." Each of the Complex Directors supervises several of the company's 600 branch offices, and within each branch office the brokers exercise a good deal of autonomy, though only within a framework established by the company.

Two elements of that framework are challenged: the company's "teaming" policy and its "account distribution" policy. The teaming policy permits brokers in the same office to form teams. They are not required to form or join teams, and many prefer to work by themselves. But many others prefer to work as part of a team. Team members share clients, and the aim in forming or joining a team is to gain access to additional clients, or if one is already rich in clients to share some of them with brokers who have complementary skills that will secure the clients' loyalty and maybe persuade them to invest more with Merrill Lynch. As we said, there are lone wolves, but there is no doubt that for many brokers team membership is a plus; certainly the plaintiffs think so.

The teams are formed by brokers, and once formed a team decides whom to admit as a new member. Complex Directors and branch-office managers do not select the team's members.

Account distributions are transfers of customers' accounts when a broker leaves Merrill Lynch and his cli-

ents' accounts must therefore be transferred to other
brokers. Accounts are transferred within a branch
office, and the brokers in that office compete for the
accounts. The company establishes criteria for deciding
who will win the competition. The criteria include the
competing brokers' records of revenue generated for
the company and of the number and investments of
clients retained.

The Complex Directors, as well as the branch-office
managers, have a measure of discretion with regard to
teaming and account distribution; they can veto teams
and can supplement the company criteria for distribu-
tions. And to the extent that these regional and local
managers exercise discretion regarding the compensa-
tion of the brokers whom they supervise, the case is
indeed like *Wal-Mart*. But the exercise of that discretion
is influenced by the two company-wide policies at
issue: authorization to brokers, rather than managers, to
form and staff teams; and basing account distributions
on the past success of the brokers who are competing
for the transfers. Furthermore, team participation and
account distribution can affect a broker's performance
evaluation, which under company policy influences
the broker's pay and promotion. The plaintiffs argue
that these company-wide policies exacerbate racial dis-
crimination by brokers.

The teams, they say, are little fraternities (our term but
their meaning), and as in fraternities the brokers choose
as team members people who are like themselves. If
they are white, they, or some of them anyway, are more

No. 11-3639                                                    15

comfortable teaming with other white brokers. Obviously
they have their eyes on the bottom line; they will join
a team only if they think it will result in their getting
paid more, and they would doubtless ask a superstar
broker to join their team regardless of his or her race.
But there is bound to be uncertainty about who will be
effective in bringing and keeping shared clients; and
when there is uncertainty people tend to base decisions
on emotions and preconceptions, for want of objective
criteria.

   Suppose a police department authorizes each police
officer to select an officer junior to him to be his partner.
And suppose it turns out that male police officers never
select female officers as their partners and white
officers never select black officers as their partners. There
would be no intentional discrimination at the depart-
mental level, but the practice of allowing police officers
to choose their partners could be challenged as enabling
sexual and racial discrimination—as having in the
jargon of discrimination law a "disparate impact" on a
protected group—and if a discriminatory effect was
proved, then to avoid an adverse judgment the depart-
ment would have to prove that the policy was essential
to the department's mission. 42 U.S.C. § 2000e-2(k)(1)(A)(i);
*Ricci v. DeStefano*, 129 S. Ct. 2658, 2672-73 (2009); *Bryant
v. City of Chicago*, 200 F.3d 1092, 1098-99 (7th Cir. 2000).
That case would not be controlled by *Wal-Mart* (al-
though there is an undoubted resemblance), in which
employment decisions were delegated to local managers;
it would be an employment decision by top management.

Merrill Lynch's broker teams are formed by brokers, not managers, just as in our hypothetical example police officers' partners are chosen by police officers, not supervisors. If the teaming policy causes racial discrimination and is not justified by business necessity, then it violates Title VII as "disparate impact" employment discrimination—and whether it causes racial discrimination and whether it nonetheless is justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination.

And likewise with regard to account distributions: if as a result of racial preference at the team level black brokers employed by Merrill Lynch find it hard to join teams, or at least good teams, and as a result don't generate as much revenue or attract and retain as many clients as white brokers do, then they will not do well in the competition for account distributions either; and a kind of vicious cycle will set in. A portion of a team's pre-existing revenues are transferred within a team to a new recruit, who thus starts out with that much "new" revenue credited to him or her—an advantage, over anyone who is not on a team and thus must generate all of his own "new" revenue, that translates into a larger share of account distributions, which in turn helps the broker do well in the next round of such distributions. This spiral effect attributable to company-wide policy and arguably disadvantageous to black brokers presents another question common to the class, along with the question whether, if the team-inflected account distribution system does have this disparate impact, it nevertheless is justified by business necessity.

There is no indication that the corporate level of Merrill Lynch (or its parent, Bank of America) *wants* to discriminate against black brokers. Probably it just wants to maximize profits. But in a disparate impact case the presence or absence of discriminatory intent is irrelevant; and permitting brokers to form their own teams and prescribing criteria for account distributions that favor the already successful—those who may owe their success to having been invited to join a successful or promising team—are practices of Merrill Lynch, rather than practices that local managers can choose or not at their whim. Therefore challenging those policies in a class action is not forbidden by the *Wal-Mart* decision; rather that decision helps (as the district judge sensed) to show on which side of the line that separates a company-wide practice from an exercise of discretion by local managers this case falls.

