# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

Nº 10-CV-1413 (JFB)(ETB)

———————————————

JUDY CALIBUSO, JULIE MOSS, DIANNE GOEDTEL, JEAN EVANS, AND MARY DESALVATORE ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

VERSUS

BANK OF AMERICA CORPORATION, MERRILL LYNCH & CO., INC. AND MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,

Defendants.

———————————————

**MEMORANDUM AND ORDER**
September 27, 2012

———————————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Judy Calibuso ("Calibuso"), Julie Moss ("Moss"), Dianne Goedtel ("Goedtel"), Jean Evans ("Evans") and Mary DeSalvatore ("DeSalvatore") (collectively "plaintiffs") commenced this action on behalf of themselves and all others similarly situated, against Bank of America Corporation ("BofA," "BOA" or "Bank of America"), Merrill Lynch & Co. ("ML") and Merrill Lynch, Pierce, Fenner & Smith ("MLPF&S")[1] (collectively "defendants"), claiming that the defendants' unvalidated compensation and account distribution systems cause a disparate impact on women because, *inter alia*, they rely on tainted

criteria and are implemented in a discriminatory manner. Specifically, plaintiffs claim that the defendants have violated the Equal Pay Act, 29 U.S.C. § 206, *et seq.* (the "EPA"), the New York Equal Pay Act New York Labor Law § 194 *et seq.* (the "NY EPA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York States Human Rights Law, New York Executive Law § 296 *et seq.* ("NYSHRL"), the Florida Civil Rights Act of 1992, F.S.A. § 760.01 *et seq.* ("FCRA"), the Missouri Human Rights Act RSMo. § 213.010 *et seq.* ("MHRA"), and the New Jersey Law Against Discrimination, NJ.S.A. § 10:5-1 *et seq.* ("NJ LAD").

—————————

[1] ML and MLPF&S will collectively be referred to as "Merrill" or "Merrill Lynch" throughout this opinion.

Defendants have moved to dismiss and/or strike the class claims in plaintiffs' third amended complaint. Specifically, defendants argue the following: (1) the disparate impact claim as it relates to the production and merit based policies must be dismissed as a matter of law because these policies are immune from attack pursuant to § 703(h) of Title VII; (2) pursuant to the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), the challenge to defendants' policies that allow manager discretion to make discriminatory decisions cannot be sustained; (3) defendants' commission plans do not need to be validated; and (4) the disparate impact theory is outside of plaintiffs' EEOC charges. Moreover, defendants contend that the proposed classes are overbroad and include time-barred claims.

For the reasons set forth below, the Court denies the defendants' motion to dismiss for failure to exhaust, and denies the remainder of the motion without prejudice to defendants asserting these various grounds in response to plaintiffs' class certification motion.

The primary argument in defendants' motion is that class claims are precluded, as a matter of law, by the Supreme Court's recent decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2551 (2011). Specifically, defendants argue that plaintiffs have not (and cannot) plausibly state a disparate impact claim that can satisfy the commonality requirements under Rule 23(a) after *Dukes*. This Court disagrees. The fatal flaw identified by the Supreme Court in *Dukes* was that the class claims alleged discrimination by local managers exercising their broad, subjective discretion in the absence of any policies, which by its very nature could not satisfy the commonality

requirement of Rule 23(a)(2). However, the Supreme Court made clear that a putative class could satisfy commonality, even where there is subjective decisionmaking involved, if the subjective decisionmaking was "operated under a general policy of discrimination." *Id*. at 2553. That is precisely what plaintiffs allege here. In the third amended complaint, plaintiffs assert that specific employment practices – namely, the criteria of the compensation and account distribution systems – systematically favor male Financial Advisors at BOA, and result in a discriminatory impact on female Financial Advisors. The fact that these criteria within the general policy may involve some level of discretion does not automatically preclude such class claims under Rule 23(a)(2) at this juncture of the proceedings, prior to certification. The critical question is whether plaintiffs, after discovery, can show that the alleged discriminatory policies have resulted in a "common mode of exercising discretion that pervades the entire company." *Id*. at 2554-55. Similarly, defendants' argument that Section 703(h) of Title VII precludes any disparate impact claims based upon the commission and distribution policies, because they are merit and production based systems, is equally unavailing at the motion to dismiss stage. Plaintiffs here allege that (1) the compensation and account distribution systems are not merit or production based, but rather are governed by tainted and discriminatory criteria, and (2) defendants intentionally discriminated in implementing these policies. Such allegations are sufficient to survive defendants' motion to dismiss and/or strike the class claims.

The Court recognizes that the mere existence of a uniform employment policy, including those involving compensation and commissions, does not necessarily mean that

a disparate impact claim based upon that policy will be subject to common proof, or that there will be common questions with common answers for the class as a whole, such that Rule 23(a) will be satisfied. In fact, defendants emphatically contend that "[t]he undeniable reality is that every FA in the proposed disparate impact class experienced the challenged policies and practices in unique ways." (Defs.' Br. at 10.) That may or may not be the case here, but the core problem with defendants' argument is that it is premature at this point in the litigation. In other words, because plaintiffs have *alleged* a plausible disparate impact claim that can survive the legal strictures of *Dukes*, an analysis of whether there is a sufficient factual basis for these allegations can only be decided in conjunction with plaintiffs' anticipated class certification motion, in which plaintiffs (with the benefit of discovery) will have the burden of producing "significant proof" that the requirements of Rule 23(a), including commonality, are met. *Dukes*, 131 S. Ct. at 2553. Thus, the Court emphasizes that it has not concluded that this case will ultimately satisfy Rule 23(a) under *Dukes*; rather, the Court merely has determined that plaintiffs have alleged a plausible, disparate impact claim under *Dukes* that requires the Court's full consideration in the context of a class certification motion. Accordingly, defendants' motion is denied, without prejudice to raising these arguments and issues in their opposition to the anticipated class certification motion.

## I.   BACKGROUND

### A.   Facts

The following facts are taken from the third amended complaint and are not findings of fact by the Court. Instead, the Court assumes these facts to be true for purposes of deciding the pending motion to dismiss and/or strike the class claims, and will construe them in a light most favorable to plaintiffs, the non-moving party.

