UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

JUDY CALIBUSO, *et al.*,

                                Plaintiffs,

                -against-

BANK OF AMERICA CORPORATION, *et al.*,

                               Defendants.

-----------------------------------------------------------------x

**MEMORANDUM ON FINAL
APPROVAL OF CLASS ACTION
SETTLEMENT**

10-CV-1413 (PKC)

PAMELA K. CHEN, United States District Judge:

On December 27, 2013, the Court finally approved the class (and collective) action settlement (the "Settlement") in this case. (Dkt. No. 202 ("Final Approval Order").) The Settlement resolves the full range of Plaintiffs' gender discrimination claims under federal law[1]

---

[1]      *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); Equal Pay Act, 29 U.S.C. §§ 206 *et seq.* ("EPA"). Technically, the EPA claim is brought as a collective action, "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated," based on Section 16(b) of the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 216(b). The difference between certifying a FLSA collective action and a traditional class action under Federal Rule of Civil Procedure ("FRCP") 23 is that the former is "*not* subject to [FRCP] 23's strict requirements." *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 263 (S.D.N.Y. 1997) (Sotomayor, J.) (emphasis in original). The former need only satisfy a "similarly situated" requirement, which falls short of the "much higher threshold of demonstrating that common questions of law and fact will 'predominate' for [FRCP] 23 purposes." *Myers v. Hertz Corp.*, 624 F.3d 537, 555-56 (2d Cir. 2010). Therefore, insofar as the Court certifies a traditional class action for the Title VII claim, it correspondingly certifies a collective action for the EPA claim. *Accord id.* at 556 (holding that, where "the higher predominance standard [for FRCP 23 purposes] *has not been met*," however, the plaintiffs may not necessarily have failed to "satisfy the lower standard" for a FLSA collective action) (emphasis added).

and the state laws of New York, Florida, Missouri, and New Jersey,[2] alleging that female financial advisors ("brokers") at Banc of America Investment Services, Inc. and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S")[3] were subject to policies that affected them less favorably than their male counterparts, mainly, with respect to account distribution, the sharing of accounts among brokers through teams (also known as "teaming"), and, as a result, overall compensation (the "Class and Subclass Claims"). (Dkt. No. 201 ("Settlement Agreement"), at 2-3); *see Calibuso I*, 893 F. Supp. 2d at 376, 379-81 (detailing the allegations in the operative third amended complaint, dated October 5, 2011). The Settlement also resolves the individual claims of Named Plaintiffs Julie Moss, Dianne Goedtel, Jean Evans, and Mary DeSalvatore, alleging sexual harassment and retaliation (the "Individual Claims"). (Settlement Agreement, at 2 n.5, 24-26.)

The active participation of Class Counsel,[4] Lieff, Cabraser, Heimann & Bernstein, LLP and Outten & Golden LLP; Defense Counsel, Proskauer Rose LLP; and Objector Counsel, Stowell & Friedman, Ltd., throughout the settlement approval process, assured that this process would fulfill its purpose of achieving a fair, reasonable, and adequate result for all Settlement

---

[2]     *See* New York Equal Pay Act, N.Y. Lab. Law §§ 194 *et seq.*; New York State Human Rights Law, N.Y. Exec. Law §§ 296 *et seq.*; Florida Civil Rights Act of 1992, Fla. Stat. Ann. §§ 760.01 *et seq.*; Missouri Human Rights Act, Mo. Ann. Stat. §§ 213.010 *et seq.*; New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5–1 *et seq.*

[3]     Prior to the merger between Bank of America Corporation and Merrill Lynch & Co., Inc. in January 2009, Banc of America Investment Services, Inc. and MLPF&S, respectively, were separate brokerage subsidiaries of the two banks. *Calibuso v. Bank of Am. Corp.* ("*Calibuso I*"), 893 F. Supp. 2d 374, 379 (E.D.N.Y. 2012) (Bianco, J.). Settlement Class Members—who worked for these subsidiaries *before*, and possibly stayed after, the merger—are identified as "Legacy Bank of America" and "Legacy Merrill Lynch." After the merger, Bank of America Corporation maintained MLPF&S, as a brokerage subsidiary, into which Legacy Bank of America brokers were consolidated. *Id.*

[4]     The Court's preliminary approval order, dated October 15, 2013, designated these firms as Class Counsel. (Dkt. No. 178 ("Prelim. Approval Order"), at 5.)

Class Members. Objector Counsel objected to the Settlement, on behalf of Named Plaintiff Judy Calibuso and other Settlement Class Members. (Dkt. Nos. 165 ("Calibuso Objections"); 189 ("Settlement Class Members' Objections").) Class Counsel and Defense Counsel responded, in detail, to these objections in their papers. (Dkt. Nos. 182 ("Pls.' Br."); 190 ("Defs.' Monetary Relief Br."); 194 ("Defs.' Programmatic Relief Br."); 196 ("Pls.' Reply").) And, all of the parties discussed these objections during lengthy preliminary and final approval hearings before the Court. (Transcript of Hearing, dated Oct. 9, 2013 ("Prelim. Approval Hr'g Tr."); Transcript of Hearing, dated Dec. 20, 2013 ("Final Approval Hr'g Tr.").) The Court considered these objections and any responses and discussions thereto, and "overrule[d] all such objections on the bases that: (i) for settlement purposes, FRCP 23(a)(2)-(4) are satisfied; (ii) the programmatic relief is fair, reasonable, and adequate; and (iii) the monetary relief and the plan of allocation are fair, reasonable, and adequate." (Final Approval Order, at 4.)

In this Memorandum, the Court explains the reasons for its certification of the Settlement Class and Subclasses and final approval of the Settlement as fair, reasonable, and adequate, notwithstanding the objections advanced by Objector Counsel.

I.  Relevant Background

The Court presumes the parties' familiarity with the procedural background in this case before they commenced their negotiations over the Settlement. *See Calibuso I*, 893 F. Supp. 2d at 381-82. Further details concerning this background, including the broad, class-certification discovery conducted by the parties, are contained in the parties' other papers. (*See, e.g.*, Dkt. No. 185 ¶¶ 11-17.)

In December 2012, the parties retained experienced mediator, David Rotman, to oversee their negotiations. (Dkt. No. 162–2 ("Rotman Decl.") ¶¶ 2-3.) Thereafter, the parties exchanged, and Rotman reviewed, mediation statements and supporting documents discussing

their respective positions.  (*Id.* ¶ 3.)  Between February 11, 2013 and June 27, 2013, the parties' negotiations took place, consisting of four full-day mediation sessions and follow-up conversations with Rotman.  (*Id.* ¶¶ 1, 4-6.)  At least one Named Plaintiff, including Calibuso, attended each session.  (*Id.* ¶ 4; *see* Prelim. Approval Hr'g Tr., at 124:19 ("Ms. Calibuso was present at the mediation.").)  With Rotman's assistance, the parties were able to negotiate a preliminary agreement regarding the Settlement, which provided for monetary relief of approximately $39 million and various forms of non-monetary, programmatic relief.  (*See* Rotman Decl. ¶ 5.)

On September 6, 2013, Class Counsel submitted their motion for the Court's preliminary approval of the Settlement.  (Dkt. No. 153.)  Accompanying the preliminary approval motion was a draft Settlement Agreement detailing the original terms of the Settlement, which, among other things, provided that (i) the Settlement Class and Subclasses would be certified pursuant to FRCP 23(b)(3); (ii) Defendants would "track usage and adherence to [the Account Distribution Policy ('ADP')], as it may be updated and modified from time to time"; and (iii) Kathleen Lundquist, as the Independent Consultant, would conduct a study on teaming.  (*See* Dkt. No. 155–1, at 14, 30, 36.)