Echoing the district judge, the defendant's brief states that "any discrimination here would result from local, highly-individualized implementation of policies rather than the policies themselves." That is too stark a dichotomy. Assume that with no company-wide policy on teaming or account distribution, but instead delegation to local management of the decision whether to allow teaming and the criteria for account distribution, there would be racial discrimination by brokers or local managers, like the discrimination alleged in *Wal-Mart*. But assume further that company-wide policies authorizing broker-initiated teaming, and basing account distributions on past success, increase the amount of discrimination. The incremental causal effect (overlooked by the district

judge) of those company-wide policies—which is the alleged disparate impact—could be most efficiently determined on a class-wide basis.

We are not suggesting that there is in fact racial discrimination at any level within Merrill Lynch, or that management's teaming and account distribution policies have a racial effect. The fact that black brokers have on average lower earnings than white brokers may have different causes altogether. The only issue at this stage is whether the plaintiffs' claim of disparate impact is most efficiently determined on a class-wide basis rather than in 700 individual lawsuits.

The district judge exaggerated the impact on the feasibility and desirability of class action treatment of the fact that the exercise of discretion at the local level is undoubtedly a factor in the differential success of brokers, even if not a factor that overwhelms the effect of the corporate policies on teaming and on account distributions. Obviously a single proceeding, while it might result in an injunction, could not resolve class members' claims. Each class member would have to prove that his compensation had been adversely affected by the corporate policies, and by how much. So should the claim of disparate impact prevail in the class-wide proceeding, hundreds of separate trials may be necessary to determine which class members were actually adversely affected by one or both of the practices and if so what loss he sustained—and remember that the class has 700 members. But at least it wouldn't be necessary in each of those trials to determine whether the chal-

lenged practices were unlawful. Rule 23(c)(4) provides that "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." The practices challenged in this case present a pair of issues that can most efficiently be determined on a class-wide basis, consistent with the rule just quoted.

As said in *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910, 911 (7th Cir. 2003),

> class action treatment is appropriate and is permitted by Rule 23 when the judicial economy from consolidation of separate claims outweighs any concern with possible inaccuracies from their being lumped together in a single proceeding for decision by a single judge or jury. Often, and as it seems to us here, these competing considerations can be reconciled in a "mass tort" case by carving at the joints of the parties' dispute. If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.

The kicker is whether "the accuracy of the resolution" would be "unlikely to be enhanced by repeated proceedings." If resisting a class action requires betting one's company on a single jury verdict, a defendant may be forced to settle; and this is an argument against definitively resolving an issue in a single case if enormous

consequences ride on that resolution. *In re Bridgestone/ Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1299-1300 (7th Cir. 1995); contra, *Klay v. Humana, Inc.*, 382 F.3d 1241, 1274 (11th Cir. 2004). But Merrill Lynch is in no danger of being destroyed by a binding class-wide determination that it has committed disparate impact discrimination against 700 brokers, although an erroneous injunction against its teaming and account distribution policies could disadvantage it in competition with brokerage firms that employ similar policies—though we have no information on whether others do.

The *Mejdrech* decision, and *Bridgestone/Firestone* and *Rhone-Poulenc* more fully, discuss the danger that resolving an issue common to hundreds of different claimants in a single proceeding may make too much turn on the decision of a single, fallible judge or jury. The alternative is multiple proceedings before different triers of fact, from which a consensus might emerge; a larger sample provides a more robust basis for an inference. But that is an argument for separate trials on pecuniary relief, and the only issue of relief at present is whether to allow the plaintiffs to seek class-wide injunctive relief. There isn't any feasible method—certainly none has been proposed in this case—for withholding injunctive relief until a series of separate injunctive actions has yielded a consensus for or against the plaintiffs.

As far as pecuniary relief is concerned, there may be no common issues (though then again there may be,

see *Allen v. International Truck & Engine Corp., supra,*
358 F.3d at 472), and in that event the next stage of the
litigation, should the class-wide issue be resolved in
favor of the plaintiffs, will be hundreds of separate suits
for backpay (or conceivably for compensatory damages
and even punitive damages as well, if the plaintiffs aug-
ment their disparate-impact claim with proof of inten-
tional discrimination). The stakes in each of the plain-
tiffs' claims are great enough to make individual suits
feasible. Most of Merrill Lynch's brokers earn at least
$100,000 a year, and many earn much more, and
the individual claims involve multiple years. But
the lawsuits will be more complex if, until issue or
claim preclusion sets in, the question whether Merrill
Lynch has violated the antidiscrimination statutes
must be determined anew in each case.

   We have trouble seeing the downside of the limited
class action treatment that we think would be appro-
priate in this case, and we conclude that the district
judge erred in deciding to the contrary (with evident
misgivings, however). The denial of class certification
under Rules 23(b)(2) and (c)(4) is therefore

                                         REVERSED.