#### 1.   Plaintiffs

Calibuso lives in Miami-Dade County, Florida, and has been employed by the defendants as a financial advisor ("FA") since approximately 1995. (Third Amended Complaint (the "TAC") ¶¶ 9-10.) Specifically, Calibuso began working for Barnett Bank, which was acquired by BofA's predecessor firm in or around January 1998, and since January 1998, she has been employed by BofA as an FA and currently works in the Bricknell Avenue office of Merrill in Miami, Florida. (TAC ¶ 100.) Calibuso filed a charge of discrimination, individually and on behalf of all similarly-situated female FAs with the Equal Employment Opportunity Commission ("EEOC") on January 10, 2007, and her charge is considered dually filed with the Florida Commission on Human Rights ("FCHR"), pursuant to the EEOC's worksharing agreement. (*Id.* ¶ 35.) Calibuso filed a supplemental charge of retaliation on March 4, 2008. (*Id.*) By notice dated June 17, 2008, the EEOC dismissed her case and issued a Notice of Right to Sue. (*Id.*) She filed an additional supplemental charge of retaliation on November 19, 2010, and by notice dated September 30, 2011, the EEOC dismissed Calibuso's additional supplemental charge of retaliation and issued a Notice of Right to Sue. (*Id.*)

Moss lives in Jefferson County, Louisiana and was employed as an FA at BofA from March 2003 to October 2006. (*Id.* ¶¶ 11-12.) Specifically, she was hired by BofA on March 15, 2003 as an Assistant Vice President/Financial Advisor. (*Id.*

¶ 118.)   Plaintiffs allege that, through BofA's misconduct, BofA constructively discharged Moss, forcing her to resign effective October 27, 2006. (*Id.* ¶ 126.) On April 5, 2007, she filed a charge of discrimination and retaliation with the EEOC individually and on behalf of all others similarly situated and, pursuant to the EEOC workshare agreement, her claim is considered dually filed with the FCHR. (*Id.* ¶ 36.) By notice dated June 17, 2008, the EEOC dismissed Moss's case and issued a Right to Sue letter.  (*Id.*)

Goedtel lives in Suffolk County, New York, and was employed by BofA in its Melville, Long Island Office, as an FA from approximately February 3, 2006 to September 20, 2007. (*Id.* ¶¶ 13-14, 130.) Plaintiffs allege that, as a result of discrimination and retaliation, BofA constructively discharged Goedtel from her employment with BofA on September 20, 2007.  (*Id.* ¶ 136.) Goedtel filed her charge of discrimination and retaliation with the EEOC individually and on behalf of others similarly situated on November 12, 2007, and by notice dated May 21, 2008, the EEOC dismissed Goedtel's case and issued a Notice of Right to Sue.  (*Id.* ¶ 37.) Pursuant to the workshare agreement with the New York State Division of Human Rights ("NYSDHR"), her charge was dually filed with the NYSDHR.  (*Id.*)

On August 19, 2008, Calibuso, Moss and Goedtel, on behalf of themselves and all others similarly situated, entered into a Tolling Agreement (the "Tolling Agreement") with Bank of America Corporation, Bank of America, N.A., and Banc of America Investment Services, Inc., that tolled Calibuso, Moss and Goedtel's right to sue through April 5, 2010.  (Defs.' Ex. B; TAC ¶¶ 35-37.)

Evans lives in St. Louis County, in Missouri, and was employed by the defendants as an FA from December 2007 through November 2010.  (TAC ¶¶ 15-16.) Evans worked for Merrill as an FA from about December 17, 2007 to November 5, 2010 in Merrill's Chesterfield, Missouri Office.  (*Id.* ¶ 139.)  According to plaintiffs, Evans was constructively discharged and forced to resign on November 5, 2010.  (*Id.* ¶ 154.)   On June 17, 2010, she filed her charge of discrimination with the EEOC individually and on behalf of others similarly situated, which is considered dually filed with the Missouri Commission on Human Rights ("MCHR") pursuant to the worksharing agreement.  (*Id.* ¶ 38.)  By notice dated August 19, 2010, the EEOC dismissed Evans' case and issued a Notice of Right to Sue.  (*Id.*)  She also filed a supplemental charge of retaliation on October 15, 2010, and by notice dated September 27, 2011, the EEOC issued a Notice of Right to Sue for the supplemental charge of retaliation.  (*Id.*)

DeSalvatore lives in Monmouth County, New Jersey, and is presently employed by defendants as an FA.  (*Id.* ¶¶ 17-18.)  She has held that position since 2006 when she joined Merrill's Paths of Achievement program, which she graduated from in August 2008.  (*Id.* ¶¶ 18, 156.)  On March 11, 2011, she filed her charge of discrimination with the EEOC individually and on behalf of all others similarly situated, and pursuant to the worksharing agreement with the New Jersey Division of Civil Rights ("NJ DCR"), her charge is considered dually filed with the NJ DCR.  (*Id* ¶ 39.)  By notice dated September 16, 2011, the EEOC issued a Notice of Right to Sue. (*Id.*)

2.      Acquisition of Merrill Lynch by
Bank of America

On January 1, 2009, BofA completed its acquisition of Merrill and brought together BofA's retail brokerage unit, Banc of America Investment Services, Inc. ("BAI"), with Merrill's brokerage operations, MLPF&S. (*Id.* ¶ 43.) Upon information and belief, plaintiffs allege that, after the merger, BofA kept MLPF&S as a wholly owned subsidiary and "swept its 'legacy' Financial Advisors who had worked for BAI into MLPF&S." (*Id.*) Plaintiffs allege that defendants' company-wide policies and practices relating to setting compensation and distributing client accounts, which discriminate against female FAs, have remained largely the same. (*Id.* ¶ 44.)

3.      Defendants' Compensation Policies
and Practices

Plaintiffs allege that defendants' compensation policies and practices have applied to all FAs in all of defendants' branches throughout the liability period. (*Id.* ¶ 45.) They also allege that female FAs have earned materially less than similarly situated FAs throughout every year of the class-liability period because defendants' common and unvalidated company-wide compensation policies and practices have a discriminatory impact on female FAs. (*Id.* ¶ 47.)

Defendants pay their FAs commissions according to commission grids set out in the nationwide compensation plan. (*Id.* ¶ 49.) The percentage payout schedule for the commission grid is based in large part on production credits associated with each FA. (*Id.*) A production credit is based on the value of commissions or fees associated with a particular transaction or service charge relating to a particular client account. (*Id.*)

The operation of commission grids also depends in part on the FA's length of service ("LOS") in the industry based on registration information maintained by the Financial Industry Regulatory Authority ("FINRA"). (*Id.* ¶ 50.) LOS impacts FA compensation because the longer FAs are in the industry, the more they are expected to earn in production credits to maintain their income. (*Id.* ¶ 52.) Plaintiffs allege that management adjusts LOS for various reasons in favor of male FAs, and thus, defendants' determination of an FA's LOS is based on unreliable and unvalidated criteria. (*Id.*)

Production credits impact an FA's compensation because the higher an FA's production, the higher the FA's overall percentage payout from the grid. (*Id.* ¶ 53.) Production credits can be generated by accounts that the FA manages and management can also assign production credits to FAs of their own choosing from "house accounts" or from other FAs through a uniform, systematically documented and unvalidated company-wide procedure that allegedly has an adverse impact on the compensation of female FAs. (*Id.*)

Moreover, plaintiffs allege that the defendants direct the distribution of accounts and business opportunities through uniform, systematically documented, and unvalidated company-wide procedures that favor male FAs over female FAs. (*Id.* ¶ 54.) Plaintiffs also allege that defendants permit deviations from the grid in favor of male FAs. (*Id.* ¶ 55.) The deviations allegedly result from, among other things, adjustments to payments, forgiveness of excess compensation, and negotiation with lateral

recruits of guaranteed payout from the grid for a certain amount of time.  (*Id.*)

Defendants offer compensation packages to lateral recruits that include "upfront money" (forgivable loans that defendants extend to new FAs) and back-end bonuses (bonuses that new FAs may earn after joining the company if the FAs meet certain targets).  (*Id.* ¶ 56.)  According to plaintiffs, defendants offer these packages to lateral recruits using systematically documented and unvalidated criteria that have an adverse impact on the compensation of female FAs.  (*Id.* ¶ 57.)