In response to the above motion, the Court scheduled the preliminary approval hearing for September 19, 2013.  (Scheduling Order, dated Sept. 9, 2013.)  Two days before the hearing, however, Calibuso retained Objector Counsel as new counsel to raise objections, on her behalf, "to be heard prior to preliminary approval of [the] proposed settlement."  (Dkt. No. 161, at 1.)  The Court converted the hearing into a status conference, at which time, "in recognition of [Calibuso's] special status as a Named Plaintiff," it agreed to entertain Calibuso's *pre-*preliminary approval objections, as an "exception" to the normal course, at the hearing

rescheduled for October 9, 2013.[5] *Calibuso v. Bank of Am. Corp.* ("*Calibuso II*"), No. 10-CV-1413, 2013 WL 5532631, at *1 n.2 (E.D.N.Y. Oct. 4, 2013) (Chen, J.); (Order, dated Sept. 19, 2013). Objector Counsel filed these objections about a week later. (Calibuso Objections.)

On September 30, 2013, Objector Counsel proposed that two named plaintiffs from a separate, but related, class action by male and female African-American brokers against MLPF&S[6]—one of whom was already a Settlement Class Member in this case and one of whom, a male broker, was not—be allowed to intervene, so that they too could object to the Settlement. (Dkt. No. 167, at 2.) The Court, however, denied Objector Counsel's proposal: (i) for the intervenor who was already a Settlement Class Member, because she could object "vis-à-vis the settlement process," or opt out of the Settlement altogether;[7] and (ii) for the proposed male intervenor who was not, because "it would be cumbersome to permit class members—in separate actions against the same financial institutions—to come in and out of other actions as intervenors with indirect interests, solely because the actions involve the same category of violations." *Calibuso II*, 2013 WL 5532631, at *2-3.

---

[5]     At the final approval hearing, Objector Counsel acknowledged, "I thought [the Court] gave us an extraordinary amount of time and opportunity both before preliminary approval and at preliminary approval to be heard." (Final Approval Hr'g Tr., at 25:15-17.)

[6]     *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 05-CV-6583 (N.D. Ill.).

[7]     Under the original terms of the Settlement, the proposed intervention by the individual who was already a Settlement Class Member was a necessary vehicle for being able to object, because, upon opting out, she would not have had any right to do so. (*See* Prelim. Approval Hr'g Tr., at 10:17-19 (statement from Objector Counsel that the only "mechanism[]" for objecting, other than "as a class member," was "to intervene").) As discussed herein, however, the *final* terms of the Settlement made the proposed intervention unnecessary, based on the fact that a Settlement Class Member could not opt out of the programmatic relief and, thus, would be able to challenge such relief, even if she were to opt out of the monetary relief.

Therefore, at the October 9, 2013 hearing, the Court only addressed Calibuso's pre-preliminary approval objections:

> I did review and consider those objections very carefully, and although I'm not prepared to adopt any of the objections or require any changes on the basis of those objections, *they obviously informed some of the issues that I raised for today's proceeding. . . .*
>
> [W]hile the objections may well be ones that have to be addressed again in the final approval hearing, all I have now [are] [sic] the objections of one particular class member, and to give it undue weight would turn this preliminary hearing into a final hearing.
>
> . . .
>
> *[T]he question remains whether or not there will be other individuals who feel similarly at the final approval stage, and it may well be that these objections represent the objections of others in the class.  But that remains to be seen.*

(Prelim. Approval Hr'g Tr., at 3:12–4:17 (emphasis added).)

Significantly though, the parties resolved, on their own, the objection to certifying the Settlement Class and Subclasses under FRCP 23(b)(3) *only*, as provided by the original terms of the Settlement (Calibuso Objections, at 3). The agreed-upon resolution was to certify the Settlement Class and Subclasses under both FRCP 23(b)(2) *and* 23(b)(3), *i.e.*, a "hybrid certification," such that Settlement Class Members could not opt of, and could therefore object to, the programmatic relief, whether or not they opted out of the monetary relief.  (Prelim. Approval Hr'g Tr., at 19:11–21:20; *see id.* at 5:6-8, 11:19-24, 17:11-20.)

On October 15, 2013, the Court issued its preliminary approval order, which also authorized the parties to notify Settlement Class Members about, among other things, "how to challenge or opt-out of" the Settlement.[8]  (Prelim. Approval Order, at 7-9.)  Among the 4,928

---

[8] The Court's preliminary approval order also *preliminarily* certified the Settlement Class and Subclasses, pursuant to FRCP 23(b)(2) and 23(b)(3).  (Prelim. Approval Order, at 2-5); *see Plummer v. Chem. Bank*, 668 F.2d 654, 657 (2d Cir. 1982) (noting that "tentative designations of

Settlement Class Members to whom such notices were sent, 99 individuals opted out of the monetary relief, but 42 of them, including Calibuso, continued to object to the programmatic relief;[9] and only one individual, Linda Davila, objected to both the monetary and programmatic relief, because she did not opt out.[10]  (Dkt. No. 198–1 ¶¶ 9, 15; Settlement Class Members' Objections, at 1-2.)

On December 20, 2013, the Court held the final approval hearing.  (Final Approval Hr'g Tr., at 1, 4:18-20.)  When the hearing began, Defense Counsel and Objector Counsel reported that they had reached a "confidential agreement," whereby "Ms. Calibuso is opting back in[] [and] withdrawing her objections."  (*Id.* at 7:4, 9:17-18.)  Later, during the hearing, Objector Counsel also represented that, in light of confidential discussions between the parties and with the Court, they had a "list of people who will opt back in," based on an "anticipated change in the language [in the Settlement] regarding the Account Distribution Policy."  (*Id.* at 40:12-13, 47:11-12.)  The list, submitted six days after the hearing, rescinded 55 of the original 99 opt-outs,

---

class for settlement purposes are not uncommon"); *In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 177 (5th Cir. 1979) ("'A blanket rule prohibiting the use of temporary settlement classes may render it virtually impossible for the parties to compromise class issues and reach a proposed class settlement before a class certification.  Such a firm restriction does not appear necessary or desirable.'") (quoting 3 Newberg, Class Actions § 5570c (1977)).

[9]     Although Objector Counsel named Courtney Moore as a 43rd opt-out who objected to the programmatic relief (Settlement Class Members' Objections, at 1), Moore's name appeared nowhere on the list of 99 opt-outs (*see* Dkt. No. 198–1, Ex. A), and, according to Defense Counsel, Moore was not a Settlement Class Member (Dkt. No. 195 ¶ 8).

[10]     As with Calibuso, Davila and the other objecting Settlement Class Members were represented by Objector Counsel.  (Settlement Class Members' Objections, at 1-2; *see* Pls.' Reply, at 1.)

leaving only 45 individuals opting out of the monetary relief.[11]  (*See* Dkt. Nos. 199, Ex. A; 204, at 1-2.)