According to plaintiffs, defendants also pay bonuses to their FAs through a uniform, systematically documented and unvalidated company-wide procedure using criteria that have an adverse impact on the compensation of female FAs.  (*Id.* ¶ 58.)

### 4.  Alleged Discriminatory Impact of Defendants' Policies and Practices

The accounts and business opportunities that defendants distribute typically come from one of four sources: (1) when individuals call or walk into the office to open a new account; (2) "leads" and "referrals"; (3) when an FA departs from the firm; and (4) through company-permitted partnership or teams, in which an FA partners or teams with other FAs and splits the partnership's earned revenue according to a negotiated or predetermined ratio, or in which an FA partners with a BAI employee in another line of business, whereby the partner refers accounts to the FA. (*Id.* ¶ 60.) According to defendants' account distribution policy, accounts are distributed through an FA ranking system that is based on a series of criteria including past revenue and quintile ranking (the FA's ranking in

that category compared to other FAs within the same LOS).  (*Id.* ¶ 61).

According to plaintiffs, when an FA receives an account, the FA gains not only the value of the account and the production credits it generates, the FA also gets the opportunity to grow that client's account to increase the value and generate more revenue and the opportunity to gain new clients through that client's referrals.  (*Id.* ¶ 64.)  According to plaintiffs, defendants' distribution policies have a discriminatory impact on the number of, and type of, accounts that female FAs receive from defendants, and therefore, there is a discriminatory impact on compensation.  (*Id.* ¶ 65.)

Moreover, plaintiffs claim that, by using the tainted variable of past performance as a criterion for compensation and account distribution, defendants further perpetuate the gender-based compensation disparities and create a cumulative advantage for male FAs based on systematically documented and unvalidated criteria that has an adverse impact on female FAs.  (*Id.* ¶ 66.)  According to plaintiffs, the account distribution policy rewards FAs who have generated more revenue in the past by ranking them higher on the distribution list to receive accounts, and thus, when a male FA receives an account, the revenue generated by that account allows him to earn greater and more lucrative accounts in the future.  (*Id.* ¶ 67.)  According to plaintiffs, by disproportionately giving a greater number of accounts and more lucrative accounts to male FAs, defendants use unvalidated criteria that advantage male FAs and enable them to secure additional accounts and other business opportunities under the account distribution policy.  (*Id.*)  Thus, male FAs receive a better position for the next round of account distributions.  (*Id.*)

As a result, revenue and production credits of female FAs are, on average, lower than their similarly situated male FAs.  (*Id.* ¶ 69.)

Plaintiffs also argue that defendants' compensation and account distribution systems are not bona fide merit or production systems because they are unvalidated and do not have predetermined criteria for measuring merit or productivity, they are not adequately communicated to employees, and they are not consistently and/or even-handedly applied.  (*Id.* ¶¶ 74, 75.)  Plaintiffs also claim that defendants further compound the discriminatory effects of their procedures through the award of corporate titles and provisions of sales, administrative, and professional support.  (*Id.* ¶ 81.)

Plaintiffs also claim that defendants do not have an adequate policy against discrimination and have retaliated against female FAs who have complained of gender discrimination.  (*Id.* ¶¶ 82-83.)  Female FAs have allegedly been retaliated against by denying them necessary resources and support to perform their jobs, subjecting them to harsher discipline, constructively discharging them, placing negative and misleading language on their U-5 forms, and bringing legal proceedings against them.  (*Id.* ¶ 83.)

### B.      Procedural History

Plaintiffs commenced this action on March 30, 2010.  By stipulation dated June 29, 2012, the parties agreed to permit plaintiffs to file an amended complaint, which plaintiffs subsequently filed on August 2, 2010.  On February 18, 2012, defendants requested a pre-motion conference in anticipation of their motion for partial judgment on the pleadings and/or partial summary judgment.  After the parties

participated in the pre-motion conference on March 4, 2011, defendants consented to the filing of plaintiffs' second amended complaint and suggested a briefing schedule for defendants' motion.  The motion for judgment on the pleadings was fully briefed on July 8, 2011.

However, in light of the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, defendants submitted a letter on June 27, 2011, arguing that plaintiffs' Title VII and state law claims seeking class action certification under Rule 23 must be dismissed, and requested a pre-motion conference.  The parties participated in a telephone conference on July 18, 2011, where a briefing schedule was set.

On August 31, 2011, plaintiffs requested a pre-motion conference in anticipation of their motion to amend the second amended complaint to clarify their class allegations in light of the *Dukes* decision.  The parties participated in a telephone conference on October 4, 2011, where a date was set for plaintiffs to file their third amended complaint and a briefing schedule was set for defendants' motion to dismiss and/or strike the class claims.  The third amended complaint was filed on October 5, 2011.  Defendants' motion was filed on October 26, 2011.  Plaintiffs' opposition was filed on November 22, 2011.  Defendants' reply was filed on December 6, 2011.  Both defendants and plaintiffs submitted supplemental authority on January 13, 2012.  Defendants submitted additional supplemental authority on January 16, 2012.  The parties participated in oral argument on January 17, 2012.  Following oral argument, both parties proceeded to submit supplemental authority to the Court.[2]  The Court has fully

---

[2] On January 20, 2012, plaintiffs filed supplemental authority, and defendants replied to plaintiffs' submission on January 20, 2012.  Plaintiffs replied to

considered all of the arguments presented by the parties.

## II.   STANDARD OF REVIEW

### A.   Motion to Dismiss

When a Court reviews a motion to dismiss for failure to state a claim for which relief can be granted, it must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth a two-pronged approach for courts deciding a motion to dismiss. 556 U.S. 662, 129 S. Ct. 1937 (2009). The

Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (internal citations omitted) (quoting and citing *Twombly*, 550 U.S. at 556-57).