On December 27, 2013, the Court issued its final approval order.  The final terms of the Settlement, which the Court approved, were contained in the actual Settlement Agreement and outlined in the parties' other papers (*e.g.*, Pls.' Br., at 2-9).  Among other things, the Settlement provided that:

- For the purpose of resolving the Individual Claims, the Individual Named Plaintiffs' Settlement Fund shall contain $775,000 to be allocated to Moss, Goedtel, Evans, and DeSalvatore (Settlement Agreement, at 9-10 ¶ 18, 24-25, 43);

- For the purpose of resolving the Class and Subclass Claims, the Settlement Fund shall contain approximately $25,412,981.36—*i.e.*, the $38,225,000 Settlement Sum, minus the court-approved attorneys' fees and costs ($12,629,518.64) and service awards ($7,500 for Named Plaintiff Kathleen Wing and $35,000 for the remaining Named Plaintiffs)—to be allocated to Settlement Class Members who submit claim forms (*see id.* at 13 ¶¶ 30-31, 43, 45-46, 52, 54; Final Approval Order, at 9 ¶¶ 17-18);

- The plan of allocation, with respect to money awarded from the Settlement Fund, will account for Settlement Class Members' (i) "length of tenure (e.g., weeks worked) during the [Settlement] Class Period" and (ii), if applicable, "actual or constructive termination" relating to allegations of discrimination (Settlement Agreement, at 47-48);

- Settlement Class Members include:

  (i) nationwide Legacy Bank of America brokers employed between March 16, 2006 and September 15, 2013, and other nationwide MLPF&S (including Legacy Merrill Lynch) brokers employed between August 2, 2007 and September 15, 2013, who  constitute the Settlement Class for the Title VII claim,[12]

---

[11]    The remaining 45 opt-outs included 44 of the original 99 opt-outs and a new opt-out, Shannon Nickels. (*See* Dkt. Nos. 198–1, Ex. A; 199, Ex. A.)

[12]    Any member of the Settlement Class for the Title VII claim is a member of the Settlement Subclass (or, more accurately, the collective action) for the EPA claim.  (*See* Final Approval Order, at 2-3.)

(ii) New York-based Legacy Bank of America brokers employed between November 10, 2004 and September 15, 2013, who constitute the Settlement Subclass for the New York claims,

(iii) Florida-based Legacy Bank of America brokers employed between January 10, 2006 and September 15, 2013, who constitute the Settlement Subclass for the Florida claim,

(iv) Missouri-based MLPF&S (including Legacy Merrill Lynch) brokers employed between January 1, 2007 and September 15, 2013, who constitute the Settlement Subclass for the Missouri claim, and

(v) New Jersey-based MLPF&S (including Legacy Merrill Lynch) brokers employed between January 1, 2007 and September 15, 2013, who constitute the Settlement Subclass for the New Jersey claim (*id.* at 2-3, 11-12 ¶¶ 28-29);

- The Settlement Class Period begins on March 16, 2006 for Legacy Bank of America brokers, and August 2, 2007 for other MLPF&S (including Legacy Merrill Lynch) brokers, *but* the period begins sooner for certain Legacy Bank of America and other MLPF&S (including Legacy Merrill Lynch) brokers located in New York, Florida, Missouri, and New Jersey, because of the Subclass Claims based on those states' laws (*id.* at 2-3);[13] and

- In addition to the above monetary relief, the programmatic relief includes:

(i) a study on teaming by Harold Goldstein, instead of Lundquist (as the Independent Consultant),

---

[13] The state-law Subclass Claims apply to a small subset of states and brokers—Legacy Bank of America brokers for New York and Florida and MLPF&S (including Legacy Merrill Lynch) brokers for Missouri and New Jersey—since Named Plaintiffs could only bring such claims on behalf of the Settlement Subclasses that they could otherwise bring on their own behalf. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (Powell, J.) ("That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975) (Powell, J.)). Goedtel was a New York-based Legacy Bank of America broker; Calibuso and Moss were both Florida-based Legacy Bank of America brokers; Evans was a Missouri-based Legacy Merrill Lynch broker; and DeSalvatore was a New Jersey-based Legacy Merrill Lynch broker. (*See* Dkt. No. 108 ¶¶ 92, 100, 118, 130, 139, 156, 201-20; Pls.' Reply, at 7 n.7.) Wing, a Michigan-based Legacy Merrill Lynch broker, did not bring a state-law Subclass Claim, because she was added as a representative *after* the negotiation of the Settlement. (*See* Dkt. Nos. 162–1, at 1-3; 186–9 ¶ 2.)

(ii) periodic review on overall compliance with the Settlement by Lundquist (as the Independent Settlement Monitor),

(iii) maintenance of a "gender neutral Account Distribution Policy ('ADP')" for redistributing accounts among brokers in accordance "with the law and the company's EEO policies," and related reviews of account redistributions pursuant to such a policy, and

(iv) various policies, procedures, and programs that pertain to the performance of female brokers at MLPF&S (*see id.* at 30-43).

## II. Discussion

### A. Legal Standard

#### 1. The Settlement Class and Subclasses

"Before approving a class settlement agreement, a district court must first determine whether the requirements for class certification in [FRCP] 23(a) and (b) have been satisfied. . . . Thus, the court must assess whether the proposed class satisfies [FRCP] 23(a)'s four threshold requirements: (1) numerosity ('the class is so numerous that joinder of all members is impracticable'), (2) commonality ('there are questions of law or fact common to the class'), (3) typicality ('the claims or defenses of the representative parties are typical of the claims or defenses of the class'), and (4) adequacy of representation ('the representative parties will fairly and adequately protect the interests of the class'). . . . The district court must also determine whether the action can be maintained under [FRCP] 23(b)(1), (2), or (3)."[14] *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012) (citations omitted); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (same). Indeed, in the context of a class action settlement, "the [FRCP] 23(a) requirements designed to

---

[14] The standard for approving a class action settlement, *see infra* discussion at Section II.A.2, does not displace the standard for certifying a settlement class. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997) (Ginsburg, J.) ("[FRCP 23(e)] was designed to function as an additional requirement, not a superseding direction, for the 'class action' to which [FRCP] 23(e) refers is one qualified for certification under [FRCP] 23(a) and (b).").

protect absent class members 'demand undiluted, even heightened, attention.'" *In re Literary Works*, 654 F.3d at 249 (quoting *Amchem*, 521 U.S. at 620). Still, the district court's "decision to certify a [settlement] class" is discretionary. *Id.*

The salience of the "adequacy" factor, Fed. R. Civ. P. 23(a)(4), is "particularly acute in settlement class situations." *In re Gen. Motors Corp. Pick-Up Truck Fuel Prods. Liab. Litig.*, 55 F.3d 768, 795 (3d Cir. 1995) (Becker, J.). The relevant inquiry for this factor, which focuses on avoiding "conflicts of interest between named parties and the class they seek to represent," is whether such parties have (i) "an interest in vigorously pursuing the claims of the class" and, correspondingly, (ii) "no interests antagonistic to the interest of other class members." *Amchem*, 521 U.S. at 625; *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (Jacobs, J.).

### 2. The Settlement

FRCP 23(e) requires that a class action settlement be approved by the district court, based on its "finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e). Although the district court should apply a "higher degree of scrutiny" in approving a settlement reached before class certification, as in this case, once it has approved such a settlement, its approval is subject only to review for abuse of discretion. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *see also Weinberger v. Kendrick*, 698 F.2d 61, 72-73 (2d Cir. 1982) (Friendly, J.) (holding that a "clearer showing of a settlement's fairness, reasonableness and adequacy" is required for a settlement reached "prior to class certification," though "we have long recognized that a district court's disposition of a proposed class action settlement should be accorded considerable deference").

The district court "determines fairness, reasonableness, and adequacy of a proposed settlement by considering (1) the substantive terms of the settlement compared to the likely result of a trial, . . . and (2) the negotiating process, examined in light of the experience of counsel, the

vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983) (citations omitted); *see also D'Amato*, 236 F.3d at 85 (same). "The primary concern is with the substantive terms of the settlement[.]" *Weinberger*, 698 F.2d at 73. Nine factors nearly always inform the consideration of a settlement's substantive terms, including "the ability of the defendants to withstand a greater judgment" and, of course, "the reaction of the class to the settlement." *City of Detroit v. Grinnell Corp.* ("*Grinnell*"), 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).