The Court notes that in adjudicating this motion, it is entitled to consider: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (internal citations omitted), *aff'd in part and reversed in part on other grounds sub nom.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), *cert. denied*, 546 U.S. 935 (2005); *see also*

---

defendants' January 20, 2012 opposition on January 23, 2012. Plaintiffs again submitted supplemental authority on February 24, 2012, to which defendants replied on February 28, 2012. Defendants submitted supplemental authority on March 12, 2012, and plaintiffs submitted supplemental authority on March 28, 2012. On April 19, 2012, plaintiffs submitted supplemental authority, and defendants responded on April 23, 2012. On July 6, 2012, plaintiffs submitted supplemental authority, to which defendants responded on July 10, 2012. On September 11, 2012, defendants filed supplemental authority, to which plaintiffs responded on September 13, 2012.

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)("[T]he district court . . . could have viewed [the documents] on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim."); *Brodeur v. City of New York*, No. 04 Civ. 1859 (JG), 2005 U.S. Dist. LEXIS 10865, at *9-10 (E.D.N.Y. May 13, 2005) (court could consider documents within the public domain on a Rule 12(b)(6) motion to dismiss)

**B.    Motion to Strike Class Allegations**

"Motions to strike are generally looked upon with disfavor." *Chenensky v. New York Life Ins. Co.*, No. 07 Civ. 11503, 2011 WL 1795305, at * 1 (S.D.N.Y. Apr. 27, 2011) (quoting *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 404 (W.D.N.Y. 2010)). "A motion to strike class allegations under Rule 12(f) is even more disfavored because it requires a reviewing court to 'preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification.'" *Ironforge.com*, 747 F. Supp. 2d at 404 (alterations in original) (quoting *Francis v. Mead Johnson & Co.*, No. 10-CV-701, 2010 WL 3733023, at *1 (D. Colo. Sept. 16, 2010) and *Bryant v. Food Lion, Inc.*, 774 F. Supp. 1484, 1495 (D.S.C. 1991)). However, "[a] motion to strike that addresses issues 'separate and apart from the issues that will be decided on a class certification motion' is not procedurally premature." *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950(LBS)(JCF), 2012 WL 2912741, at *2 (S.D.N.Y. July 17, 2012) (adopting in part and reversing in part report and recommendation) (quoting *Rahman v. Smith*

*& Wollensky Rest. Group, Inc.*, 06 Civ. 6198, 2008 U.S. Dist. Lexis 2932, at *11, 2008 WL 161230 (S.D.N.Y. Jan. 16, 2008)).

### III.    DISCUSSION

#### A.    Scope of EEOC Charge

Defendants argue that plaintiffs' disparate impact claim in the third amended complaint exceeds the scope of their EEOC charges. For the reasons set forth below, the Court disagrees and concludes that plaintiffs' disparate impact claims do not exceed the scope of plaintiffs' EEOC charges.

#### 1.    Applicable Law

Generally, to bring a Title VII discrimination claim in federal district court, a plaintiff must first exhaust her administrative remedies by "filing a timely charge with the EEOC or with 'a State or local agency with authority to grant or seek relief from such practice.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82-83 (2d Cir. 2001) (quoting 42 U.S.C. § 2000e-5(e)). However, "'claims that were not asserted before the EEOC [or an appropriate State or local agency] may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency.'" *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005) (quoting *Legnani v. Alitalia Linee Aeree Italiane*, *S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (per curiam)). "Reasonably related conduct is that which 'would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" *Id.* (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359-69 (2d Cir. 2001)).[3] In determining

---

[3] Two other kinds of claims may be considered "reasonably related": those alleging "retaliation by an

whether a claim is "reasonably related" to the EEOC charge, "'the focus should be on the factual allegations made in the [EEOC] charge itself . . .'" and on whether those allegations "gave the [EEOC] 'adequate notice to investigate'" the claims asserted in court. *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Deravin v. Kerik*, 335 F.3d 195, 201-02 (2d Cir. 2003)).

### 2.    Application

Defendants argue that the disparate impact claim, as articulated in the third amended complaint, must be dismissed because it exceeds the scope of the administrative charges. (Defs.' Br. at 14.) Plaintiffs counter that they are not barred from bringing the action because "[p]laintiffs are entitled to litigate claims 'reasonably related to the allegations in the complaint filed with the EEOC.'" (Pls.' Opp. at 22 (citing *Kirkland v. Buffalo Bd. of Educ.*, 622 F.2d 1066, 1068 (2d Cir. 1980).) However, according to defendants, since none of the plaintiffs' EEOC charges alleges that unvalidated systems had a disparate impact on female FAs, and that four of the five EEOC charges do not mention disparate impact at all, the EEOC charges are not reasonably related to the third amended complaint. (Defs.' Br. at 14.) However, this Court disagrees with defendants.

Here, all of the plaintiffs' EEOC charges complain of sexual discrimination based on the compensation and account distribution systems. (*See* TAC, Exs. 1-5.) For example, Calibuso's EEOC charge states that:

> BofA routinely distributed business opportunities, including accounts from departing and retiring brokers, referrals, leads, and potential clients, and more advantageous partnerships with different departments within BofA, to male Financial Advis[o]rs rather than to female Financial Advis[o]rs.

(TAC, Ex. 1 ¶ 3.)   Calibuso further alleged that "[a]s a result of the inequitable and discriminatory distribution of accounts and account prospects, female Financial Advis[o]rs have diminished income potential and diminished actual income as compared to similarly-situated male employees." (*Id.*) Similarly, Moss alleged in her EEOC charge that:

> BofA routinely distributed business opportunities, including accounts from departing brokers, referrals, leads, potential clients, and more advantageous partnerships with different BofA departments, to male advisors rather than female advisors.

(TAC, Ex. 2 ¶ 3.) Evans stated in her charge that:

> Merrill Lynch has routinely distributed business opportunities – including accounts from departing and retiring brokers, and more advantageous partnerships with other brokers – to male Financial Advisors rather than to female Financial Advisors. As a result of the inequitable and discriminatory distribution of accounts and partnerships, female Financial Advisors have diminished income

---

employer against an employee for filing an EEOC charge," and those alleging "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993), *superseded by statute on other grounds as stated in Hawkins v. 115 Legal Serv. Care*, 163 F.3d 684 (2d Cir. 1998).

potential and diminished actual income as compared to similarly-situated male employees.

(TAC, Ex. 4 ¶ 4.) DeSalvatore also included similar allegations in her EEOC charge:

> Pursuant to company-wide policies, Respondents have routinely distributed business opportunities, including accounts from departing and retiring brokers, referrals, leads, potential clients, and more advantageous partnerships, to male FAs rather than to female FAs. As a result of the inequitable and discriminatory distribution of accounts and account prospects, female FAs including myself have diminished income potential and diminished actual income as compared to similarly situated male FAs.

(TAC, Ex. 5 ¶ 5.) In addition, Goedtel described a series of instances in which male FAs were given accounts as opposed to her, and thus her salary was affected. (TAC, Ex. 3.) Goedtel also alleged in her EEOC charge that:

> I believe that the conduct described above is part of a pattern and practice of discrimination against female FA's at BofA. I believe that BofA routinely discriminates against female FA's with respect to pay, business opportunities, and other terms and conditions of employment.