Where, as here, a settlement achieves a combination of non-monetary relief and monetary relief, the value of the non-monetary relief, along with the value of the monetary relief, may inform the district court's view on what the defendants are actually giving up and thus whether they have "the ability . . . to withstand a greater judgment." *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 117, 119 (2d Cir. 2005) (concluding, as to "the ability of the defendants to withstand a greater judgment," that "the injunctive relief . . . valued at approximately $25 to $87 billion or more . . . adds great value to the Settlement," paired with the "compensatory relief" provided therein); *Wright v. Stern*, 553 F. Supp. 2d 337, 341, 347 (S.D.N.Y. 2008) (Chin, J.) (finding, with respect to a settlement that "contains both injunctive and monetary relief," that "the City has the ability to withstand a greater judgment"). [15]

---

[15]    By contrast, where only non-monetary relief is being sought, more than one district court has suggested that "the ability of the defendants to withstand a greater judgment" is not relevant to its determination. *See*, *e.g., Ingles v. Toro*, 438 F. Supp. 2d 203, 211 (S.D.N.Y. 2006) (Chin, J.) ("In cases where the plaintiffs seek declaratory and injunctive relief rather than money damages, there is no need to examine the last three *Grinnell* factors."); *see also Handschu v. Special Servs. Div.*, 605 F. Supp. 1384, 1394 (S.D.N.Y. 1985) ("Where . . . the suit sounds only in equity, the relief achieved by the proposed settlement is measured against the Court's likely decree after trial. That exercise has two components: (1) plaintiffs' prospects of proving their

While the district court, in rendering its determination, is not allowed to "rewrite" a settlement to make it fair, reasonable, and adequate, the settlement approval process allows for changes to be made, with the district court's input:

> The parties might be willing to make changes before the notice of the settlement agreement is sent to the class members if the judge makes such suggestions at the preliminary approval stage. Even after notice of a proposed settlement is sent, a judge's statement of concerns about the settlement during the fairness hearing might stimulate the parties to renegotiate in order to avoid possible rejection by the judge.

Manual for Complex Litigation § 21.61 (4th ed.); *see also Evans v. Jeff D.*, 475 U.S. 717, 726-27 (1986) (Stevens, J.) (same).

    B.  Objections to the Settlement Class and Subclasses

       1.  FRCP 23(b)

Objector Counsel claimed that the original FRCP 23(b)(3)-only certification of the Settlement Class and Subclasses would force Settlement Class Members to choose between (i) opting out of both the programmatic and monetary relief, or (ii) accepting the monetary relief "in order to [preserve the right to] object" to the programmatic relief. (*See* Calibuso Objections, at 3.) Purportedly, if Settlement Class Members had to make such a "Hobbesian choice," the Court would only encounter a "bunch of happy campers . . . , none of whom will be offering any comments on the programmatic relief," but "exclude from the dialogue [about the programmatic relief] all people who believe that the money is too low." *Calibuso II*, 2013 WL 5532631, at *2; (Prelim. Approval Hr'g Tr., at 14:5-16). By contrast, the separate certification of the Settlement Class and Subclasses—based on FRCP 23(b)(2) for the programmatic relief and FRCP 23(b)(3)

---

claims, and (2) assuming plaintiffs' success on the merits, the likelihood of the Court giving the requested declaratory and injunctive relief."); *but see Foe v. Cuomo*, 700 F. Supp. 107, 110 (E.D.N.Y. 1988) (Bartels, J.) (citing "several criteria, those pertin[e]nt [sic] to cases involving injunctive relief," such as "the ability of plaintiffs to obtain, and of defendants to withstand, a greater judgment").

for the monetary relief—would allow Settlement Class Members "to object to the programmatic relief because they could not opt out of the [FRCP] 23(b)(2) class[,] while still being able to opt out of the monetary relief provided to the class under [FRCP] 23(b)(3)."  (Calibuso Objections, at 3.)

In this case, "where [programmatic] relief is sought in addition to substantial monetary damages," the Court "*may* proceed in at least one of three ways:  (1) certify the class under [FRCP] 23(b)(3) for all proceedings; (2) *certify separate [FRCP] 23(b)(2) and (b)(3) classes addressing equitable relief and damages, respectively*; or (3) certify the class under [FRCP] 23(b)(2) for both equitable and monetary relief but provide all class members with notice and opportunity and opt-out."  *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 288-89 (S.D.N.Y. 2012) (Chin, J.) (emphasis added).  In other words, nothing *required* the Court to separately certify the Settlement Class and Subclasses to preserve Settlement Class Members' right to object to the programmatic relief, while still permitting them to opt out of the monetary relief.

Nonetheless, as discussed *supra* at Section I, the parties resolved the objection on their own, by modifying the requested certification to delineate separate FRCP 23(b)(2) and FRCP 23(b)(3) classes.  As Class Counsel acknowledged, "[w]e are not opposed to and think this settlement could support a structure in which somebody who opts out of the money, which says nothing about their view of the money, makes comments on the programmatic relief."  (Prelim. Approval Hr'g Tr., at 17:11-14.)  Defense Counsel similarly stated, "[W]e're prepared to address any objections [to the programmatic relief], even by people who opt out [of the monetary relief]."  (*Id.* at 11:23-24.)  The objection, therefore, is moot.

2. Adequacy of Representation

    i. Awards for Named Plaintiffs' Individual Claims and Service Awards

Objector Counsel claimed that Named Plaintiffs were conflicted between representing their own interests and the interests of other Settlement Class Members during the negotiations over the Settlement, based on Named Plaintiffs' right to "sizeable special payments," *i.e.*, awards for their Individual Claims and service awards. (Settlement Class Members' Objections, at 10; *see also* Final Approval Hr'g Tr., at 110:5-8, ("[G]iven that [Named Plaintiffs] stand to gain so much more by this deal going through, it creates a tension in terms of negotiating a larger settlement, monetary settlement, for the rest of the class[.]").) The promise of these payments allegedly "preclude[d] [Named Plaintiffs] from standing in the shoes of other class members in assessing the Settlement's monetary relief." (Settlement Class Members' Objections, at 10; *see also id.* at 18 (same).) According to Objector Counsel, absent that promise, Named Plaintiffs might have assessed the monetary relief differently. (*See* Prelim. Approval Hr'g Tr., at 30:1-3 ("The real issue is, if you didn't have that promise present, would [Named Plaintiffs'] support for the settlement evaporate?").)

By the Court's calculations, which are necessarily theoretical,[16] Moss, Goedtel, Evans, and DeSalvatore, as Named Plaintiffs, stand to receive (i) *1,774%* more than the maximum average award from the Settlement Fund, if 40% of Settlement Class Members receive awards; and (ii) *2,218%* more than the maximum average award from the Settlement Fund, if 50% of

---

[16] These calculations assume that (i) there are 4,928 Settlement Class Members; (ii) the Settlement Fund contains $25,412,981.36, all of which will be distributed to Settlement Class Members; (iii) the entire Individual Named Plaintiffs' Settlement Fund ($775,000) will be equally distributed to Moss, Goedtel, Evans, and DeSalvatore; and (iv) Moss, Goedtel, Evans, and DeSalvatore are also entitled to $35,000 service awards. The formula for these calculations is as follows: [$775,000/4 + $35,000]/[$25,412,981.36/(% of Settlement Class Members x 4,928)].

Settlement Class Members receive awards.[17]  These percentages, which reflect a significant "disparity in the amount" that Named Plaintiffs could receive, would seem to support Objector Counsel's view that the "potential awards for the four named plaintiffs . . . all on . . . top of their individual class award[s]" might have induced them to accept the Settlement, regardless of the amount that other Settlement Class Members may receive.  (Final Approval Hr'g Tr., at 104:9, 105:9-12.)