(TAC, Ex. 3 ¶ 21.)

Despite defendants' contention, it is clear from the allegations in the EEOC charges that plaintiffs were alleging violations of Title VII based the discriminatory distribution of accounts and that there was discrimination against women in compensation. Thus, the allegations related to the disparate impact claim in the third amended complaint reasonably relate to the allegations in the EEOC charge, and the defendants were on notice of the allegations. *See, e.g.*, *Gomes v. Avco Corp.*, 964 F.2d 1330, 1334-35 (2d Cir. 1992) ("To be sure, this complaint most naturally supports a claim of intentional discrimination. . . . Nonetheless, once the EEOC investigated the case and found that Gomes did not satisfy the eight year rule, it would have been perfectly natural for the EEOC to question the necessity of the eight year rule itself. . . . Accordingly, we conclude that an investigation of Gomes' disparate impact claim would reasonably have flowed from an investigation of his disparate treatment claim."); *Jenkins v. N.Y.C. Transit Auth.*, 646 F. Supp. 2d 464, 470 (S.D.N.Y. 2009) ("Even though the plaintiff may not have used the term 'disparate impact' in her charge, it is the substance of the charge and not its label that controls. . . . The plaintiff's disparate impact claim is therefore not barred because it is reasonably related to the conduct alleged in her EEOC charge." (quotations and citations omitted)); *Maniatas v. N.Y. Hosp.-Cornell Med. Ctr.*, 58 F. Supp. 2d 221, 227 (S.D.N.Y. 1999) ("Because plaintiff's claim under disparate impact theory is arguably 'reasonably related' to her intentional discrimination claim, this Court will analyze the claim as well.").

In sum, plaintiffs' third amended complaint does not exceed the scope of the EEOC charges, and the motion to dismiss on that ground is denied.

B.  Commonality Requirement and *Walmart Stores Inc. v. Dukes*

Defendants argue that plaintiffs' disparate impact claims could never satisfy Rule 23(a)'s commonality requirement after the Supreme Court's decision in *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541 (2011). In response, plaintiffs argue that they have sufficiently alleged commonality and that "[t]he sort of fact-based inquiry the *Dukes* Court espoused and engaged in, while required at the class certification stage when the court is armed with a full class certification record, has no place in a Rule 12(b)(6) analysis that considers only whether plaintiffs have provided fair notice to the defendants of the basis for an employment claim through facially plausible allegations." (Pls.' Opp. at 10.) For the reasons set forth below, this Court agrees with the plaintiffs and concludes that plaintiffs have alleged a plausible claim that is consistent with the Rule 23(a)'s commonality requirement as articulated in *Dukes*. Thus, given the existence of a plausible claim based upon the pleadings, defendants' motion is premature in this case, and plaintiffs should be given an opportunity to set forth their proof of commonality at the class certification stage.

1.  Class Certification

a.  Rule 23(a) and (b)

In order for a class to be certified, the party seeking certification must comport with the requirements of Federal Rule of Civil Procedure 23. Federal Rule of Civil Procedure 23(a) provides that:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Moreover, the party seeking class certification must satisfy at least one of the requirements listed in Federal Rule of Civil Procedure 23(b). Federal Rule of Civil Procedure 23(b) provides:

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or

would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

b.    *Dukes* and its Progeny

In *Dukes*, the Supreme Court reversed the decision of the Ninth Circuit that certified a class of female employees who alleged that the discretion exercised by their local supervisors over pay and promotion matters violated Title VII by discriminating against women. *Dukes*, 131 S. Ct. 2541. In coming to this conclusion, the Court held that commonality requires that the plaintiffs "'have suffered the same injury" as opposed to "suffer[ing] a violation of the same provision of law." *Id.* at 2551. Accordingly, the Court held that the claims must be a "common contention" and that the common contention "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

In addition, the *Dukes* Court stated that:

Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc. We recognized in [*General Telephone Co. of Southwest v.*] *Falcon* [457 U.S. 147 (1982)] that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," 457 U.S., at 160, 102 S. Ct. 2364, and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," . . . .

*Dukes*, 131 S. Ct. at 2551.

In reaching this determination, the Supreme Court noted that, in certain cases, discretion given to lower level supervisors can lead to Title VII liability under a disparate impact theory, but noted that it "does not lead to the conclusion that every employee in a company using a system of discretion has such a claim in common." *Id.* 2554. Moreover, the Court held that "Respondents have not identified a common mode of exercising discretion that pervades the entire company . . ." and subsequently held that the statistical evidence submitted by respondents was insufficient to establish that respondents' theory could be proven on a classwide basis. *Id.* 2554-55

Since *Dukes*, several federal courts have denied class certification because there was not a common mode of discretion, and thus Rule 23(a)'s requirements were not satisfied. *See, e.g.*, *Bell v. Lockheed Martin Corp.*, No. 08-CV-6292, 2011 WL 6256978, at * 6 (D.N.J. Dec. 14, 2011) (granting defendants' motion to deny class certification because "[t]he Court finds that the allegedly discriminatory Lockheed policies were substantially similar to the Wal-Mart discretionary policies that the *Dukes* Court found to be immune from class action suit."); *Rodriguez v. Nat'l City Bank*, 277 F.R.D. 148, 154-55 (E.D. Pa. 2011) ("although the plaintiffs in *Dukes* were bringing employment discrimination claims under Title VII and Plaintiffs in this case bring discriminatory lending claims under the FHA and ECOA, both groups rely on the disparate impact theory to show that the defendants' policy of granting discretion to decision-makers resulted in discrimination"); *In re Wells Fargo Res. Mortg. Lending Discrim. Litg.*, No. 08-MD-1930 MMC, 2011 WL 3903117, at *4-5 (N.D. Cal. Sept. 6, 2011) (denying class

certification because plaintiffs were unable to demonstrate that, with regard to the loan officers, there was "[a] common mode of exercising discretion that pervades the entire company"); *Daskalea v. Walsh Humane Soc'y*, 275 F.R.D. 346, 360 (D.D.C. Aug. 10, 2011) (denying class certification and holding that the plaintiffs failed to demonstrate typicality because "[i]n short, the Act was sufficiently open-ended that the Humane Society's enforcement and administration of the Act were largely left to its discretion, and it therefore comes as no surprise that there would be considerable variation among class members' experiences").

2.      Application

In the case at bar, defendants attempt to have this Court, in essence, conduct the rigorous Rule 23(a) class certification analysis at the pleading stage before the plaintiffs have been given an opportunity to set forth their proof of, among other things, commonality. However, under the circumstances of this particular case, this Court concludes that such an analysis is premature at this stage of the litigation because plaintiffs have sufficiently alleged commonality, consistent with *Dukes*, in the third amended complaint.