These percentages, however, are not dispositive.  The "prospect of a substantial personal recovery" for the named plaintiff in a class action settlement might "run afoul of the named plaintiff's duty to negotiate fairly on behalf of all members of the class"; but, the ability to show that *the named plaintiff would still agree to such a settlement, even "if he or she were to share in any award on the same terms as everyone else,"* may otherwise demonstrate its "acceptability." *Women's Comm. for Equal Emp't Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173, 181 (S.D.N.Y. 1977) (emphasis added).  The parties can make such a showing by establishing that, during their negotiations, "none of the named plaintiffs were promised an incentive award or were told that they should expect one." *In re W. Union Money Transfer Litig.*, No. 01-CV-335, 2004 WL 3709932, at *16 (E.D.N.Y. Oct. 19, 2004) (Sifton, J.) (holding that, as such, the "disbursement of incentive awards" did not "create[] a conflict of interest"); *accord Sheppard v.*

---

[17]    As a point of reference, the named plaintiffs in *McReynolds* only stand to receive (i) 121% more than the maximum average award from the settlement fund, if 40% of settlement class members receive awards; and (ii) 151% more than the maximum average award from the settlement fund, if 50% of settlement class members receive awards.  In *McReynolds*, there are 1,433 settlement class members; the settlement fund, minus the attorneys' fees and costs and service awards, amounts to $118,446,062.21; and the named plaintiffs are also entitled to $250,000 service awards.  *See* Class Counsel's Petition for Attorneys' Fees & Costs, *McReynolds*, No. 05-CV-6583, ECF No. 596; Ex. 1, Settlement Agreement & Release, *McReynolds*, No. 05-CV-6583, ECF No. 611–1; Final Approval Order, *McReynolds*, No. 05-CV-6583, ECF No. 616.

*Consol. Edison Co. of N.Y., Inc.*, No. 94-CV-403, 2002 WL 2003206, at *6 (E.D.N.Y. Aug. 1, 2002) (Gleeson, J.) ("In awarding [incentive awards] as part of a settlement, a court must ensure that the named plaintiffs, as fiduciaries to the class, have not been tempted to receive high incentive awards in exchange for accepting suboptimal settlements for absent class members.").

Objector Counsel acknowledged that the separate negotiation of these awards would suggest adequate representation by Named Plaintiffs:

> The question that [the Court] asked is spot on, which is, if that promise [of additional monetary relief for Named Plaintiffs] didn't exist, would [their] support evaporate for the settlement?
>
> So, we think the way that it should be done is, it should be, *from the get-go[,] [the monetary relief for Settlement Class Members and additional monetary relief for Named Plaintiffs] should not have been negotiated side by side*[.]
>
> . . .
>
> *[Y]ou are supposed to negotiate these things separately.  You are not supposed to mention to your class reps anything of a bonus, anything more than they are supposed to get until you are done with the deal.*  Then you say, [y]ou may be entitled to a bonus here[.]

(Prelim. Approval Hr'g Tr., at 29:5-10, 30:22–31:1 (emphasis added).)

In response, Class Counsel confirmed that Named Plaintiffs "were wearing their hat as class representatives in negotiating the Class Settlement Fund before they were thinking about what they personally might get as an individual set-off within that class fund."  (Final Approval Hr'g Tr., at 110:24–111:3.)  Class Counsel also confirmed that there was no "seductive kind of wink" with respect to the additional monetary relief for Named Plaintiffs, when the parties were negotiating the monetary relief for Settlement Class Members.  (*Id.* at 111:6.)  Because Named Plaintiffs did not negotiate on behalf of the Settlement Class and Subclasses with the allure or promise of benefits for themselves, there was no incentive for them to betray other Settlement Class Members in favor of their own self-interest.   Accordingly, the Court finds that the

objection to the adequacy of Named Plaintiffs' representation based on such benefits does not warrant disapproving the Settlement.

ii. Longer Periods for the State-Law Settlement Subclasses in the Plan of Allocation

Objector Counsel also claimed that Named Plaintiffs—as Legacy Bank of America or Legacy Merrill Lynch brokers from certain states (*i.e.*, New York, Florida, Missouri, and New Jersey) for purposes of the state-law Subclass Claims—negotiated special "treatment" in the plan of allocation, specifically for Legacy Bank of America or Legacy Merrill Lynch brokers "who work in their states, including themselves." (Settlement Class Members' Objections, at 10, 19-20.) According to Objector Counsel, such "treatment" belies the adequacy of Named Plaintiffs' representation on behalf of all Settlement Class Members. (*Id.*)

To clarify, the alleged problem stems from the fact that Named Plaintiffs had standing to bring the state-law Subclass Claims on behalf of New York-based and Florida-based Legacy Bank of America brokers, and Missouri-based and New Jersey-based Legacy Merrill Lynch brokers. *See supra* discussion at note 13. For those brokers, the state-law Subclass Claims supported longer statutes of limitations than the federal Class Claim, based on each state's own statute of limitations. (*See* Defs.' Monetary Relief Br., at 11-12.) As a "practical consequence," the longer statutes of limitations for the state-law Subclass Claims translated to "greater claims periods for the state-specific subclasses," including Named Plaintiffs, as factored into the plan of allocation.[18] (*Id.*; *see also* Settlement Class Members' Objections, at 19 ("[I]t cannot be

---

[18] Specifically, the plan of allocation accounts for Settlement Class Members' "length of tenure (e.g., weeks worked) *during the [Settlement] Class Period*" (Settlement Agreement, at 47 (emphasis added)), which begins on (i) November 10, 2004 and January 10, 2006 for New York-based and Florida-based Legacy Bank of America brokers, respectively, rather than March 16, 2006 for other nationwide Legacy Bank of America brokers, and (ii) January 1, 2007 for both Missouri-based and New Jersey-based Legacy Merrill Lynch brokers, rather than August 2, 2007

18

overlooked that the longest limitation period and award of work-weeks under the Settlement's allocation formula is to Legacy Bank of America class members from Florida and New York, including Named Plaintiffs Moss and Goedtel."); Final Approval Hr'g Tr., at 75:21-25 ("[T]he named plaintiffs brought state law claims in the states in which they resided and . . . the period at issue in those claims was a function of the statute of limitations in those states[.]").)  For instance, the Settlement Subclass of New York-based Legacy Bank of America brokers, based on the New York claims that Goedtel brought, are allowed to "file claims dating back to November 10, 2004"; whereas, New York-based Legacy Merrill Lynch brokers, not represented as a Settlement Subclass by any Named Plaintiffs, are only allowed to go back as far as August 2, 2007.  (Settlement Class Members' Objections, at 19); *see supra* discussion at Section I.

The heart of Objector Counsel's argument was that, if Named Plaintiffs' representation *were* adequate, they would have negotiated for the plan of allocation to account for claims periods in the same way for *all* Settlement Class Members from *all* states, regardless of whether such individuals were covered by the state-law Subclass Claims that Named Plaintiffs brought. Objector Counsel stated:

> It would seem to us that *the fair thing to do would be[,] if you negotiated the money and you have some states that you went back for[,] to sort of do an exploration to figure out what all the states are*[.]
>
> . . .
>
> [E]very state law that has a claim that's being released ought to be able to go back from the date of the filing of the lawsuit and those class members should get credit in the weeks computation [pursuant to the plan of allocation] rather than just picking and choosing some and applying inconsistent rules.

---

for other nationwide MLPF&S (including Legacy Merrill Lynch) brokers.  *See supra* discussion at Section I.