Defendants urge the Court to follow the reasoning of the Sixth Circuit and the Western District of North Carolina and dismiss this action before plaintiffs have had an opportunity to file their class certification motion. *See, e.g.*, *Scott v. Family Dollar Stores, Inc.*, No. 3:08CV540, 2012 WL 113657, at *4 (W.D.N.C. Jan. 13, 2012) ("Furthermore, the court finds that, after *Dukes*, it would be futile to allow plaintiffs to conduct discovery because plaintiff's theory for class certification is simply foreclosed by *Dukes*. Indeed, here, in

support of their request for discovery, plaintiffs have stated that discovery is mostly completed, and that they will be able to identify questions of law or fact that are common to the proposed class at the class certification stage. . . .  Like the plaintiffs in *Dukes*, plaintiffs here have been unable to 'identif[y] a common mode of exercising discretion that pervades the entire company. . . .'"); *Pilgrim v. Universal Health Card, LLC*, 660 F. 3d 943, 949 (6th Cir. 2011) ("That the motion to strike came before the plaintiffs had filed a motion to certify the class does not by itself make the court's decision reversibly premature.  Rule 23(c)(1)(A) says that the district court should decide whether to certify a class '[a]t an early practicable time' in the litigation, and nothing in the rules says that the court must await a motion by the plaintiffs.")[4]

First, plaintiffs' claims in this action are distinguishable from *Pilgrim* and *Family Dollar*.  In this case, the claims set forth by the plaintiffs are not substantially similar to the claims in *Dukes*, and therefore, it is not clear at this stage of the litigation whether plaintiffs can prove commonality at the class certification stage.  Here, plaintiffs do not argue that the discretion afforded to individual lower level supervisors, by itself, results in a disparate impact on female FAs.  Instead, plaintiffs argue that, because the common compensation and account distribution systems rely on criteria that systematically favors male FAs, there is a discriminatory impact on women.  (*See* Pls.' Opp. at 11.)    This is clearly alleged

throughout the third amended complaint. For example, plaintiffs allege that:

> This earning disparity is a result of Defendants' unvalidated company-wide policies and practices that govern compensation and the distribution of accounts and business opportunities, and the lack of proper accountability measures to ensure fairness.

(TAC ¶ 3).  Plaintiffs further allege that:

> Specifically, Defendants, through their conduct throughout the liability period, have caused these gender-based earning disparities by . . . (c) intentionally implementing and retaining company-wide policies and practices relating to compensation, the distribution of client accounts from departing or retiring FAs, as well as other business opportunities, which give male FAs greater opportunities to earn compensation; (d) intentionally implementing and retaining company-wide policies and practices that have created a "cumulative advantage" effect by perpetuating and widening the gender-based earning disparities that Defendants' discriminatory policies and practices have caused; and (e) utilizing a uniform, unvalidated quintile ranking procedure to measure performance that has a disparate impact on female FAs, as discussed below.

(TAC ¶ 5.)  Plaintiffs also allege that:

> Defendants direct the distribution of accounts and business opportunities through uniform, systematically documented, and unvalidated

---

[4] It should be noted that the court in *Pilgrim* granted defendants' motion because plaintiffs were unable to meet the predominance requirement of Rule 23(b). *Pilgrim*, 660 F.3d at 946.  However, as will be discussed *infra*, like the commonality requirement, the Court believes that plaintiffs should be given an opportunity to support that claim at the class certification stage.

company-wide procedures described below that favor male FAs over female FAs.

(TAC ¶ 54.)   Accordingly, although there appears to be some level of discretion afforded to lower level supervisors, this claim is not purely based on the discretion afforded to the defendants' supervisors. Unlike in *Dukes*, plaintiffs here have alleged that it is the criteria used by the defendants to distribute accounts that results in the disparate impact.   This critical distinction makes this case more analogous to the Seventh Circuit case *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith*,  672 F.3d 482 (6th Cir. 2012) (hereinafter "*McReynolds I*"), than to *Dukes*.   In *McReynolds I*, the employee-plaintiffs sought class certification and alleged that the implementation of defendants' teaming policy and account distribution policy had a disparate impact on African Americans. *Id.* at 488.   The Sixth Circuit explained how, although discretion was afforded to directors, the case was not similar to *Dukes*:

The Complex Directors, as well as the branch-office managers, have a measure of discretion with regard to teaming and account distribution; they can veto teams and can supplement the company criteria for distributions. And to the extent that these regional and local managers exercise discretion regarding the compensation of the brokers whom they supervise, the case is indeed like *Wal-Mart*. But the exercise of that discretion is influenced by the two company-wide policies at issue: authorization to brokers, rather than managers, to form and staff teams; and basing account distributions on the past success of the brokers who are competing for the transfers.

Furthermore, team participation and account distribution can affect a broker's performance evaluation, which under company policy influences the broker's pay and promotion.

*Id. at* 489.   The Sixth Circuit further explained that, despite the discretion afforded to Complex Directors, the class should be certified:

There is no indication that the corporate level of Merrill Lynch (or its parent, Bank of America) wants to discriminate against black brokers. Probably it just wants to maximize profits. But in a disparate impact case the presence or absence of discriminatory intent is irrelevant; and permitting brokers to form their own teams and prescribing criteria for account distributions that favor the already successful – those who may owe their success to having been invited to join a successful or promising team – are practices of Merrill Lynch, rather than practices that local managers can choose or not at their whim.   Therefore challenging those policies in a class action is not forbidden by the *Wal-Mart* decision; rather that decision helps (as the district judge sensed) to show on which side of the line that separates a company-wide practice from an exercise of discretion by local managers this case falls.

*Id* at 490.   Although defendants attempt to argue that the decision by the Seventh Circuit is distinguishable, the Court finds this argument to be unavailing.   (*See* Defs.' Response to Pls.' Supplemental Authority, Feb. 28, 2012, ECF No. 124). Plaintiffs in this case, like the plaintiffs in *McReynolds I*,

claim, in short, that it is the criteria used by the supervisors or managers that leads to the disparate impact, not only the discretion afforded to lower level supervisors.