(Final Approval Hr'g Tr., at 72:6-17 (emphasis added).) Arguably, Named Plaintiffs, notwithstanding the state-law Subclass Claims, could have negotiated "to set a class period [for the plan of allocation] that applied to everyone regardless of where they were from and regardless of what the actual time frames were at the time that the case was initially brought." (*Id.* at 82:17-20.) Objector Counsel argued that Named Plaintiffs' failure to do so possibly reflects their favoritism for the Settlement Subclasses to which they belong, based on the state-law Subclass Claims.

This argument is not without merit. The Court "must focus on the settlement's distribution terms . . . to detect situations where some class members' interests diverge from those of others in the class. . . . [A] settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group." *In re Gen. Motors*, 55 F.3d at 797. Nonetheless, in a class action where the named plaintiffs from particular states bring federal claims and other claims based on those states' laws, there is nothing inherently inadequate about their negotiating a settlement for a broader class of individuals from other states as well. *See Sewell v. Bovis Lend Lease, Inc.*, No. 09-CV-6548, 2012 WL 1320124, at *1, 4 (S.D.N.Y. Apr. 16, 2012) (concluding that the named plaintiffs, though "employed by Defendants in New York and New Jersey," were adequate representatives of the nationwide "FLSA Class" for the FLSA and state-law claims); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 175, 187 (W.D.N.Y. 2011) (refusing to find, where the named plaintiffs asserted FLSA and New York "wage and hour claims," that they inadequately represented the whole "class covering all fifty states"); *Glass v. UBS Fin. Servs., Inc.*, No. 06-CV-4068, 2007 WL 221862, at *1 & n.1, 9-10, 12-13 (N.D. Cal. Jan. 26, 2007) (holding that the named plaintiffs from New York, New Jersey, and Connecticut, who had

asserted FLSA and state-law claims, were adequate representatives for a class of nationwide employees), *aff'd*, 331 F. App'x 452 (9th Cir. 2009); *cf. Charron v. Wiener*, 731 F.3d 241, 253-54 (2d Cir. 2013) ("All class settlements value some claims more highly than others, based on their perceived merits, and strike compromises based on probabilistic assessments. . . . If these types of compromises automatically created subclasses that required separate representation, the class action procedure would become even more cumbersome than it already is[.]") (citation omitted).

Indeed, in *Sewell v. Bovis Lend Lease, Inc.*, the district court considered whether the two named plaintiffs—employed in New York, as well as New Jersey—adequately represented the "FLSA Class" of employees "anywhere in the United States" *and* the "NY Class," when negotiating the settlement of their FLSA and state-law (*i.e.*, New York and New Jersey) claims. 2012 WL 1320124, at *1, 4; Ex. A, Joint Stipulation of Settlement & Release, at 1-3, *Sewell*, No. 09-CV-6548, ECF No. 68–1. The court found that the named plaintiffs *were* adequate representatives, *despite* the fact that the class action settlement "propose[d] to distribute monies" based on a longer period for the "NY Class" (*i.e.*, "between July 23, 2003, and December 31, 2010") than the nationwide "FLSA Class" (*i.e.*, "between March 4, 2007, and December 31, 2010"). *Sewell*, 2012 WL 1320124, at *1, 4. In other words, there was no basis for assuming that the named plaintiffs were conflicted, simply because they asserted state-law claims, along with their FLSA claim, and thus negotiated better terms on behalf of the "NY Class" to which they belonged than the nationwide "FLSA Class."

In *Glass v. UBS Fin. Servs., Inc.*, the district court also addressed a similar objection that the named plaintiffs, certain of whom were employed in New York and New Jersey, had asserted a FLSA claim and claims under those states' laws; and, thereafter, settled their claims for a class

of employees "anywhere in the United States or its territories," while promising an "increased payout for class members who worked in New York, New Jersey, and Pennsylvania." 2007 WL 221862, at *1 & n.1, 12. The court, however, found that "the parties have set forth a reasonable basis for treating claimants employed in New York, New Jersey, and Pennsylvania differently from claimants employed in other jurisdictions." *Id.* at *13. Such differential treatment did not support the assumption that the named plaintiffs were inadequately representing the rest of the settlement class.

Like the district courts in *Sewell* and *Glass*, the Court declines to assume that the differential treatment of Settlement Class Members in the state-law Settlement Subclasses indicates that Named Plaintiffs did not adequately represent the interests of all Settlement Class Members. Indeed, at the final approval hearing, Defense Counsel noted that Defendants would not have agreed to longer claims periods in the plan of allocation for all Settlement Class Members, simply because the state-law Settlement Subclasses were entitled to longer claims periods. (*See* Final Approval Hr'g Tr., at 87:15-17 ("Your Honor, defendants are not willing to pay more money to people whose claims are time barred and I believe that's what [Objector Counsel] is asking.").) In effect, there was nothing that Named Plaintiffs could have done during the negotiations to more adequately represent the Settlement Class and Subclasses. Accordingly, the Court finds unavailing the objection based on the purported conflict between Named Plaintiffs' representation of the Settlement Subclasses for the state-law Subclass Claims and other Settlement Class Members.

C.  Objections to the Settlement

    1.  Programmatic Relief

        i.  Adherence to the ADP

Objector Counsel claimed that the ADP partially relies on a factor that will "have a discriminatory impact on the number and quality of accounts distributed to [female brokers]," namely, "past performance," which has historically favored male brokers due to the challenged policies in this case.  (Settlement Class Members' Objections, at 12-15.)  Thus, as Objector Counsel argued, "adherence" to the ADP, as sanctioned by the original ADP provision in the Settlement, might actually work to the detriment, not the benefit, of Settlement Class Members. (*Id.*)  According to Objector Counsel, "[t]his is the most troubling aspect of the Settlement." (Calibuso Objections, at 5.)

    The district court, in *Handschu v. Special Servs. Div.*, addressed a similar objection to a class action settlement, which provided that the New York City Police Department would follow certain guidelines for the "future collection, retention and dissemination of [law enforcement-related intelligence] information."  605 F. Supp. at 1389, 1395.  Like Objector Counsel in this case, the objectors in *Handschu* claimed that, rather than requiring the defendants to offer "value for the class," the settlement sanctioned the guidelines which would "make the situation [with respect to the intelligence gathering activities at issue] worse, not better."  *Id.* at 1395.

    The *Handschu* court dismissed this objection, based on its finding that the alleged "illegality" of the guidelines sanctioned by the settlement did not "appear as a legal certainty on the face of the [settlement]."  *Id.* at 1395, 1403-406, 1417 (quotations omitted) (concluding that "it cannot fairly be said that the proposed NYPD guidelines sanction unconstitutional behavior" and thus "the settlement does not initiate or authorize illegal conduct"); *see also Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) (holding, in an antitrust class action,

that, although "a settlement that authorizes the continuation of clearly illegal conduct cannot be approved, . . . the alleged illegality of the settlement agreement is not a legal certainty") (citations and quotations omitted).