Moreover, *Dukes* did not foreclose all class action claims where there is a level of discretion afforded to individual managers and supervisors. As stated *supra*, the *Dukes* Court stated that the "[r]espondents have not identified a common mode of exercising discretion that pervades the entire company . . ." *Dukes*, 131 S. Ct. at 2554-55. Although, in *Dukes*, the plaintiffs merely alleged a strong corporate culture of gender discrimination, here plaintiffs allege that the implementation of company-wide procedures, *i.e.* the compensation and distribution systems, results in a disparate impact on women because the criteria used by individual managers is flawed. Thus, although there may be some level of discretion afforded to the defendants' managers and supervisors, such discretion does not necessarily preclude plaintiffs' class claims under *Dukes*. In short, based on the allegations in the third amended complaint, it is plausible that plaintiffs will come forth with sufficient evidence at the class certification stage to demonstrate commonality consistent with the *Dukes* decision.[5]

It should also be noted that other federal courts in analogous contexts have refrained from dismissing a class action case at the motion to dismiss stage when the defendants have challenged the class claims on *Dukes* grounds. In *Chen-Oster v. Goldman Sachs*

*& Co.*, Judge Sand denied defendants' motion to strike all class allegations and motion for partial summary judgment. No. 10 Civ. 6950(LBS)(JCF), 2012 WL 2912741, at *1 (S.D.N.Y. 2012). The Court distinguished the *Dukes* case from the case before it:

> What was missing in *Dukes*, but is present here, are "specific employment practice[s]" . . . that "tie[] all [of Plaintiffs'] claims together." . . . It is true that an individual manager's discretion might be more or less discretionary, but this, as the Supreme Court made clear in *Dukes*, does not doom a class, since this discretion would have been exercised under the rubric of a company-wide employment practice.

*Id*. at *2 (citations omitted).

Similarly, in *Barghout v. Bayer Healthcare Pharmaceuticals*, the court denied the defendants' motion to dismiss and strike the class allegations. No. 11-cv-1576, 2012 WL 1113973, at *11-12 (D.N.J. Mar. 30, 2012). In that case, the District of New Jersey noted that the case before it was distinguishable from *Dukes*, because "[a]lthough the *Dukes* Court reasoning is binding and relevant to analysis of whether an expansive class of employee-Plaintiffs should be certified, its applicability is tenuous a[t] this stage of litigation." *Id*. at *11. Moreover, the Court noted that plaintiffs had been "candid in terms of describing their strategy and envisioned approach in this case" and demonstrated an understanding of what certification under Rule 23 would require.[6] *Id*. at *12.

---

[5] For the reasons discussed *supra* with regard to commonality, the Court also finds that plaintiffs have properly pled predominance pursuant to Rule 23(b)(3), and that it is possible, despite *Dukes*, for plaintiffs to come forth with proof at the class certification stage. Accordingly, the Court denies defendants' motion to dismiss and/or strike the class claims on that ground.

[6] At oral argument, defendants argued that discovery had been completed, and thus, plaintiffs should have come forward at this stage of the litigation and set

Although defendants attempt to distinguish this case from *Chen-Oster* and *Barghout*, and argue that this case is more analogous to *Pilgrim* and *Family Dollar*, this Court disagrees. (*See* Defs.' Notice of Supplemental Authority, Jan. 16, 2012, ECF No. 117; Response to Pls.' Supplemental Authority, Jan. 20, 2012, ECF No. 120). As discussed *supra*, this case, unlike *Pilgrim* and *Family Dollar*, is distinguishable, according to the allegations in the third amended complaint, from *Dukes*, and thus foreclosing plaintiff from having the ability to set forth its proof of commonality at this stage of the litigation is premature. Accordingly, the defendants' motion to dismiss and/or strike plaintiffs' class claims due to a lack of commonality is denied.[7]

### C.    703(h) of Title VII

Defendants also argue that the plaintiffs' disparate impact claims against defendants' commission and distribution policies must be dismissed as a matter of law because they are production and merit based systems that are protected by Section 703(h) of Title VII. (Defs.' Br. at 5-6). In response, plaintiffs argue that Section 703(h) is inapplicable. (Pls.' Opp. at 5-9.) Specifically, plaintiffs argue that Section 703(h) of Title VII does not apply because "(1) BOA's compensation and account distribution systems are not merit or production systems, and (2) Plaintiffs have adequately pled that the compensation system is intentionally discriminatory." (*Id*. at 6.) For the reasons set forth below, taking the allegations in the third amended complaint as true, and drawing all reasonable inferences in plaintiffs' favor, the Court denies defendants' motion on this ground and finds that plaintiffs have adequately pled that the systems challenged are not merit or

---

forth their evidence of commonality and predominance. This Court disagrees. Defendants have pointed to no authority to support their contention that plaintiffs must set forth their evidence at the pleading stage. In fact, the *Dukes* Court clearly stated that the Court may need to "probe behind the pleadings" when conducting a Rule 23 rigorous analysis. *Dukes*, 131 S. Ct. at 2551. Here, the Court, as discussed *supra*, finds that the plaintiffs have set forth sufficient allegations to plead commonality and predominance, and the rigorous Rule 23 analysis should be conducted when plaintiffs bring their class certification motion.

[7] Defendants make a number of arguments related to the scope and categories of classwide relief and argue that *Dukes* and Second Circuit authority preclude the purported hybrid or divided certification under Rule 12(b)(2) given the facts pled. Similarly, defendants argue that certain aspects of the class claims are time-barred, the named plaintiff has no standing to assert the claims, and the sub-classes are impermissibly overbroad. However, these issues will only become relevant should plaintiffs be able to prevail at the motion for certification stage in demonstrating that there is a factual basis that will allow them to proceed as a class action in the wake of *Dukes*. Thus, in its discretion, the Court declines to address these other issues regarding the scope of the class claims and relief until the potentially dispositive issue regarding the application of *Dukes* (discussed *supra*) is decided in connection with the certification motion, because these other issues could become moot. Of course, defendants can renew these arguments in response to

plaintiffs' motion for class certification. *See, e.g.*, *Hofstetter v. Chase Home Fin., LLC*, 751 F. Supp. 2d 1116, 1131 (N.D. Cal. 2010) ("defendants' criticisms targeting the scope of the putative class allegations and the appropriateness of various 'remedies' set forth in the proposed complaint are premature and will not be addressed at this time. The propriety of plaintiff's proposed class definitions will be addressed during the class certification process, when full attention can be given to the issue"); *In re Giant Interactive Grp., Inc. Secs. Litig.*, 643 F. Supp. 2d 562, (S.D.N.Y. 2009) ("Defendants' argument is a premature attempt to limit the scope of the class at the pleading stage"); *Krane v. Capital One Servs., Inc.*, 314 F. Supp. 2d 589 (E.D. Va. 2004) ("Because the issue of class certification is not currently before the Court, the Defendant's Motion to Limit Rearward Scope of Plaintiffs' Proposed Class Definitions is not yet ripe and will be denied as premature."). Accordingly, defendants' request to strike these portions of the proposed complaint are denied, without prejudice to defendants renewing these objections and arguments in connection with the anticipated class certification motion.

production based systems and, in any event, allege intentional discrimination.

1.     Applicable Law

Section 703(h) of Title VII provides that:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.

42 U.S.C. § 2000e-2(h). "Under § 703(h), the fact that a seniority system has a discriminatory impact is not alone sufficient to invalidate the system; actual intent to discriminate must be proved." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 65 (1982). "Section 703(h) thus creates an exception to the general rule that 'a prima facie Title VII violation may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group.'" *McReynolds v. Merrill Lynch & Co., Inc.*, No. 11-1957, 2012 WL 3932328, at *4 (7th Cir. Sept 11, 2012) (hereinafter "*McReynolds II*") (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 349 (1977)). However, a compensation scheme is not protected under Section 703(h) unless it actually measures what it purports to measure. *See Guardians Ass'n of N.Y.C. Police Dep't Inc. v. Civil Serv. Comm'n*, 633 F.2d 232, 253 (2d Cir. 1980).