In this case, Objector Counsel opposed the original ADP provision in the Settlement, on the basis that it required adherence to a policy that allegedly reinforces unlawful discrimination against female brokers by incorporating the factor of "past performance." The purported illegality of a performance-driven account distribution policy in the brokerage industry, however, hardly amounts to a "legal certainty." *Robertson*, 556 F.2d at 686; *Handschu*, 605 F. Supp. at 1395. As other courts have suggested, there is nothing inherently illegal about such a policy. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 489-90 (7th Cir. 2012) (Posner, J.) (noting, as dicta, that "[w]e are not suggesting that there is in fact racial discrimination at any level within Merrill Lynch, or that management's . . . account distribution policies have a racial effect," despite the allegation that such policies "prescrib[e] criteria for account distributions that favor the already successful," *e.g.*, "records of revenue generated" and "number and investments of clients retained"); *see also Blount v. Morgan Stanley Smith Barney LLC*, No. 11-CV-2227, -- F. Supp. 2d --, 2013 WL 5663480, at *6 (N.D. Cal. Oct. 17, 2013) (refusing to find a "prima facie case of discrimination" with respect to a "court-approved method" of distributing inherited brokerage accounts "based on [the plaintiff's] performance within his peer group"). Nor has Objector Counsel cited any authority to support the opposite conclusion.[19]

---

[19] Additionally, Class Counsel and Defense Counsel alleged that the ADP, which accounts for "past performance," was intended as the panacea to issues with Defendants' longstanding account distribution policy, which reflected "favoritism and manager preference" and *not*

Objector Counsel, therefore, did not demonstrate that the illegality of a policy reinforced by the Settlement, like the ADP, is a "legal certainty"; at best, it is an issue that could have been litigated at trial. *Robertson*, 556 F.2d at 686; *Handschu*, 605 F. Supp. at 1395. However, it is axiomatic that the Court need not conduct a trial to avoid one. *See Weinberger*, 698 F.2d at 74 ("The Supreme Court could not have intended that, in order to avoid a trial, the judge must in effect conduct one."). On the contrary, the Court need only consider whether the Settlement "initiate[s] or authorize[s] any illegal conduct" with "legal certainty," not whether the sanctioned conduct would be illegal based on the standard of proof at trial. *Handschu*, 605 F. Supp. at 1395 (quotations omitted). With respect to the original ADP provision, the Court has already determined that the Settlement did not plainly authorize unlawful conduct; thus, the inclusion of this provision in the Settlement did not render it unfair, unreasonable, or inadequate.

In any event, notwithstanding the fact that the parties had no obligation to do so, they agreed to revise the final terms of the Settlement, by eliminating the requirement that Defendants "adhere[]" to the ADP, and substituting language in the Settlement that simply requires the ADP to be "gender neutral" and comply "with the law and the company's EEO policies." *Supra* discussion at Section I; *see also Handschu*, 605 F. Supp. at 1405 (holding that, in sanctioning adherence to guidelines which also stated that the NYPD would "conform to constitutionally guaranteed rights and privileges," the settlement remained "flexible" as to "future developments in the law" that would "more closely conform[] to [objector] counsel's present views"). In response, Objector Counsel indicated that this revision "resolves the ADP objection" and, as a result, resolves "the major issues with respect to the substance of the objections." (Final

---

"objective" factors like "past performance." (*See* Defs.' Programmatic Relief Br., at 8; Pls.' Reply, at 8.)

Approval Hr'g Tr., at 38:6-8.) Based on this revision, 55 opt-outs also opted back into the monetary relief. (*See* Dkt. No. 204, at 1-2.) Accordingly, the objection with respect to the original ADP provision is not only without merit, but is also now moot.

ii. Lundquist's Role

Objector Counsel also objected to the Settlement's appointment of Lundquist, an industrial psychologist, as either the Independent Consultant or the Independent Settlement Monitor.[20] According to Objector Counsel, Lundquist was unfit to serve in either capacity, because she created Abercrombie & Fitch Stores, Inc.'s ("Abercrombie") "Look Policy," described to the Court as a policy to make Abercrombie employees "look like the models in their catalogs and on their posters."[21] (Final Approval Hr'g Tr., at 18:10–19:8, 50:15-18, 56:20–57:4.) Objector Counsel argued that Lundquist's creation of this allegedly discriminatory policy suggests that Lundquist would detract from the achievements for minority (*i.e.*, female and African-American) brokers in the Settlement and, by extension, the *McReynolds* settlement, if she were to serve as either the Independent Consultant or the Independent Settlement Monitor in this case. (*See id.* at 54:14-22, 63:15-20.) Objector Counsel stated that, instead of Lundquist, the

---

[20] Originally, Lundquist was appointed as the Independent Consultant. (Dkt. No. 155–1, at 30.) In an attempt to address Objector Counsel's concern, the parties appointed Lundquist as the Independent Settlement Monitor instead. (Settlement Agreement, at 34.) Objector Counsel, however, objected to Lundquist acting in any capacity for the Settlement. (*See* Final Approval Hr'g Tr., at 19:21-23 ("[W]e understood that 'swapped' meant remove Lundquist [as the Independent Consultant] and put in Goldstein, and somebody else would be the [Independent Settlement Monitor][,] not just [that] the two would swap roles.").)

[21] "Abercrombie requires employees in its stores to comply with a 'Look Policy.' That policy is intended to promote and showcase the Abercrombie brand, which exemplifies a classic East Coast collegiate style of clothing. . . . Employees must dress in clothing that is consistent with the kinds of clothing that Abercrombie sells in its stores." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1111 (10th Cir. 2013) (citations and quotations omitted) (reversing the district court's grant of summary judgment to the EEOC and granting summary judgment to Abercrombie).

parties should have chosen "somebody who wasn't connected with the defense and wasn't somebody who the EEOC and civil rights groups opposed." (*Id.* at 19:7-8.)

However, there is no basis to Objector Counsel's concern, because Lundquist did not create the allegedly discriminatory "Look Policy." (*See id.* at 50:22-23 ("[Abercrombie's] Look Policy was not designed by Kathleen Lundquist[;] that was designed by their marketing department."); 55:13-15 ("[I]t sounds like Ms. Lundquist was hired to come in and do a job analysis and describe what you do for this job.").) The Court's own review of Lundquist's declaration in *EEOC v. Abercrombie & Fitch Stores, Inc.* ("*Abercrombie*"), No. 09-CV-602 (N.D. Okla.), on which Objector Counsel relied, reveals as much. According to the declaration, Lundquist was retained solely to provide a descriptive account of the current, in-store positions at Abercrombie and the extent to which the "Model job" depends on "adherence to the Look Policy." Decl. of Kathleen K. Lundquist ¶¶ 7-8, *Abercrombie*, No. 09-CV-602, ECF No. 50–7. Primarily based on the results from a prior "job analysis," which involved reviewing Abercrombie's internal documents and surveying its store managers, Lundquist reported that, at Abercrombie, "adhering to and upholding the Look Policy are important or critical to the Model job." *Id.* ¶¶ 10, 15, 22-23. Nothing in the declaration insinuated that Lundquist created the "Look Policy" or promoted adherence thereto. Lundquist's "opinion that it is critical to the job of Model at Abercrombie to comply with standards of conduct including the Look Policy" was merely what Lundquist had uncovered in her "job analysis," in light of the existing information, and not a normative statement on the way that Abercrombie should operate. *Id.* ¶ 24.

Indeed, in an employment case before this District, Lundquist was retained *by the plaintiffs* to provide a similar "job analysis opinion" on certain positions at the "police and fire departments" and the duties required for each position. *Ebbert v. Nassau Cnty.*, No. 05-CV-

5445, 2008 WL 8086382, at *1-2 (E.D.N.Y. Sept. 29, 2008) (Tomlinson, Mag. J.) (quotations omitted). Rendering the "job analysis opinion" simply required Lundquist to "synthesize the information for the finders of fact and offer her analysis as to how the job categories . . . compare." *Id.* at *4 (quotations omitted); *see also id.* at *12 (same). In declining to exclude Lundquist's "job analysis opinion," the district court observed:

> Dr. Lundquist has been retained as an expert in fair employment law cases on 40 occasions, not including the instant case, in federal jurisdictions across the United States, eleven of which cases are currently pending. . . . Defendants have produced no evidence that any court has ever rejected her as an expert.

*Id.* at *7 (citation omitted). The *Ebbert* court, in effect, recognized that Lundquist's qualifications to render a "job analysis opinion," like the one that the plaintiffs retained her to provide, were well-established.