2.     Application

As stated *supra*, plaintiffs argue that Section 703 of Title VII does not bar their claims that the compensation and account distribution polices are not merit or production systems and because they allege that the systems intentionally discriminate. Viewing the evidence in the light most favorable to the plaintiffs, the Court finds that plaintiffs have sufficiently alleged a disparate impact claim that is not barred by Section 703(h) of Title VII.

As a threshold matter, this Court agrees with the plaintiffs that "[t]he cases BOA cites in its current motion to dismiss are also inapposite because in each of those cases the district court determined, with the benefit of a full evidentiary record at summary judgment, that the compensation system at issue measured what it purported to measure." (Pls.' Opp. at 8 (emphasis in original) (citing Defs.' Br. at 5).) At this stage of the litigation, the inquiry is whether the plaintiffs have properly alleged a

plausible disparate impact claim that is not barred by Section 703 of Title VII, and the Court concludes that they have.

Plaintiffs have properly alleged that defendants' compensation and production based policies do not measure what they purport to measure. *See Guardians*, 633 F.2d at 253. For example, the third amended complaint alleges that:

> Defendants further cause and compound the discriminatory effects of the commission grids by permitting deviations from the grid in favor of male FAs. These deviations result from, among other things, adjustments of payments, forgiveness of excess compensation . . . and negotiation with lateral recruits of guaranteed payout from the grid for a certain amount of time.

(TAC ¶ 55.) The third amended complaint further alleges that:

> By using the tainted variable of past performance as a criterion for compensation and account distribution, Defendants further perpetuate the gender-based compensation disparities and create a cumulative advantage for male FAs based on systematically documented and unvalidated criteria that has an adverse impact on female FAs.

(TAC ¶ 66.) Plaintiffs clearly state their allegation that the compensation and account distribution systems are not merit or production based systems in paragraph 77 of the third amended complaint which states: "Defendants' compensation and account distribution system are not justified by business necessity because they do not compensate FAs based on actual measure of

performance." (TAC ¶ 77.) In sum, the complaint alleges that the criteria used by defendants to determine compensation and account distribution have a discriminatory impact on women and, while they appear to be facially neutral, through "unstated but officially sanctioned and ubiquitous exceptions driven by favoritism, not merit," (*See* Pls.' Opp at 7 (citing TAC ¶¶ 5, 52-58, 61-65, 66, 77)), and the use of tainted criteria, compensation and account distributions do not measure what they purport to measure.

In support of their argument, defendants recently submitted the Seventh Circuit's opinion in *McReynolds II*, as supplemental authority in support of their motion to dismiss. (Defs.' Notice of Supplemental Authority, Sept. 11, 2012, ECF No. 132.) In that decision, the Seventh Circuit affirmed the district court's dismissal of plaintiffs' disparate impact claims. *McReynolds II*, 2012 WL 3932328, at *1. The Court held that "[a]s described in the complaint, the retention program awarded bonuses based on race-neutral assessment of broker's prior level of production, which suffices to protect the program under § 703(h) unless it was adopted with the intent to discriminate." *Id*. However, unlike in the case at bar, in *McReynolds II*, the court concluded that "the production-credit system is about as direct a measure of production as one could imagine in the financial[]services industry, *and the plaintiffs do not suggest otherwise*. *Id*. at *5 (emphasis added). Moreover, in *McReynolds II*, the Court noted that "[n]owhere does the complaint allege that the formula is actually *applied* in a discriminatory manner – only that the 'inputs' determining a broker's production levels were themselves the products of past discrimination." *Id*.

Here, as described *supra*, plaintiffs allege that the criteria relied upon by the compensation and account distribution systems are tainted, and result in discrimination against women. Accordingly, at this stage of the litigation, where the Court must take the allegations in the third amended complaint as true, and draw every reasonable inference in plaintiffs' favor, the Court finds that plaintiffs have sufficiently alleged that the compensation and account distribution systems are not merit or production based systems protected by Section 703(h) of Title VII. Moreover, as plaintiffs note, unlike *McReynolds II*, "[t]he female financial advisors in this lawsuit do *not* challenge the retention bonus. Instead, they challenge account distribution, teaming and partnership, and other facets of the compensation system, like in *McReynolds I*." (Pls.' Response to Defs.' Notice of Supplemental, Sept. 13, 2012, ECF No. 133 (emphasis in original).) Thus, this case is distinguishable from *McReynolds II* and, as discussed in detail *supra*, similar to *McReynolds I*.[8]

Accordingly, plaintiffs have adequately pled their disparate impact claims in a manner that is not barred by Section 703(h) of Title VII.[9] Therefore, the Court denies

defendants' motion to dismiss and/or strike the class claims on this ground.

## IV. CONCLUSION

For the reasons set forth above, the Court denies the defendants' motion to dismiss and/or strike the class claims for failure to exhaust, and denies the remainder of the motion without prejudice to defendants asserting these various grounds in response to plaintiffs' class certification motion.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:      September 27, 2012
            Central Islip, NY
                    * * *

Plaintiffs are represented by Rachel Geman Kelly M. Dermody, Rachel Geman, Allison M. Stocking, Heather H. Wong of Lieff Cabraser Heimann & Bernstein, LLP, 250 Hudson Street, 8th Floor, New York New York, 10013-1413 and also located at 275 Battery Street, 29th Floor, San Francisco, CA 94111. Defendants are represented by Katherine H. Parker, Gershom Radin Smith and Joseph Baumgarten of Proskauer & Rose LLP, Eleven Times Square, New York, New York 10036.

---

[8] The Court also concludes, in the alternative, that plaintiffs have sufficiently pled that the defendants implemented the compensation and account distribution systems in a manner that was intentionally discriminatory. (*See* TAC ¶¶ 42, 79-85.) Plaintiffs contend that "[a]t the appropriate time, Plaintiffs will present factual evidence supporting their allegations of intentional discrimination, including evidence taken from numerous audits and other discovery that describes systematic deviations from the account distribution system that favored male FAs." (Pls.' Opp. at 9 n.9.)

[9] Defendants also argue that "plaintiffs attempt to improve their disparate impact claim by asserting that the commission plans and account distribution policy/guidelines are 'unvalidated' should be rejected

out of hand." (Defs.' Br. at 12.) Plaintiffs dispute this legal contention. However, the validation issue is not critical to the plausibility of plaintiffs' disparate impact claim for purposes of this motion. In other words, the Court concludes that the claim is plausible independent of the allegations regarding a lack of validation. Thus, the Court need not address this issue at this juncture.