To conclude, nothing evidences that Lundquist was ever asked to *create* any discriminatory policies. Rather, in employment cases like *Abercrombie* and *Ebbert*, Lundquist was only asked to render "job analysis" opinions which synthesized the existing information about positions at specific employers. Accordingly, the Court finds that the objection about Lundquist serving in either a consulting or monitoring capacity for the Settlement lacks a factual basis and is entirely without merit.

### iii. Other Overlapping Relief

Lastly, Objector Counsel claimed that much of the programmatic relief in the Settlement overlaps with existing measures at MLPF&S (*e.g.*, circulation of "Non-Discrimination and Anti-Retaliation Policies" (Settlement Agreement, at 35)) *or* the relief in the *McReynolds* settlement (*e.g.*, policies to promote "[d]iverse [t]eams" of brokers (*id.* at 37)); and thus fails to provide "consideration" for settling the Class and Subclass Claims. (Settlement Class Members' Objections, at 15-16; *see also* Calibuso Objections, at 9-14 (same).) Objector Counsel also

claimed that Goldstein's study on teaming (Settlement Agreement, at 30-34) not only overlaps with, but will possibly counteract the benefits of a broader study in the *McReynolds* settlement. (Calibuso Objections, at 9-10; *see also* Final Approval Hr'g Tr., at 63:2-20 (same).)

Although some of the Settlement's programmatic relief replicates various policies, procedures, and programs already in place at MLPF&S, such replication may still add value to the Settlement. The inclusion in the Settlement of MLPF&S's existing measures to prevent discrimination and promote diversity ensures that these "voluntary" measures are "now subject to this Court's scrutiny." *Plummer v. Chem. Bank*, 579 F. Supp. 1364, 1368, 1374 (S.D.N.Y. 1984) (holding that, although the proposed settlement in the race-discrimination class action provided that the bank would comply with its "goals" for African-American employees "derived directly from [its] existing affirmative action program," this provision was still a "significant benefit"); (*see* Defs.' Programmatic Relief Br., at 10; Pls.' Reply, at 8-9).

Furthermore, the fact that the parties in this case and *McReynolds* negotiated parallel class action settlements, the latter of which resolved claims of discrimination against African-American brokers at MLPF&S, should not bar duplicative programmatic relief from being credited towards *both* settlements. *See Lo Re v. Chase Manhattan Corp.*, No. 76-CV-154, 1979 WL 236, at *1-3, 6 (S.D.N.Y. May 25, 1979) (approving the "proposed settlement" to resolve allegations of Chase's "employment practices which discriminated against women" with, among other things, $850,000 in programmatic relief, even though "[t]he proposed settlement is *identical in concept with the conciliation agreement" that Chase already signed*) (emphasis added). It was probably inevitable that, in the process of settling related discrimination claims, the parties would obtain certain of the same relief for their respective settlement class members.

As for Goldstein's study, this study and its recommendations on "teaming arrangements *for women [brokers]*" (Settlement Agreement, at 30-34 (emphasis added)) will complement, not counteract, the benefits of the *McReynolds* study and its recommendations on teaming *overall*, Ex. 1, Settlement Agreement & Release, at 49-52, *McReynolds*, No. 05-CV-6583, ECF No. 611–1. Indeed, Goldman's study will be tailored to female brokers, and, if anything, might offer more targeted insights than the *McReynolds* study. (*See* Final Approval Hr'g Tr., at 64:2-3 (stating that Goldstein "would be conducting the study *with regard to gender issues*") (emphasis added); *see also* Defs.' Programmatic Relief Br., at 11 ("Objectors do not and cannot identify any harm to women or African-Americans by having an additional expert conduct a study of teaming issues *specific to women*.") (emphasis added).) While Goldman's study will touch upon topics subsumed under the broader *McReynolds* study, it still provides a distinct benefit to Settlement Class Members, which does not warrant invalidating the Settlement based on the mere possibility of a conflict between these studies.

Accordingly, the objection to the overlapping programmatic relief in the Settlement is inapposite.

2. Monetary Relief

Objector Counsel claimed that the plan of allocation "yields absurd and unfair results," because it fails to account for (i) Legacy Merrill Lynch brokers' "higher earnings, on average"; (ii) the fact that their "length of service" factored into earnings at Legacy Merrill Lynch; and (iii) their entitlement to "substantial retention bonuses" after the announcement of the January 2009 merger, which Legacy Merrill Lynch had agreed to pay. (Settlement Class Members' Objections, at 17-18, 20-23; *see* Final Approval Hr'g Tr., at 96:24–97:2 ("[I]t was raised by Ms. Friedman . . . that legacy Merrill-Lynch advisors typically, ordinarily, would make more than Bank of America advisors[.]").) Instead, the plan of allocation allegedly fails to compare the

compensation of Legacy Merrill Lynch brokers and Legacy Bank of America brokers, by awarding money from the Settlement Fund based on the "same simplistic allocation formula."[22] (Settlement Class Members' Objections, at 23.)

Class Counsel, however, convincingly argued that, in formulating the plan of allocation, the relevant comparison was between the "pay differentials" for male and female Legacy Bank of America brokers and the "pay differentials" for male and female Legacy Merrill Lynch brokers. (Final Approval Hr'g Tr., at 98:9–99:21.) According to Class Counsel, their regression analysis revealed that the "*gross* differences in pay" for male and female brokers at Legacy Bank of America versus Legacy Merrill Lynch "fall away," when the analysis was adjusted to "pay differentials *tied to the observed general policies and practices*" being challenged. (*Id.* (emphasis added).) Class Counsel represented, to the Court's satisfaction, that "had there been substantial differences between those two populations [*i.e.*, Legacy Bank of America brokers and Legacy Merrill Lynch brokers] we would have considered that in formulating the Plan of Allocation." (*Id.*)

---

[22] Objector Counsel also attempted to recast this argument in terms of Named Plaintiffs' adequacy as representatives. (*See* Final Approval Hr'g Tr., at 77:8-12, 77:25–78:2 ("[I]t doesn't go to whether it is fair, reasonable, or adequate. What Ms. Davila would say is that there is a conflict of interest between the Bank of America class members and the Merrill-Lynch class members and having them participate in a common fund. . . . *[U]sing the same formula raises issues that we talked about which was the adequacy of class representation[.]*") (emphasis added).) It is unclear, however, how this argument relates to adequacy of representation, where Named Plaintiffs, who negotiated the plan of allocation, include Legacy Merrill Lynch brokers (*i.e.*, Evans and DeSalvatore) *and* Legacy Bank of America brokers (*i.e.*, Goedtel, Calibuso, and Moss). *See supra* discussion at note 13. In other words, Evans and DeSalvatore would have represented the interests of Legacy Merrill Lynch brokers during the negotiations. (*See* Final Approval Hr'g Tr., at 80:2-4 ("[W]e do have class reps who work [at] [sic] both legacy banks and at a combined bank and were well able to represent the interests of the class in these discussions.").) Accordingly, the Court only construes this argument as one that relates to the substantive fairness, reasonableness, and adequacy of the Settlement.

Because the differences in earnings for male and female brokers at both Legacy Bank of America and Legacy Merrill Lynch, attributable to the challenged policies, were nearly equivalent, there was no need for the plan of allocation to award money from the Settlement Fund based on separate formulas for Legacy Bank of America and Legacy Merrill Lynch brokers.  Therefore, the objection that there should have been separate formulas fails.

III. <u>Conclusion</u>

For the reasons set forth above, the Court certified the Settlement Class and Subclasses and approved the Settlement in its final approval order, dated December 27, 2013.   The Clerk of the Court is directed to terminate this case.

SO ORDERED:

 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: April 30, 2014
        Brooklyn, New York